# Exhibit 30
# Redacted Version



# OCEAN TOMO
### INTELLECTUAL CAPITAL EQUITY

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## (SAN FRANCISCO DIVISION)

### CASE NO. 3:14-CV-03657-SI

## MLC INTELLECTUAL PROPERTY, LLC.
## V.
## MICRON TECHNOLOGY, INC.

### AMENDED EXPERT REPORT OF MICHAEL K. MILANI

### MARCH 15, 2019

Highly Confidential – Attorneys' Eyes Only

INTELLECTUAL CAPITAL EQUITY

1.  Firm Background and Qualifications ..................................................................................... 3

2.  Assignment .......................................................................................................................... 4

3.  Background .......................................................................................................................... 5

    3.1  Flash Memory Technology Background ........................................................................ 5
    3.2  Flash Memory Market ................................................................................................ 8

4.  Relevant Parties ................................................................................................................. 13

    4.1  Jerry Banks ............................................................................................................. 13
    4.2  BTG International, Inc. ............................................................................................. 14
    4.3  MLC Intellectual Property, LLC ................................................................................. 15
    4.4  Micron Technology, Inc. ........................................................................................... 15

5.  Accused Products ............................................................................................................... 20

6.  Patent-In-Suit .................................................................................................................... 21

    6.1  Asserted Claims ....................................................................................................... 22
    6.2  Benefits of the Asserted Claims of the Patent-In-Suit .................................................. 24

7.  Timeline of Events ............................................................................................................. 25

8.  Reasonable Royalty Considerations .................................................................................... 27

9.  Hypothetical Negotiation Parameters ................................................................................. 29

    9.1  Hypothetical Negotiation Date .................................................................................. 29
    9.2  Parties to the Negotiation ......................................................................................... 29

10.  The Royalty Bases ............................................................................................................ 30

    10.1  Compensation Period .............................................................................................. 30
    10.2  Royalty Bases ........................................................................................................ 30

11.  Consideration of *Georgia-Pacific* Factors ....................................................................... 40

    11.1  *Georgia-Pacific* Factors ....................................................................................... 40

12.  Prejudgment Interest ........................................................................................................ 68

13.  Signature .......................................................................................................................... 68

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

## 1.    FIRM BACKGROUND AND QUALIFICATIONS

My name is Michael K. Milani and I am a Managing Director at Ocean Tomo.  Ocean Tomo provides financial products and services related to Intellectual Property expert testimony, valuation, investments, strategy, and transactions.

I share responsibility for managing the Expert Services practice in the firm's Chicago office, which quantifies economic damages arising from commercial disputes and provides related expert testimony and general litigation support.  My professional experience includes over 20 years of litigation experience, combined with 6 years of corporate strategy expertise.

My litigation experience covers all types of IP matters, as well as other types of complex commercial litigation.  I have testified in matters pending in Federal Court, State Court, the Patent Trial and Appeals Board (PTAB) and Alternative Dispute Resolution (ADR) proceedings, offering opinions relating economic damages, commercial success and irreparable harm.  I have also testified at the International Trade Commission (ITC), where I offered opinions relating to domestic industry, remedy, bond, public interest and commercial success.

All combined, I have worked on well over 100 assignments, consulting clients in all phases of the litigation process.  In addition to my litigation related work, I have provided IP related transaction, valuation, and management advice.  I also have experience performing intellectual property, business, and product line valuations, inside and outside of litigation.

My professional experience covers a wide range of industries including consumer products and electronics, medical equipment and devices, pharmaceuticals, semiconductors, computer networking equipment, cellular technologies, avionics, retail security, industrial/building products, lighting products, automotive products and carpeting/flooring products, among others.

Prior to joining Ocean Tomo, I was a Senior Manager with a multi-national consulting firm.  In connection with that experience, I spent more than 6 years developing comprehensive business strategies for a wide variety of companies.

In addition to my professional experience, I have served as an Adjunct Professor, spending several years teaching both graduate level business and law school classes related to intellectual property management and monetization.  I have also spoken on similar topics at a number of additional law school and business programs, including Northwestern University, University of Notre Dame, New York University, the University of Michigan and the University of Illinois, further reflecting my affinity for teaching.  In addition to my teaching and speaking experience, I have authored several publications which discuss financial, accounting, business, and/or legal issues relating to the monetization of intellectual property.  A list of such articles and presentations along with my prior testimony is included in my curriculum vitae, which is attached to this report. Finally, I hold a Bachelor of Science degree in Finance from the University of Illinois and a Master's in Business Administration from Northwestern University with concentrations in Finance, Marketing and Strategy.  I am also a Certified Licensing Professional.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Ocean Tomo is presently being compensated for my work in this matter at a rate of $545 per hour. Other Ocean Tomo consultants are assisting me in this engagement and Ocean Tomo is being compensated for their time at various rates under $545 per hour. No part of my compensation depends on the outcome of this litigation.

2.    **ASSIGNMENT**[1]

Ocean Tomo was retained by counsel for MLC Intellectual Property, LLC ("MLCIP" or "Plaintiff") in connection with this matter. Ocean Tomo was asked to provide an opinion on how the facts of circumstances of this matter relate to the *Georgia-Pacific* Factors to assist the trier-of-fact with determining a reasonable royalty, in the event liability is found against Micron Technology, Inc. ("Micron") for infringement of one or any of the asserted claims of U.S. Patent No. 5,764,571 ("the '571 Patent" or "the Patent-in-Suit").[2]

I have also reviewed financial information produced by Micron and calculated several royalty bases to which a reasonable royalty should be applied. As will be discussed later in my report, I have been asked to calculate multiple royalty bases because certain disputed issues remain unresolved. Each of the royalty bases I have calculated are discussed in Section 10 of this report.

In connection with performing that assignment, I have considered the following types of information. A detailed listing of all the information considered by Ocean Tomo in connection with this assignment is attached as Exhibit 2.

- Legal filings and proceedings related to the case;
- Documents produced by MLCIP and Micron relating to damages, including but not limited to, financial records, sales records, license agreements, marketing documents, and promotional materials;
- Documents produced by third-parties;
- Independent research;
- The Patent-in-Suit;
- Deposition testimony of MLCIP personnel:
  - Jerry Banks, CEO and Member: July 27-29, 2009 and December 14, 2018;
  - Bob Hinckley, Chairman and Counsel, December 11, 2018.

---

[1] This report amends and replaces the prior expert report I issued on February 8, 2019 to reflect the Court's order regarding the infringement contentions and schedule. *See*, Order Granting in Part and Denying in Part Plaintiff's Motion to Amend Infringement Contentions; and Adjusting Pretrial and Trial Schedule, February 28, 2019.

[2] Complaint for Patent Infringement, August 12, 2014.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

- Deposition testimony of Micron personnel:
  - Mark Helm, Senior Fellow and former Core Design Manager, December 5, 2018 and January 24, 2019;
  - David Kaplan, Senior Director of Global IP Strategy, December 20, 2018;
  - Roger Kearsley, January 29, 2019, Global Transfer Pricing Director;
  - Michael Myers, Director of Litigation and Technology Licensing, December 20, 2018;
  - David Westergard, Senior Director of Licensing and Litigation, November 20, 2018.
- Deposition testimony of third-party personnel:
  - Simon Fisher, Strategic Acquisition Asset Management for BTG, August 20-21, 2009;
  - Louise Makin, CEO for BTG, August 24, 2009.
- Information prepared and produced by other experts, including:
  - Dr. Jack Lee, Technical Expert for Plaintiff;
  - Ronald Epstein, Licensing Expert for Plaintiff.

In addition to the information referenced above, Ocean Tomo also spoke directly with Dr. Lee, Technical Expert for Plaintiff.

The following report and accompanying analyses summarize my current opinions. The information in this report is based on discovery to date and information that is currently available to me. Accordingly, I reserve the right to refine the opinions described herein, based on future discovery, the testimony of other experts, and other case developments. In addition to this report, I may rely on excerpts taken from videotaped depositions and/or demonstrative exhibits that illustrate the concepts and conclusions contained in this report. Furthermore, although this report references my understanding of certain legal requirements and related case law, I am not offering any legal opinions. Rather, such references are provided solely for the purpose of providing context to my opinions, based on my understanding of how prior rulings may relate to the determination of patent damages in matters such as this.

## 3. BACKGROUND

### 3.1 Flash Memory Technology Background

I understand memory semiconductor chips are used in a wide variety of computing applications to store data. The basic building block of a memory chip is a cell, or small circuit, with a capacitor that stores data as a charge,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

and one or more transistors which activate the data. Historically, the capacitor was capable of handling one bit of data, either a zero or a one, based on whether the capacitor was charged or discharged.[3]

Additionally, I understand memory can generally be classified into volatile and non-volatile memory.[4] Volatile memory needs power to preserve stored data. Once the power is turned off, anything stored in volatile memory is removed or deleted. Random access memory ("RAM"), including dynamic RAM ("DRAM") is volatile. DRAM is commonly used for main memory because of its speed. Main memory is an active type of memory, holding data currently being used or changed.[5]

Conversely, non-volatile memory retains data after the power is turned off. Flash memory is a type of non-volatile memory. For the longer-term storage of data, integrity and capacity are more important than speed. Given the growing demand for storing large amounts of data, and the cost-efficient nature of flash memory, the primary application for flash is data storage. While there are generally two types of flash memory, NOR and NAND, NAND is smaller than NOR, allowing for higher densities, and is less costly to manufacture. Thus, NAND flash has become the standard for storage related applications.[6] Flash memory is used in many products and devices including "enterprise server, storage and networking technology, as well as in a wide range of consumer devices, including USB flash drives, mobile phones, digital cameras, tablet computers, PC cards in notebook computers and embedded controllers."[7]

Based on my discussions with Dr. Jack Lee, Technical Expert for Plaintiff, I understand that the '571 Patent relates to fundamental technology which enables multi-level cell ("MLC") and triple-level cell ("TLC") flash memory. As noted above, traditional flash memory cells, known as single-level cell ("SLC"), were capable of holding only one bit of data, either a "0" or a "1". I understand MLC/TLC flash has increased density compared to SLC, enabled by more bit states, or levels. MLC holds two bits per cell. TLC holds three bits per cell. The higher cell density of MLC allows for increased capacity at a cheaper cost per bit. However, introducing multiple bits per cell creates more complexity and increases the chance for error.[8] The following Figures provide an illustration of the differences between SLC, MLC, and TLC.

---

[3] "Understanding Memory," *Semiconductor Engineering*, February 15, 2018, <https://semiengineering.com/whats-really-happening-inside-memory/>.

[4] "Understanding Memory," *Semiconductor Engineering*, February 15, 2018, <https://semiengineering.com/whats-really-happening-inside-memory/>.

[5] "Volatile Storage," *Techopedia*, <https://www.techopedia.com/definition/9966/volatile-storage>; "Understanding Memory," *Semiconductor Engineering*, February 15, 2018, <https://semiengineering.com/whats-really-happening-inside-memory/>.

[6] "Volatile Storage," *Techopedia*, <https://www.techopedia.com/definition/9966/volatile-storage>; "flash memory," *TechTarget*, <https://searchstorage.techtarget.com/definition/flash-memory>; "Understanding Memory," *Semiconductor Engineering*, February 15, 2018, <https://semiengineering.com/whats-really-happening-inside-memory/>.

[7] "flash memory," *TechTarget*, <https://searchstorage.techtarget.com/definition/flash-memory>.

[8] "NAND Flash Memory Technology: The Basics of a Flash Memory Cell" *Silicon Power Blog*, April 12, 2018, < https://blog.silicon-power.com/index.php/guides/nand-flash-memory-technology-basics/>; "flash memory," *TechTarget*, <https://searchstorage.techtarget.com/definition/flash-memory>.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY


INTELLECTUAL CAPITAL EQUITY

Figure 1:

Illustration of SLC, MLC, TLC Bit States[9]



Figure 2:

Summary of SLC, MLC, and TLC NAND Flash[10]

|  | Description | Advantages | Disadvantages | Primary Use |
|---|---|---|---|---|
| Single-Level Cell ("SLC") | Stores one bit per cell and two levels of charge. | Higher performance, endurance and reliability than other types of NAND flash. | Higher cost than other types of NAND flash. | Enterprise storage, mission-critical applications. |
| Multi-Level Cell ("MLC") | Can store multiple bits per cell and multiple levels of charge. The term MLC equates to two bits per cell | Cheaper than SLC and enterprise MLC (eMLC), high density. | Lower endurance than SLC and eMLC, slower than SLC. | Consumer devices, enterprise storage. |
| Triple-Level Cell ("TLC") | Stores three bits per cell and multiple levels of charge. Also referred to as MLC-3, X3 or 3-bit MLC. | Lower cost and higher density than MLC and SLC. | Lower performance and endurance than MLC and SLC. | Mass storage consumer applications, such as USB drives, flash memory cards, smartphones, and client SSDs, and data center SSDs for read-intensive workloads. |

---

[9] "NAND Flash Memory Technology: The Basics of a Flash Memory Cell" *Silicon Power Blog*, April 12, 2018, < https://blog.silicon-power.com/index.php/guides/nand-flash-memory-technology-basics/>.

[10] "flash memory," *TechTarget*, <https://searchstorage.techtarget.com/definition/flash-memory>.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



As illustrated above, MLC/TLC provide more cost-effective flash solutions and is therefore utilized in many enterprise and consumer applications, while SLC is typically reserved for more mission critical applications. As explained later in this report, I understand the '571 provides critical technology which enables and verifies accuracy in MLC/TLC flash.

## 3.2    Flash Memory Market

Fueled by growth in the consumer electronics market, flash memory is a prominent segment of the semiconductor industry. During the early to mid-2000s, the flash memory market was experiencing rapid growth, causing some in the industry to predict that it would soon overtake DRAM for the dominant position in the memory market. Flash memory is ideal for the consumer electronics market in that it enables mobility and miniaturization. Additionally, flash memory encouraged and supported the development of new consumer applications such as digital cameras and MP3 Players, and was also well suited for laptop computers.[11]

During the mid-2000s, the flash memory market became more saturated as competitors in the memory market shifted production from DRAM to flash memory, and in particular NAND flash.[12] Given the significant supply of NAND flash by 2006, the market was described as a commodity market, with competitors mainly competing on price.[13] In 2006, competitors in the worldwide NAND flash memory market included Samsung, Toshiba, Hynix, Renesas, Micron, ST Micro, Intel and Qimonda.[14] In terms of revenue, Samsung dominated the $12.4 billion market in 2006, with a 45.4% share.[15] Hynix and Micron were relatively smaller competitors, with market shares of 17.7% and 2.9%, respectively.[16] However, at that time, Micron stated that "the market for NAND products has grown rapidly and [Micron] expects it to continue to grow due to demand for removable and embedded storage devices."[17] The following Figure illustrates the 2006 worldwide market share by competitor, in terms of revenue, for the NAND flash market.

---

[11] "The Rise of the Flash Memory Market: Its Impact on Firm Behavior and Global Semiconductor Trade Partners," *United States International Trade Commission*, July 2007, pp. 2-4, <https://www.usitc.gov/publications/332/journals/rise_flash_memory_market.pdf>.
[12] "The Rise of the Flash Memory Market: Its Impact on Firm Behavior and Global Semiconductor Trade Partners," *United States International Trade Commission*, July 2007, p.9, <https://www.usitc.gov/publications/332/journals/rise_flash_memory_market.pdf>.
[13] "NAND sails into 'commodity storm'," *EETimes*, October 23, 2006, <https://www.eetimes.com/document.asp?doc_id=1164075>; "Intel and Micron Plan Flash-Memory Venture," *The New York Times*, November 22, 2005,
<https://www.nytimes.com/2005/11/22/technology/intel-and-micron-plan-flashmemory-venture.html>.
[14] Exhibit 10.0.
[15] Exhibit 10.0.
[16] Figure 3.
[17] Micron SEC Form 10-K for the fiscal year ended August 31, 2006, p. 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

**Figure 3:**

**2006 NAND Flash Revenue Based Market Share By Competitor[18]**



By 2015, the NAND flash market had grown to almost $32 billion.[19]  Samsung continued to lead the market, with an 30.8% share, although Micron had grown its market share to 14.7%, while Hynix's market share had fallen to 11.8%.[20]  The following Figure illustrates the 2015 worldwide market share by competitor, in terms of revenue, for the NAND flash market.

---

[18] Exhibit 10.0.
[19] Exhibit 10.0.
[20] Figure 4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

**Figure 4:**

**2015 NAND Flash Market Share By Competitor[21]**



Initially, SLC NAND flash dominated the market, however MLC rapidly overtook SLC in the mid-2000s. At the beginning of 2005, MLC represented only about 20% of worldwide NAND flash production, while SLC dominated the market.[22]  But by the end of 2006, MLC had overtaken SLC, representing 72% of flash production.[23]  By 2011, SLC only represented 1% to 2% of the total flash market, with MLC and TLC making up almost 99% of the market.[24]  The Figure below illustrates the worldwide annual flash memory market production in terms of SLC, MLC, and TLC production.

---

[21] Exhibit 10.0.  I understand Western Digital purchased SanDisk in May 2016, including its NAND flash storage business.  See, Western Digital Corporation SEC Form 10-K for the Fiscal Year Ended July 1, 2016, p. 4.

[22] MICRONM047491, tab "SLC_MLC".

[23] MICRONM047491, tab "SLC_MLC".

[24] MICRONM047491, tab "SLC_MLC".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**

**Figure 5:**

**Flash Memory Market: SLC, MLC, and TLC[25]**



As discussed previously, MLC NAND flash is cheaper to manufacture than SLC NAND flash.  Thus, I understand MLC is sold at a lower price for the same capacity.  Between 2006 and Q1 2012, an 8Gbit (1GB) MLC flash memory unit sold for on average 43.4% less than a similarly sized SLC unit.[26]  The following Figure reflects the pricing difference between MLC and SLC in the 2006 to 2012 time-frame.

---

[25] Exhibit 12.0.
[26] Exhibit 9.0.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

**Figure 6:**

**MLC and SLC Pricing for 8Gbit (1GB) Storage, 2006-Q1 2012[27]**



Given the pricing disparity between MLC and SLC, as sales of MLC expanded, SLC became reserved for mission critical applications, while MLC and TLC were used in more cost sensitive applications. Micron's website described the application and use cases for SLC, TLC, and MLC as follows:[28]

- **SLC**- *One bit per cell; high performance and write endurance; designed for high-end, high-density, mission-critical systems where NAND high performance standards and reliability are required and cost reduction is not a major driver.*

- **MLC**- *Two bits per cell; a good balanced of performance and write endurance for a wide range of cost-sensitive, high-density applications.*

- **TLC** - *Three bits per cell; high cell density, but lower performance and endurance specifications; most often used in mass storage consumer applications (e.g., client SSDs, USB drives or SD cards) with very high cost sensitivity.*

---

[27] Exhibit 9.0.

[28] "Choosing the Right NAND," *Micron*, < https://www.micron.com/products/nand-flash/choosing-the-right-nand>.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



I also understand that memory firms have sought to increase their share of the flash memory market through partnerships. In 2000, Toshiba and SanDisk formed Flash Vision, a joint venture to produce advanced NAND flash memory for use in digital cameras, music players, and cell phones.[29] Also, at the end of 2005, Intel and Micron announced the creation of IM Flash Technology ("IMFT"), which is discussed later in more detail.[30]

## 4.    RELEVANT PARTIES

### 4.1    Jerry Banks

I understand Mr. Banks is the inventor of a portfolio of patents related to multi-level flash memory, including the '571 Patent.[31] Mr. Banks has an electrical engineering degree and significant experience in the semiconductor technology industry, including experience at well-known companies such as Hewlett-Packard.[32] Mr. Banks filed the first patent in the portfolio in February 1991.[33] At that time, Mr. Banks recognized the limitations of the memory technology that was available. He believed a new approach to memory technology was necessary, which allowed densities and speed to increase, while allowing price to decrease. At the same time, he expected his approach to lead to better profit margins for manufacturers. As stated above, his solution related to storing multiple memory bits on a single memory cell, or multilevel flash. At this time, in the early 1990s, according to Mr. Banks, no memory manufacturer had been successful with a similar approach.[34] In 1997, Mr. Banks entered into a Commercialization Agreement assigning his patented technology to BTG, as described in more detail below.

Effective January 17, 1997, Mr. Banks and BTG entered into a Commercialization Agreement whereby Mr. Banks granted to BTG an option to take assignment of all of Mr. Banks's right, title, interest in and to the Technology Transfer Package.[35] Under the Commercialization Agreement, Mr. Banks was required to fully cooperate with BTG to facilitate BTG's evaluation of the Assigned Patents and prospects for commercialization of the Technology Transfer Package.[36] The assignment was worldwide, and BTG's rights included the legal and equitable rights to pursue infringers by way of legal suit, settlement, or grant of a license to the Assigned Patents,

---

[29] "Toshiba and SanDisk Sign Agreement to Invest $700 million in Fab Plant to Produce Flash Memory," *Toshiba*, May 10, 2000, https://www.toshiba.co.jp/about/press/2000_05/pr1002.htm.

[30] "The Rise of the Flash Memory Market: Its Impact on Firm Behavior and Global Semiconductor Trade Partners," *United States International Trade Commission*, July 2007, p. 12, <https://www.usitc.gov/publications/332/journals/rise_flash_memory_market.pdf>.

[31] BTG_05501-568 at 511,513; MLC00007225-262 at 226; U.S. Patent No. 5,764,571.

[32] Deposition of Jerry Banks, July 27, 2009, pp. 18-33.

[33] BTG_05501-568 at 511.

[34] MLC00000106-271 at 109-117.

[35] MLC00059592-621 at 592, 597.

[36] MLC00059592-621 at 597.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



and to claim damages.[37]  BTG was required to "use diligent and reasonable efforts to commercialize the Technology Transfer Package in accordance with the terms hereof."[38]

The "Technology Transfer Package" meant the Assigned Patents, the Assigned Know-how, or any combination thereof.[39]  The "Assigned Patents" included any and all patents or patent applications owned by Mr. Banks and assigned to BTG, including without limitation U.S. Patent Nos. 5,394,362 and 5,218,569, together with any parents, divisions, renewals, reissues, reexaminations, continuations, continuations-in-part, extensions, substitutes, and any foreign counterparts or improvements (the "MLCIP Patent Portfolio").[40]  In consideration for the rights granted, BTG agreed to pay Mr. Banks one half of Gross Receipts after costs.[41]  The term was set to run until the expiration of the last to expire of the Assigned Patents.[42]

In connection with the Commercialization Agreement, BTG executed its option and was assigned the MLCIP Patent Portfolio, including the U.S. Patent Application No. 410,200 which became the '571 Patent, on February 13, 1997.[43]

## 4.2    BTG International, Inc.

I understand that in the mid-2000s, BTG was engaged in the development and commercialization of technologies, primarily in the life and physical sciences.  I understand BTG uses innovations protected by strong intellectual property portfolios to capture value through licensing and venturing activity.  It has commercialized major innovations in MRI technology, blood-clotting technology, and multi-level cell memory.  BTG is quoted on the London Stock Exchange.[44]

As described above, BTG acquired the '571 Patent, and other related patents from Mr. Banks in 1997.  BTG subsequently granted Hitachi exclusive rights to the MLCIP Patent Portfolio.[45]  Hitachi subsequently licensed the MLCIP Patent Portfolio to SanDisk in 1999 and Intel in 2002.[46]  On November 9, 2006, BTG and Hitachi terminated their exclusive license,[47] and subsequently BTG and Renesas (the successor to the Hitachi memory business) agreed to a non-exclusive license.[48]  In April 2007, BTG entered into non-exclusive licenses with Hynix and Toshiba.[49]  In December 2010, after suing Samsung for infringement of certain patents in the MLCIP

---

[37] MLC00059592-621 at 598.

[38] MLC00059592-621 at 598.

[39] MLC00059592-621 at 597.

[40] MLC00059592-621 at 595.

[41] MLC00059592-621 at 602.

[42] MLC00059592-621 at 609.

[43] MLC00059592-621 at 619-620; U.S. Patent No. 5,764,571.

[44] "BTG PLC," *FE Investegate*, < https://www.investegate.co.uk/btg-plc--btg-/rns/disposal/200403020900010036W/>.

[45] EPICENTER029247-259 at 247, 249.

[46] See SNDK000001-053 (SanDisk) and EPICENTER029326-333 (Intel).

[47] EPICENTER029243-246 at 243.

[48] EPICENTER029334-344 at 334, 336.

[49] MLC00007148-158 (Hynix); BTG_09023-036 (Toshiba).



Patent Portfolio, including the '571 Patent, BTG and Samsung entered into a Settlement and License Agreement with respect to the MLCIP Patent Portfolio.[50]  Thus, I understand that Micron remains the only major manufacturer of NAND flash that does not have a license to the patents in the MLCIP Patent Portfolio.[51]

### 4.3     MLC Intellectual Property, LLC

MLCIP, formed in July 2006 by Mr. Banks and Mr. Robert Hinkley, is a Delaware limited liability company with its principal place of business in Palo Alto, California.[52]  MLCIP was formed to (i) provide further cooperation and assistance with respect to the licensing and enforcement of the MLCIP Patent Portfolio; (ii) acquire or commercialize intellectual property rights; (iii) provide consulting or other services to others related to the licensing and enforcement of intellectual property.[53]  In January 2007, Mr. Banks assigned his interest in the Commercialization Agreement to MLCIP.[54]

I understand that after litigation between MLCIP and BTG, MLCIP eventually re-acquired the rights to the MLCIP Patent Portfolio.  On May 12, 2012, BTG and MLCIP reached an Assignment and Termination Agreement, effectively ending the Commercialization Agreement.[55]  MLCIP also granted to BTG a non-exclusive royalty free back license to the granted patents, solely for the purposes of enabling BTG to maintain the existing sublicenses.[56]

I understand after re-obtaining the patents from BTG, MLCIP engaged Mr. Epstein and his firm Epicenter, to represent MLC as its licensing agent in negotiations with Micron regarding the MLCIP Patent Portfolio.[57]  I understand in connection with those negotiations, Mr. Epstein offered Micron royalty rates ranging from 1% to 3%.[58]

### 4.4     Micron Technology, Inc.

███████████████████████████████████████████████████████

███████████████████████████████████    █████████████████

██████████████████████████████████████████    █████

---

[50] BTG_00393-452.

[51] Deposition of Jerry Banks, December 14, 2018, p. 49.

[52] MLC00061152-185 at 157-158.

[53] MLC00061152-185 at 157.

[54] MLC00007225-262 at 227.

[55] MLC00002514-535 at 514, 516.

[56] MLC00002514-535 at 531.

[57] Expert Report of Ronald Epstein, February 8, 2019, ¶22 and ¶29-30.

[58] MICRONM001102-114; Expert Report of Ronald Epstein, February 8, 2019, ¶68.

[59] Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, pp. 1, 11, 24.

[60] Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, p. 1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY



[61] Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, p. 1.  I understand MTI sells products it manufactures to Micron subsidiaries and also imports flash memory products manufactured by MTI or other Micron subsidiaries into the U.S.  See, Corrected Declaration of Roger Kearsley, December 18, 2018, p. 2.

[62] Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, p. 24.

[63] Corrected Declaration of Roger Kearsley, December 18, 2018, p. 2.

[64] "Corporate Profile," *Micron*, <https://www.micron.com/about/our-company/corporate-profile>.

[65] Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, p. 5; "Corporate Profile," *Micron*, <https://www.micron.com/about/our-company/corporate-profile>.

[66] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, pp. 4, 33.

[67] "Micron Exercises Option to Buyout Intel's Share of IMFT,"  *ANANDTECH*, <https://www.anandtech.com/show/13862/micron-exercises-option-to-buyout-intels-share-of-imft.>

[68] "Micron acquires Lexar Media," *EETimes*, March 8, 2006, <https://www.eetimes.com/document.asp?doc_id=1159898>.

[69] "Crucial.com Voted Best Website for Buying Memory Products," November 18, 2008 <http://investors.micron.com/news-releases/news-release-details/crucialcom-voted-best-website-buying-memory-products>.

[70] "Lexar Introduces New 128GB Capacity of Industry-Leading 2000x SDXC UHS-II Card," *Micron*, October 13, 2015, <http://investors.micron.com/news-releases/news-release-details/lexar-introduces-new-128gb-capacity-industry-leading-2000x-sdxc>.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**INTELLECTUAL CAPITAL EQUITY**



### 4.4.1    Micron Subsidiaries



---

[71] Exhibit 14.0.  Micron's fiscal year 2015 ends September 3, 2015.

[72] Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, p. 1; *see also,* Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014.

[73] MICRONM063950-952, MICRONM064386.

[74] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, Exhibit 21.1 ("Subsidiaries of the Registrant"); *see also,* https://www.micron.com/about/locations.

[75] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, Exhibit 21.1 ("Subsidiaries of the Registrant").

[76] Micron Technology, Inc.'s Opposition to Plaintiff's Motion for Leave to File a First Amended Complaint (Dkt. No. 233), Exhibit 10, November 29, 2018.

[77] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, p. 18.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

███████████████████ ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

█████████████████████████████████████████████████

████████████████████████████

- *MTI guarantees certain debt obligations of its subsidiaries.[81]*

- *As of August 28, 2014, Micron had guaranteed $610 million of debt obligations of its subsidiaries. Micron's guarantees of its subsidiary debt obligations are unsecured obligations ranking equally in right of payment with all of its other existing and future unsecured indebtedness.[82]*

- *Micron has provided various financial guarantees issued in the normal course of business on behalf of its subsidiaries. These contracts include debt guarantees and guarantees on certain banking facilities. Micron enters into these arrangements to facilitate commercial transactions with third parties by enhancing the value of the transaction to the third party. Micron has entered into agreements covering certain activities of its subsidiaries, and occasionally Micron may be required to perform under such agreements on behalf of its subsidiaries.[83]*

- *As of August 28, 2014, the maximum potential amount of future payments Micron could have been required to make under its debt guarantees was approximately $610 million. Substantially all of this amount relates to guarantees for debt of wholly-owned entities whereby Micron would be obligated to perform under the guarantee if a subsidiary were to default on the term of their debt arrangements.[84]*

- *Micron also guarantees credit facilities of certain of its subsidiaries that provide for up to $408 million of financing.[85]*

- *Micron guarantees certain banking facilities for its wholly-owned consolidated entities. Substantially all of these guarantees relate to bank overdraft protections. The maximum potential amount of future payments Micron could be required to make under these guarantees varies based on the extent of potential overdraft. . . The majority of these guarantees have no contractual expiration.[86]*

---

[78] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, p. 18.
[79] Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, p. 32.
[80] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, pp. 111-112
[81] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, p. 111.
[82] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, p. 111.
[83] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, p. 111.
[84] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, p. 112.
[85] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, p. 112.
[86] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014, p. 112.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY



[87] Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, pp. 55-56.

[88] Micron Technology, Inc. Form 10-K for the fiscal year ended August 28, 2014 at p. 112; *see also,* Micron Technology, Inc. Form 10-K for the fiscal year ended August 30, 2018, p. 60.

[89] Deposition of David Westergard, November 20, 2018, pp. 156-157.

[90] Deposition of Roger Kearlsey, January 30, 2019, pp. 17-18.

[91] Deposition of Roger Kearlsey, January 30, 2019, pp. 33-40.

[92] Deposition of Roger Kearlsey, January 30, 2019, pp. 33-40.

[93] Deposition of Roger Kearlsey, January 30, 2019, p. 19.

[94] Deposition of Roger Kearlsey, January 30, 2019, pp. 22-23.

[95] Deposition of Roger Kearlsey, January 30, 2019, pp. 18-25.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



5.   **ACCUSED PRODUCTS**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY



6. **PATENT-IN-SUIT**

This matter relates to Micron's infringement of U.S. Patent No. 5,764,571, entitled "Electrically Alterable Non-Volatile Memory with N-Bits Per Cell."[111]  The '571 Patent was filed on February 27, 1995 and issued on June 9, 1998.[112]  I understand that the '571 Patent expired on June 9, 2015.  Mr. Banks is the named inventor of the patent.[113]  As discussed previously, Mr. Banks assigned his interest in the '571 Patent to BTG in 1997 and BTG subsequently assigned those rights to MLCIP in 2012.  Also, as discussed later, Hitachi held an exclusive license to the '571 Patent until November 9, 2006.[114]  The '571 Patent is described in abstract form as follows:[115]

*An electrically alterable, non-volatile multi-bit memory cell has $K^n$ predetermined memory states ($K^n>2$), where K is a base of a predetermined number system and n is a number of bits stored per cell. Programming of the cell is verified by selecting a reference signal corresponding to the information to be stored and comparing a signal of the cell with the selected reference signal.*



[111] Complaint for Patent Infringement, August 12, 2014, pp. 1-2 and Exhibit A.
[112] U.S. Patent No. 5,764,571.
[113] U.S. Patent No. 5,764,571.
[114] See Section 11.1.1 below.
[115] U.S. Patent No. 5,764,571.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## 6.1 Asserted Claims

I understand MLCIP contends that the Accused Products infringe claims 1, 9, 12, 30, 42, and 45 of the '571 Patent, all of which are independent.[116]  Further, I understand Claims 1, 9, 12 and 30 are device or apparatus claims while claims 42 and 45 are method claims.[117]

### Claim 1

*A multi-level memory device comprising:*

*an electrically alterable non-volatile multilevel memory cell for storing input information in a corresponding one of $K^n$ predetermined memory states of said multi-level memory cell, where K is a base of a predetermined number system, n is a number of bits stored per cell, and $K^n$ >2;*

*memory cell programming means for programming said multi-level memory cell in accordance with said input information;*

*reference voltage selecting means for selecting one of a plurality of reference voltages in accordance with said input information, each of said reference voltages corresponding to a different one of said predetermined memory states; and*

*comparator means for comparing a voltage of said multi-level memory cell with the selected reference voltage, said comparator means further generating a control signal indicating whether the state of said multilevel memory cell is the state corresponding to said input information.*

### Claim 9

*Multi-level memory apparatus, comprising:*

*an electrically alterable non-volatile memory cell having more than two predetermined memory states; a selecting device which selects one of a plurality of predetermined reference signals in accordance with information indicating a memory state to which said memory cell is to be programmed, each reference signal corresponding to a different memory state of said memory cell;*

*a programming signal source which applies a programming signal to said memory cell; and*

*a comparator which compares a signal corresponding to the state of said memory cell with the selected reference signal to verify whether said memory cell is programmed to the state indicated by said information.*

### Claim 12

*Multi-level memory apparatus, comprising:*

*an electrically alterable non-volatile memory cell having more than two predetermined memory states;*

*a selecting device which selects one of a plurality of reference signals in accordance with information indicating a memory state to which said memory cell is to be programmed,*

*each reference signal corresponding to a different memory state of said memory cell;*

---

[116] MLC Intellectual Property, LLC's Disclosure of Asserted Claims, Initial Infringement Contentions, and Document Production Accompanying Disclosure, December 5, 2014, p. 2; U.S. Patent No. 5,764,571; Expert Report of Dr. Jack Lee, January 28, 2019, p. 3.
[117] U.S. Patent No. 5,764,571.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



a programming signal source which applies a programming signal to said memory cell; and

a verifying device which detects a parameter indicating a state of said memory cell and which verifies whether said memory cell is programmed to the state indicated by said information based on the detected parameter and the selected reference signal.

### Claim 30

Apparatus for programming an electrically alterable non-volatile memory cell having more than two predetermined memory states, comprising:

a selecting device which selects one of a plurality of reference signals in accordance with information indicating a memory state to which said memory cell is to be programmed,

each reference signal corresponding to a different memory state of said memory cell;

a programming signal source to apply a programming signal to said memory cell; and

a control device to control the application of said programming signal to said memory cell based on the selected reference signal.

### Claim 42

A method of programming an electrically alterable non-volatile memory cell having more than two predetermined memory states, said method comprising:

selecting one of a plurality of reference signals in accordance with information indicating a memory state to which said memory cell is to be programmed,

each reference signal corresponding to a different memory state of said memory cell;

applying a programming signal to said memory cell;

detecting a parameter indicating the state of said memory cell; and verifying whether said memory cell is programmed to the state indicated by said information based on the detected parameter and the selected reference signal.

### Claim 45

A method of programming an electrically alterable non-volatile memory cell having more than two predetermined memory states, said method comprising:

selecting one of a plurality of reference signals in accordance with information indicating a memory state to which said memory cell is to be programmed,

each reference signal corresponding to a different memory state of said memory cell;

applying a programming signal to said memory cell; and

controlling the application of said programming signal to said memory cell based on the selected reference signal.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

## 6.2    Benefits of the Asserted Claims of the Patent-In-Suit[118]

According to Dr. Lee, the '571 Patent teaches non-volatile memory devices and methods of programming and/or verifying the programming of multi-level non-volatile memory devices.[119]  As discussed previously, I understand conventional memory cells were capable of only two information states, an "on" state or an "off" state.  The combination of either an on state or an off state corresponds to one bit of data.  Thus, conventional memory required one cell for every one bit of data stored and increasing the number of bits to be stored in a single-bit memory device required increasing the number of memory cells on a one-for-one basis.

Prior attempts to increase the number of bits in a memory device have relied upon advanced manufacturing techniques such as larger die that contain more memory cells, improved lithography techniques to build smaller memory cells that allow for greater densities, or customized masks for each data pattern.[120]   However, I understand that such approaches did not allow for the benefits of greater density with a smaller footprint at a lower cost that are provided for by the Asserted Patents.[121]

As also discussed previously, Mr. Banks recognized the need for lower cost memory with increased density and speed in the early 1990s.  By 2006, around the time Micron first sold MLC flash memory, the growing demand for memory was clear.  Industry publications at the time described MLC as "a major leap forward in NAND Flash" providing double the density at a "superior cost structure."  MLC was well suited for consumer electronic products, and while MLC had certain technical disadvantages compared to SLC, its capabilities were in "excess of multimedia handset requirements."[122]

Based on my discussion with Dr. Lee and his expert report, I understand the invention of the '571 Patent is a fundamental technology which enables the features and benefits of MLC memory to be achieved; namely greater density with a smaller footprint at a lower cost, as compared to SLC.  More specifically, according to Dr. Lee, the claims of the '571 Patent are directed towards:[123]

> …*programming and verifying the state of a multi-level memory cell using incremental programming pulses and a verification cycle between the programming pulses that depends upon a "verify reference voltage."  The '571 invention requires selecting a "verify reference voltage" or "reference signal" that correspond to different memory states of the memory cell.  Then programming pulses are applied to the memory cell and, between programming pulses, a "verify cycle" is*

---

[118] In general, this section is based upon my discussion with Dr. Lee and U.S. Patent No. 5,764,561, "Background of the Invention and "Summary of the Invention."  Other references to, for example, Dr. Lee's expert report, are specifically noted.
[119] Expert Report of Dr. Jack Lee, January 28, 2019, p. 13.
[120] U.S. Patent No. 5,764,571.
[121] Discussion with Dr. Lee.
[122] "Technical Note NAND Flash 101: An Introduction to NAND Flash and How to Design It In to Your Next Product," *Micron*, 2006, p. 24, <https://ece.umd.edu/~blj/CS-590.26/micron-tn2919.pdf>.  *See also*, "Flash Memory Moves from Niche to Mainstream," *Chip Design Magazine*, April/May 2006, <http://www.chipdesignmag.com/print.php?articleId=436?issueId=16>.
[123] Expert Report of Dr. Jack Lee, January 28, 2019, p. 14-15.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

*performed to confirm whether the memory cell has met the verify reference voltage. "When the desired state is achieved, the comparator sends a 'disable signal on signal line 204' to the 'program voltage switch 220' to end the programming process.*

## 7.    TIMELINE OF EVENTS



---

124 U.S. Patent No. 5,764,571, p. 1.
125 MLC00059592-621 at 592.
126 MLC00059592-621 at 595, 598.
127 U.S. Patent No. 5,764,571.
128 EPICENTER029247-259 at 247, 249.
129 SNDK000001-053 at 001, 004, 006.
130 EPICENTER029326-333 at 327.
131 EPICENTER029243-246 at 243.
132 MLC00061152-185 at 157.
133 EPICENTER029243-246 at 243.
134 EPICENTER029334-344 at 334, 336.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY

---

[135] MICRONM034214-215 at 214.

[136] Micron's annual report for the fiscal year ending August 31, 2006 states that MLC began sampling MLC flash in fiscal year 2006. *See* Micron Technology, Inc. Form 10-K for the fiscal year ended August 31, 2006, p. 3. Micron's interrogatory answer states that "Micron began selling multi-level cell NAND flash products at least as early as 2006." *See* Micron Technology, Inc.'s Objections and Responses to MLC Intellectual Property, LLC's Fifth Set of Interrogatories (Nos. 12-21) p. 10. Market research data shows Micron sales of MLC in Q4 2006. See BTG_02345-350 at 347.

[137] MLC00007225-262 at 227.

[138] MLC00007148-158 at 148, 151.

[139] BTG_09023-036 at 023.

[140] MICRONM034216-218 at 216, 217.

[141] MLC00060545.

[142] MLC00056549-551 at 549-550.

[143] MLC00007225-262 at 225, 262.

[144] MLC00053552-560 at 552.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY



8.    **REASONABLE ROYALTY CONSIDERATIONS**



INTELLECTUAL CAPITAL EQUITY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

9.    **HYPOTHETICAL NEGOTIATION PARAMETERS**

I consider the following factors to be relevant to the determination of a reasonable royalty under the hypothetical negotiation construct.



## 10.    THE ROYALTY BASES

### 10.1    Compensation Period

Although I understand Micron may allege a different compensation period, I have been asked to assume the compensation period begins on August 12, 2008, six years prior to the filing of the complaint, and continues through the expiration of the '571 Patent on June 9, 2015.

### 10.2    Royalty Bases

INTELLECTUAL CAPITAL EQUITY







INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY

INTELLECTUAL CAPITAL EQUITY

INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY









INTELLECTUAL CAPITAL EQUITY





INTELLECTUAL CAPITAL EQUITY

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████ .

███████

████████████



## 11.    CONSIDERATION OF *GEORGIA-PACIFIC* FACTORS

### 11.1    *Georgia-Pacific* Factors

The hypothetical negotiation is to be evaluated in the context of the specific business facts and circumstances faced at that time by the patentee and the prospective licensee. *Georgia-Pacific Corp. v. United States Plywood Corp.* provides a 15-factor framework to perform such an analysis.[219]  For each of the 15 *Georgia-Pacific* factors, I have identified the relevant information and facts that I believe would have influenced the royalty rate in the hypothetical negotiation.

████  ███████████████████████████████████
     ██████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

─────────────────────

██ ███████
██ █████████████████████████████████

       ████████████████████████████████████

              ███████████

INTELLECTUAL CAPITAL EQUITY

INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY

█████████████████████████████████████████████
██████████████ █████████████████████████████████
█████████████████████████████████████████████
███████ ████████████████████████████████████
███████████████████████

████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
██████████

█████████████████████████████████████

████████████████████████████████████████████
█████████████████████████████████████████████
███████ ███████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
██████████ ██████ ███████████████████████████
█████████████████████████████████████████████
██████████████████████████

█████████████████████████████████

█████████████████████████████████████████████
████████████████████████████ █████████████████
█████████████████████████████████████████████
███████████████████████████████████████ ███████
█████████████████████████████████████████████
████████████████████ █████████████████████████
███████████████████████████████ █ ████████████

_____

▪ █████████████████
▪ ████████████████████
▪ ████████████████████
▪ ████████████████
▪ █████████████████
▪ █████████████████
▪ █████████████████
▪ ██████████████████
▪ █████████████████

████████████████████████████████████

███████████





INTELLECTUAL CAPITAL EQUITY

INTELLECTUAL CAPITAL EQUITY







INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY

INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY

INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY





INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY





INTELLECTUAL CAPITAL EQUITY

INTELLECTUAL CAPITAL EQUITY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



INTELLECTUAL CAPITAL EQUITY





INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY

INTELLECTUAL CAPITAL EQUITY



INTELLECTUAL CAPITAL EQUITY



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

### 12.    PREJUDGMENT INTEREST

From an economic analysis standpoint, a time-value-of-money award would be necessary to compensate Plaintiff for the loss of use of funds during the damages period. I understand that an award of prejudgment interest is a legal matter and that the Court has substantial discretion in determining the interest rate and compounding method to be awarded. I have not prepared any prejudgment interest calculations as of this date but am prepared to do so if requested by the Court.

### 13.    SIGNATURE

Respectfully submitted,

_____              _____

Michael K. Milani                            March 15, 2019

                                                          Date



200 West Madison, 37th Floor

Chicago, Illinois 60606

(312) 327-4400 Ph

(312) 327-4401 Fx

www.oceantomo.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 1



**OCEAN TOMO**®
INTELLECTUAL CAPITAL EQUITY®

# MICHAEL K. MILANI
# CURRICULUM VITAE

**Michael K. Milani** is a Managing Director in the Expert Testimony practice of Ocean Tomo. Ocean Tomo assists clients with the monetization of intellectual property (IP) through service offerings such as expert testimony, valuation, strategy, investments and transactions. He combines 20 years of litigation experience with 6 years of corporate strategy expertise.

Mr. Milani's litigation experience covers all types of IP matters, as well as other types of complex commercial litigation. He has testified in matters pending in Federal Court, State Court, the Patent Trial and Appeals Board (PTAB) and Alternative Dispute Resolution (ADR) proceedings, offering opinions relating economic damages, commercial success and irreparable harm. Mr. Milani has also testified at the International Trade Commission (ITC), where he offered opinions relating to domestic industry, remedy, bond, public interest and commercial success.

All combined, Mr. Milani has worked on well over 100 assignments, consulting clients in all phases of the litigation process. In addition to his litigation related work, Mr. Milani provides IP related transaction, valuation, and management advice. He also has experience performing intellectual property, business, and product line valuations, inside and outside of litigation.

Mr. Milani's professional experience covers a wide range of industries including consumer products and electronics, medical equipment and devices, pharmaceuticals, semiconductors, computer networking equipment, cellular technologies, avionics, retail security, industrial/building products, lighting products, automotive products and carpeting/flooring products, among others.

Prior to joining Ocean Tomo, Mr. Milani was a Senior Manager with a multi-national consulting firm. In connection with that experience, Mr. Milani spent more than 6 years developing comprehensive business strategies for a wide variety of companies.

In addition to his professional experience, Mr. Milani has served as an Adjunct Professor, spending several years teaching both graduate level business and law school classes related to intellectual property management and monetization. Mr. Milani has also spoken on similar topics at a number of additional law school and business programs, including Northwestern University, University of Notre Dame, New York University, the University of Michigan and the University of Illinois, further reflecting his affinity for teaching. In addition to his teaching and speaking experience, Mr. Milani has also authored several publications which discuss financial, accounting, business, and/or legal issues relating to the monetization of intellectual property.

Mr. Milani holds a Bachelor of Science degree in Finance from the University of Illinois and a Masters in Business Administration from Northwestern University with concentrations in Finance, Marketing and Strategy. He is also a Certified Licensing Professional and has served as a member of the recertification committee.

Ocean Tomo, LLC
200 West Madison, 37th Floor
Chicago, Illinois 60606
312.327.4400
www.oceantomo.com

| | |
|---|---|
| **EDUCATION/ CERTIFICATIONS** | Northwestern University Kellogg Graduate School of Management. M.B.A with concentrations in Finance, Marketing and Strategy. |
| | University of Illinois College of Business. B.S. with concentration in Finance. Graduation with honors. |
| | Certified Licensing Professional (CLP), Licensing Executives Society, Certificate No. 2045 |
| **EXPERIENCE** | Managing Director, Ocean Tomo 2007 to present |
| | Director, Ocean Tomo 2004 to 2006 |
| | Sr. Manager, BearingPoint (formerly KPMG Consulting) 2002 to 2004 |
| | Sr. Manager, Arthur Andersen Business Consulting 2001 to 2002 |
| | Manager, Arthur Andersen Business Consulting 1998 to 2001 |
| | Associate, IPC Group 1994 to 1998 |
| | Staff Consultant, IPC Group 1990-1994 |
| **MEMBERSHIPS/ AFFILIATIONS** | Member of the Intellectual Property Owners Association Member of the Licensing Executives Society Member Certified Licensing Professional Re-Certification Committee Associate Member of the American Bar Association: IP Law Section Member of the Board of Editors for Patent Strategy & Management (past) University of Illinois Business Consulting Mentorship Program (past) Chicago-Kent College of Law, Adjunct Professor, IP Financial Markets and Legal Principals (past) Illinois Institute of Technology, Adjunct Professor, Maximizing IP Value (past) |
| **SPEAKING ENGAGEMENTS / PUBLICATIONS** | "Choosing the Right Expert and Demonstration of Expert Testimony," Practicing Law Institute, November 14, 2018. |
| | "Discussion of the Value Associated with Pharmaceutical Incentives," Global Intellectual Property Committee Meeting, Pharmaceutical Manufacturers and Researchers of America, October 30, 2017. |

2

**SPEAKING ENGAGEMENTS / PUBLICATIONS Continued…**

"Patent Value in Litigation: U.S. - China IP Cooperation Dialogue," Global Intellectual Property Center, U.S. Chamber of Commerce, September 18, 2017.

"The Expert Relationship," Notre Dame Law School Trail Advocacy Program, August 2017.

"Legal and Economic Considerations Associated with Litigating at the ITC," Licensing Executives Society 2017 Spring Meeting, May, 2017.

"Valuation of Trade Secrets," AIPLA Trade Secret Law Summit, March 3, 2017.

"Valuing Trade Secrets Under The Defend Trade Secrets Act," 2017 AIPLA Trade Secret Law Summit, March 2-3, 2017.

"IP Valuation and Patent Damages," New York University Law School, April 18, 2016.

"Money Talks: Making Early and Well-Informed Dispute Resolution Decisions Using Damages Valuation Models," GSU Corporate IP Institute, October 28, 2015.

"Additional Guidance from the CAFC on Apportionment," LES Insights, Feature Article for the Week of October 19, 2015.

"Additional Guidance from the CAFC on Reasonable Royalty Damages," LES Insights, Feature Article for the Week of August 17, 2015.

"Additional Guidance from the CAFC on Territorial Restrictions and the Overall Reasonableness of Damage Claims." LES Insights, Feature Article for the Week of July 27, 2015.

"Determining Litigation Royalty Rates for Standard Essential Patents," Licensing Executives Society 2015 Spring Meeting, May, 2015.

"Lump Sum Damages Award Relates to Products Not Tried by The Jury," LES Insights, September, 2011.

"Hot Topics in Patent Damages," Boston Bar Association, November 15, 2010.

"IP Value and Monetization," Northwestern University Law School, January 15, 2010.

"*Lucent v. Gateway*: An Overview of the CAFC's Views on Patent Damages," Patent Strategy and Management, December, 2009.

"Damage Calculations Post *eBay*: The Economic Considerations," Patent Strategy and Management, July, 2009.

3

**SPEAKING ENGAGEMENTS / PUBLICATIONS Continued…**

"Bait and Switch: From the Showroom to the Courtroom," <u>Patent Strategy and Management</u>, October, 2008.

"Introduction to IP Financial Markets and Legal Principals," Chicago-Kent College of Law, August 2008.

"The Securities Act of 1933, Assessing and Managing IP Liability," <u>Patent Strategy and Management</u>, February 2008.

"Derivative Applications for Patent License Agreements," <u>Patent Strategy and Management</u>, September 2007.

"Benefits of Proactive Damages Planning," Drinker Biddle Gardner Carton, <u>IP Law Practice</u>, June 27, 2007.

"IP Valuation," Corporate Mergers and Acquisitions Graduate Studies Program, The University of Illinois at Urbana Champaign, April 2007.

"Determinants of Patent Value in U.S. Litigation- Part One," <u>Patent Strategy and Management</u>, April 2007.

"Determinants of Patent Value in U.S. Litigation- Part Two," <u>Patent Strategy and Management</u>, March 2007.

"Intellex v. Cranbrooke – Damages Testimony, Presentation and Discussion," Notre Dame Law School Trail Advocacy Program, November 2006.

"What Patent Lawyers Can Learn From Trademark Law: The New Use of Surveys in Patent Litigation," <u>IPL Newsletter</u>, Spring 2006.

"Surveys in Patent Infringement Litigation: The Next Frontier," <u>Patent Strategy and Management</u>, May 2006.

"Intellex v. Cranbrooke – Damages Testimony, Presentation and Discussion," Notre Dame Law School Trail Advocacy Program, March 2006.

"Web Based Patent Marking – A Better Mousetrap," <u>Patent Strategy and Management</u>, February 2006.

"Intellectual Capital Merchant Banking," The University of Michigan-College of Business, September 2005.

"The Emergence of IP Finance," <u>Patent Strategy and Management</u>, July 2005.

"Enabling IP Securitization by Improving Cash Flow Predictability," <u>Patent Strategy and Management</u>, April 2005.

"Federal Circuit Damages Decision Emphasizes the Importance of Sound Economic Models," <u>IP Review</u>, June 2004.

4

| | |
|---|---|
| **SPEAKING ENGAGEMENTS / PUBLICATIONS Continued…** | "The IP Merchant Banking Model," The OSBI Consulting Group, the University of Illinois at Urbana Champaign, May 2004.<br><br>"Dealing with Intellectual Property in Business Combinations," <u>IP Strategies Report</u>, January 2004. |

| | |
|---|---|
| **EXPERT ASSIGNMENTS AND TESTIMONY (Retained on behalf of underlined party)** | <u>Mohawk Industries, Inc.</u> and Shaw Industries, Inc. v. Interface, Inc.<br>Civil Action Number: 4:07-CV-212<br>United States District Court, Northern District of Georgia, Rome Division<br>Expert Report and Deposition Testimony<br>Claim(s): Patent False Marking<br>Filed: November 6, 2007<br><br><u>Lewis J. Borsellino, and I.M. Acquisitions, L.L.C.</u> v. Gerald D. Putman, Marrgwen Townsend, and Chicago Trading & Arbitrage, L.L.C.,<br>Civil Action Number: 00 CH 13958<br>Circuit Court of Cook County<br>Expert Report and Deposition Testimony<br>Claim(s): Fraud, Breach of Contract<br>Filed: December 2, 2011<br><br><u>Se-Kure Controls, Inc.</u> v. Pop Displays, USA, LLC, POP Displays, LLC, POP Displays, Inc., Diam USA, Inc., and Diam International, Inc.<br>Civil Action Number: 1:06-cv-4857<br>United States District Court, Northern District of Illinois, Eastern Division<br>Expert Report<br>Claim(s): Patent Infringement<br>Filed: September 7, 2006<br><br><u>Semiconductor Insights Inc.</u> v. Thunderbird Technologies, Inc.<br>AAA Case Number: 50-117-T-00050-09<br>American Arbitration Association<br>Claim(s): Breach of Contract<br><br><u>Sandra K. Zimnicki</u> v. Cinmar, L.P. d/b/a Frontgate, Menard, Inc., Neo-Neon International LTD., and Seasonal Concepts, Inc.<br>Civil Action Number: 1:06-cv-4879<br>United States District Court, Northern District of Illinois, Eastern Division<br>Expert Report<br>Claim(s): Copyright Infringement<br>Filed: September 8, 2006<br><br>Affinity Labs of Texas, LLC v. <u>JVC Americas Corp. and Kenwood USA Corporation</u><br>Civil Action Number: 9:08-CV-00171<br>United States District Court, Eastern District of Texas, Lufkin Division<br>Expert Report and Deposition Testimony<br>Claim(s): Patent Infringement<br>Filed: August 29, 2008 |

**EXPERT ASSIGNMENTS AND TESTIMONY Continued… (Retained on behalf of underlined party)**

Inter-Ego Systems, Inc. d/b/a Pinnacle Speakers v. DBL Distributing LLC.
AAA Case Number: 50 133T00316 06
American Arbitration Association
Expert Report and Hearing Testimony
Claim(s): Breach of Contract, Copyright Infringement

Precision Dynamics Corp. v. The Standard Register Co.
Civil Action Number: 2:09-cv-03555
United States District Court for the Central District of California
Claim(s): Patent Infringement
Filed: May 19, 2009

Lighting Ballast Control LLC. v. Universal Lighting Technologies, Inc.
Civil Action Number: 7:09-cv-00029
United States District Court, Northern District of Texas, Wichita Falls
Expert Report and Trial Testimony
Claim(s): Patent Infringement
Filed: February 4, 2009

Lantiq Deutschland GMBH v. Ralink Technology Corporation
Civil Action Number: 5:11-cv-00234
United States District Court for the Northern District of California
Claim(s): Patent Infringement
Filed: January 14, 2011

Ralink Technology Corp. v. Lantiq Deutschland GmbH
Civil Action Number: 11-cv-01549
United States District Court for the Northern District of California
Claim(s): Patent Infringement
Filed: March 30, 2011

XY, LLC v. Matthias J.G. Ottenberg, Propel Labs Inc., SIDIS Corp., Daniel N. Fox, George C. Malachowski and Tidhar Sadeh
Civil Action Number: 11-cv-02920
United States District Court of Colorado
Expert Report and Deposition Testimony
Claim(s): Trade Secret Misappropriation, Patent Infringement
Filed: November 9, 2011

Cree, Inc. v. SemiLEDs, Inc. and Helios Crew Corp.
Civil Action Number: 1:10-cv-00866
United States District Court for the District of Delaware
Claim(s): Patent Infringement
Filed: October 10, 2010

AT Engine Controls Ltd. v. Goodrich Corporation and Goodrich Pump & Engine Systems, Inc.
Civil Action Number: 3:10-cv-01539
United States District Court of Connecticut
Expert Report and Deposition Testimony
Claim(s): Trade Secret Misappropriation, Breach of Contract
Filed: September 28, 2010

**EXPERT ASSIGNMENTS AND TESTIMONY Continued… (Retained on behalf of underlined party)**

L'Oréal S.A. and L'Oréal USA, Inc. v. Merck and Co., Inc.
Civil Action Number: 12-99-GMS
United States District Court of Delaware
Expert Report, Deposition Testimony, Hearing Testimony
Claim(s): Patent Infringement
Filed: January 27, 2012

L'Oréal S.A. and L'Oréal USA, Inc. v. Johnson & Johnson, Inc. and
Neutrogena Corporation
Civil Action Number: 12-98-GMS
United States District Court of Delaware
Expert Report
Claim(s): Patent Infringement
Filed: January 27, 2012

O.S. Security LLC v. BRK Brands, Inc.
Civil Action Number: SACV 14-00310 AG (DFMx)
United States District Court for the Central District of California
Claim(s): Patent Infringement
Filed: March 3, 2014

Gratz College v. Synergis Education, Inc.
Civil Action Number: 2:14-cv-06966
United States District Court for the Eastern District of Pennsylvania
Expert Report and Deposition Testimony
Claim(s): Breach of Contract
Filed: December 8, 2014

Signal IP, Inc. v. Kia Motors America, Inc.
Civil Action Number: LA CV14-02457 JAK
United States District Court for the Central District of California
Expert Report and Deposition Testimony
Claim(s): Patent Infringement
Filed: April 1, 2014

Intellectual Ventures I LLC and Intellectual Ventures II LLC v. Ricoh
Company, Ltd., Ricoh Americas Corporation and Ricoh Electronics, Inc.
Civil Action Number: 1:13-CV-00474-SLR-SRF
United States District Court for the District of Delaware
Expert Report and Deposition Testimony
Claim(s): Patent Infringement, Objective Indicia of Non-Obviousness
Filed: March 25, 2013

Supermax, Inc., and Glovepaq Manufacturing, LLC., v. Jordan Fund, LLC
and Earl Jordan
Civil Action Number: 14 CH 15979
Circuit Court of Cook County
Claim(s): Breach of Contract
Filed: October 3, 2014

**EXPERT ASSIGNMENTS AND TESTIMONY Continued… (Retained on behalf of underlined party)**

In the Matter of Certain Personal Transporters, Components Thereof and Manuals Therefore, on behalf of Complainants Segway Inc., DEKA Products Limited Partnership and Ninebot (Tinjin) Technology Co., Ltd.
Investigation No. 337-TA-1007 / 1021 (Consolidated)
United States International Trade Commission
Expert Reports (2), Deposition Testimony, Declaration Testimony, Hearing Testimony
Claim(s): Patent Infringement, Trademark Infringement
Filed: May 17, 2016

Arroweye Solutions, Inc. v. Harry & David Operations, Inc.
Civil Action No. 1:15-cv-11524
United States District Court for the Northern District of Illinois
Claim(s): Patent Infringement
Filed: December 22, 2015

Got I LLC and Kids II, Inc. v. XRT, Inc. and David Eugene Silverglate
Civil Action No. 1:16-cv-00038-WSD
United States District Court for the Northern District of Georgia
Claim(s): Breach of Contract
Filed: January 6, 2016

Swimways Corporation and Kelsyus LLC v. Bestway (USA), Inc.
Civil Action No. 1:16-cv-608 (LMB/IDD)
United States District Court for the Eastern District of Virginia
Expert Report and Deposition Testimony
Claim(s): Patent Infringement
Filed: June 6, 2016

Valencell, Inc. v. Apple, Inc.
Civil Action No. 5:16-cv-00001-D
United States District Court for the Eastern District of North Carolina
Claim(s): Patent Infringement and Unfair Competition
Filed: January 4, 2016

Remote Year, Inc. v. We Roam, LLC
Civil Action No. 1:17-cv-00142-RGA
United States District Court for the District of Delaware
Claim(s): Trade Secret Misappropriation, Fraud, Tortious Interference
Filed: February 9, 2017

Ignite USA, LLC v. Pacific Market International, LLC
Civil Action No. 0:16-cv-01429
United States District Court for the Northern District of Illinois
Expert Report and Deposition Testimony
Claim(s): Patent Infringement
Filed: February 7, 2014

**EXPERT ASSIGNMENTS AND TESTIMONY Continued… (Retained on behalf of underlined party)**

OptoLum, Inc. v. Cree, Inc.
Civil Action No. 2:16-cv-03828-DLR
United States District Court for the District of Arizona
Transfer to Middle District of North Carolina
Claim(s):  Patent Infringement
Filed: November 3, 2016

Cree, Inc. v. OptoLum, Inc.
Cases IPR2017-01260, IPR2017-01261 and IPR2017-01511
Declarations (3)
Patent Trial and Appeal Board
Filed: April 11, 2017 and May 31, 2017

Riddell, Inc., v. Kranos Corporation, d/b/a Schutt Sports
Civil Action No. 1:16-cv-4496
United States District Court for the Northern District of Illinois
Expert Report
Claim(s): Patent Infringement
Filed: April 21, 2016

In the Matter of Certain X-Ray Breast Imaging Devices and Components Thereof, on behalf of Respondents FUJIFILM Corporation, FUJIFILM Medical Systems U.S.A., Inc. and FUJIFILM Techno Products Co., Ltd
Investigation No. 337-TA-1063
United States International Trade Commission
Expert Reports (2), Deposition Testimony, Hearing Testimony
Claim(s): Patent Infringement
Filed: June 28, 2017

Acceleron, LLC v. Dell, Inc.
Civil Action No. 1:12-CV-04123
United States District Court for the Northern District of Georgia
Claim(s): Patent Infringement
Filed: November 28, 2012

Team Worldwide Corporation v. Wal-Mart Stores, Inc., Wal-Mart Stores Texas, LLC, Wal-Mart.com USA LLC, Sam's West, Inc. D/B/A Sam's Club and Intervenor Defendant Bestway (USA), Inc.
Civil Action No. 2:17-cv-235
United States District Court for the Eastern District of Texas
Claim(s): Patent Infringement
Filed: March 29, 2017

Serta Simmons Bedding, LLC , and Dreamwell, LTD. v. Casper Sleep Inc.
Civil Action No. 17-cv-7468
United States District Court for the Southern District of New York
Expert Report and Deposition Testimony
Claim(s): Patent Infringement
Filed: September 29, 2017

**EXPERT ASSIGNMENTS AND TESTIMONY Continued… (Retained on behalf of underlined party)**

TeleCommunications Systems, Inc. and Comtech Telecommunications Corp. v. Information Systems Audit and Control Association, Inc.
AAA Case Number: 01-17-0003-0244
American Arbitration Association
Claim(s): Breach of Contract, Trademark Infringement, Unfair Competition, Fraud, Deceptive Trade Practices, Conversion
Filed: May 23, 2017

Webasto Thermo & Comfort North America, Inc. and Webasto-Edscha Cabrio USA Inc. v. Bestop, Inc.
Civil Action No. 16-13456
United States District Court for the Eastern District of Michigan
Expert Report and Deposition Testimony
Claim(s): Patent Infringement
Filed: September 23, 2016

Kranos IP Corporation, Kranos IP II Corporation, Kranos Corporation dba Schutt Sports v. Riddell, Inc.
Civil Action No. 1:17-cv-06802
United States District Court for the Eastern District of Texas
Transfer to Northern District of Illinois
Expert Report and Deposition Testimony
Claim(s): Patent Infringement
Filed: May 18, 2017

The Valspar Corporation and Valspar Sourcing, Inc. v. PPG Industries
Civil Action No. 0:16-cv-01429
United States District Court for the District of Minnesota
Claim(s): Patent Infringement
Filed: May 23, 2016

The Sherwin-Williams Company v. PPG Industries, Inc.
Civil Action No. 2:17-cv-01023
United States District Court for the Western District of Pennsylvania
Expert Report
Claim(s): Patent Infringement
Filed: August 4, 2017

Fujifilm Corporation and Fujifilm Medical Systems U.S.A., Inc., v. Hologic, Inc.
Civil Action No. 18-343-GMS
United States District Court for the District of Delaware
Claim(s): Patent Infringement, Antitrust, Unfair Competition, Tortious Interference
Filed: March 2, 2018

| | |
|---|---|
| **EXPERT ASSIGNMENTS AND TESTIMONY Continued…** **(Retained on behalf of underlined party)** | Evoqua Water Technologies, LLC v. M.W. Watermark, LLC; Michael Gethin, Daniel Janisse, Paul Malik, Andrew Hagen, David Higgins and James Driesenga<br>Civil Action No. 17-4997-CB<br>State of Michigan in the Circuit Court for the County of Ottawa<br>Claim(s): Trade Secret Misappropriation, Breach of Contract, Conversion, Unfair Competition and Unjust Enrichment<br>Expert Report and Deposition Testimony<br>Filed: June 26, 2017<br><br>MLC Intellectual Property, LLC v. Micron Technology, Inc.<br>Civil Action No. 3:14-cv-03657<br>United States District Court for the Northern District of California<br>Claim(s): Patent Infringement<br>Expert Report<br>Filed: August 12, 2014<br><br>Edgewell Personal Care Brands, LLC and International Refills Company Ltd. v. Munchkin, Inc.<br>Civil Action No. 2:18-cv-03005<br>United States District Court for the Central District of California<br>Claim(s): Patent Infringement<br>Filed: April 10, 2018<br><br>FMC Corporation and FMC ARGO Singapore PTE. LTD. v. Syngenta Crop Protection AG<br>CPR Institute for Dispute Resolution Non-Administered Arbitration<br>Claim(s): Breach of Contract<br>Filed: December 20, 2018<br><br>In the Matter of Certain Pocket Lighters, on behalf of Complainant BIC Corporation<br>Investigation No. 337-TA-1142<br>United States International Trade Commission<br>Filed: December 6, 2018 |

| | |
|---|---|
| **OTHER REPRESENTATIVE ENGAGEMENT EXPERIENCE, INCLUDING AT LEAST LAST 5 YEARS** **(Retained on behalf of underlined party)** | **Patent Infringement Matters:**<br><br>▪ Virginia Innovation Sciences, Inc. v. Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.; Samsung Telecommunications America LLC<br><br>▪ Radware, Ltd. v. F5 Networks, et al.<br><br>▪ Boston Scientific Corporation and Target Therapeutics, Inc. v. Cordis Corporation<br><br>▪ St. Clair Intellectual Property Consultants v. Fuji Photo Film Co., Ltd., Fuji Photo Film U.S.A., Inc., Fujifilm America, Inc., et al.<br><br>▪ St. Clair Intellectual Property Consultants v. Panasonic Corporation |

11

**OTHER REPRESENTATIVE ENGAGEMENT EXPERIENCE, INCLUDING AT LEAST LAST 5 YEARS Continued…**
(Retained on behalf of underlined party)

- St. Clair Intellectual Property Consultants v. <u>Victor Company of Japan aka JVC</u>
- St. Clair Intellectual Property Consultants v. <u>High Tech Computer Corp., aka HTC Corp.</u>
- <u>Fujifilm Corporation</u> v. Motorola Mobility LLC
- Forgent Networks v. <u>Digeo, Inc.</u>
- Forgent Networks v. <u>Scientific Atlanta, Inc.</u>
- Forgent Networks v. <u>Motorola, Inc.</u>
- <u>Grand Haven Stamped Products Company</u> v. Dura Automotive Systems, Inc.
- Andrx Pharmaceuticals, LLC. <u>v. Glaxosmithkline, PLC and Smithkline Beecham Corporation D/B/A Glaxosmithkline</u>
- Interface, Inc., et al., v. <u>Mohawk Industries, Inc., et al.</u>
- Power Integrations, Inc. v. <u>Fairchild Semiconductor International, Inc. et al</u>
- Compression Labs, Inc. v. <u>Fuji Photo Film U.S.A.</u>
- <u>Prism Technologies, LLC</u> v. AT&T Mobility, LLC
- <u>Fairchild Semiconductor Corporation and System General Corporation</u> v. Power Integrations, Inc.
- Analog Devices, Inc. v. <u>Knowles Electronics, LLC</u>
- <u>Knowles Electronics, LLC</u> v. Analog Devices, Inc.
- Keurig, Incorporated v. <u>Kraft Foods Global, Inc., Tassimo Corporation, and Kraft Foods, Inc.</u>
- Network-1 Security Solutions, Inc. v. <u>Hewlett Packard Company et al.</u>
- Consumer Satellite Radio, LLC v. <u>Sirius XM Radio, Inc., et al.</u>
- Medgraph, Inc. v. <u>Medtronic, Inc.</u>
- Datalogic Scanning, Inc., v. <u>Metrologic Instruments, Inc.</u>
- Nomadix, Inc. v. <u>Hewlett-Packard Company et al.</u>
- Innovention Toys, LLC v. <u>MGA Entertainment, Inc., Wal-Mart Stores, Inc. and Toys 'R Us, Inc.</u>
- Digital-Vending Services International, Inc. v. <u>The University of Phoenix, Inc. et al.</u>
- Lincoln Electric Company, et al. v. <u>National Standard, LLC</u>
- <u>Callpod, Inc.</u> v. GN Netcom, Inc., A/S, GN Store Nord, A/S (a/k/a GN Great Nordic, Ltd.), and Hello Direct, Inc.
- Fotomedia Technologies, LLC v. AOL, LLC, Photobucket.com, Inc., Shutterfly, Inc., CNET Networks, Inc., and <u>Yahoo!, Inc.</u>
- Bendix Commercial Systems LLC, et al. v. <u>WABCO Automotive Control Systems, Inc. et al.</u>
- <u>Allen J. Rushing, Ph.D.</u> v. NexPress Solutions
- <u>Nissim Corp.</u> v. Clearplay, Inc.

**OTHER REPRESENTATIVE ENGAGEMENT EXPERIENCE, INCLUDING AT LEAST LAST 5 YEARS Continued…**
(Retained on behalf of underlined party)

▪ MEI, Inc. v. JCM American Corp & Japan Cash Machine Co. Ltd.

## International Trade Commission Matters:

▪ In the Matter of Certain Wiper Blades (Inv. No. 337-TA-816), on behalf of Respondents Corea Autoparts Producing Corp. d/b/a CAP America, CAP America, Inc., PIAA Corp. U.S.A., ADM21 Co., Cequent Consumer Products, Inc., RainEater LLC, and Daewoo International Corp.

▪ In the Matter of Certain Silicon Microphone Packages and Products Containing Same (Inv. No. 337-TA-888), on behalf of Complainant Knowles Electronics, LLC.

▪ In the Matter of Certain Electronic Devices Including Handheld Wireless Communication Devices (Inv. No. 337-TA-673), on behalf of Respondent Panasonic Corporation

▪ In the Matter of Certain Short Wavelength Light Emitting Diodes, Laser Diodes and Projects Containing Same (Inv. No. 337 -TA-640), on behalf of Respondents Panasonic Corporation and Motorola

## Trade Secret Misappropriation Matters:

▪ Tekmira Pharmaceuticals Corporation and Protiva Pharmaceuticals, Inc. v. Alnylam Pharmaceuticals, Inc. and AlCana Technologies, Inc.

• Gaya Limited v. Applied Medical Resources Corporation

▪ Netlist, Inc. v. Smart Storage Systems, Inc. and Diablo Technologies, Inc.

▪ W.C Heraeus GMBH & Co.K.G and Heraeus Incorporated v. Marjorie Joy Lynn, Lynn plasma Inc. and Nxedge, Inc.

## Trademark/Copyright Matters:

▪ Oracle America Inc. v. Google Inc.

▪ Rosetta Stone Ltd. v. Google Inc.

▪ Express, LLC. v. Fetish Group, Inc.

## False Advertising Matters:

▪ Dyson, Inc. v. Bissell Homecare, Inc.

▪ Bracco Diagnostics, Inc. v. Amersham Health Inc., Amersham Health AS, Amersham plc and Amersham Health Inc. v. Bracco Diagnostics, Inc.

▪ Ashley Furniture Industries v. Laura Ashley Holdings Plc and Laura Ashley, Inc.

**OTHER REPRESENTATIVE ENGAGEMENT EXPERIENCE, INCLUDING AT LEAST LAST 5 YEARS Continued…**
**(Retained on behalf of underlined party)**

**Other Commercial Litigation Matters:**

- <u>W.C Heraeus GMBH & Co.K.G and Heraeus Incorporated</u> v. Marjorie Joy Lynn, Lynn plasma Inc. and Nxedge, Inc.

- Nomir Medical Technologies, Inc. v. <u>McDermott Will & Emery LLP, Simona Levi-Minzi, Mark Lappin and G. Matthew McCloskey</u>

- Leclerc & Masselon, et al. v. <u>MGA Entertainment, Inc.</u>

- Discovision Associates v. <u>Fuji Photo Film Co., Ltd.</u>

- <u>Boyce Thompson Institute for Plant Research</u> v. Medimmune, Inc.

- City of Hope v. <u>Juno Therapeutics, Inc.</u>

# Exhibit 2

Highly Confidential - Attorneys' Eyes Only















# Exhibit 3

Highly Confidential - Attorneys' Eyes Only











█████████████████████████
████████████████████████████████████████
██████████



█████████████████████























































































































































█████████████████████████
███████████████████████████████████████████████████████████████
██████████████





# Exhibit 4

Highly Confidential - Attorneys' Eyes Only





# Exhibit 5

Highly Confidential - Attorneys' Eyes Only

























# Exhibit 6

Highly Confidential - Attorneys' Eyes Only



# Exhibit 7

Highly Confidential - Attorneys' Eyes Only





# Exhibit 8

Highly Confidential - Attorneys' Eyes Only



# Exhibit 9

Highly Confidential - Attorneys' Eyes Only





# Exhibit 10

Highly Confidential - Attorneys' Eyes Only

████████████████████████
██████████████████████████████
██████████



██████

███████████████████████████
██████████████████████████

█████████████████████████

# Exhibit 11

Highly Confidential - Attorneys' Eyes Only



# Exhibit 12

Highly Confidential - Attorneys' Eyes Only





















# Exhibit 13

Highly Confidential - Attorneys' Eyes Only





# Exhibit 14

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only