Exhibit 5
Redacted Version

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MLC INTELLECTUAL PROPERTY, LLC, | Case No. 3:14-cv-03657-SI |
| Plaintiff, | |
| v. | |
| MICRON TECHNOLOGY, INC., | |
| Defendant. | |

**EXPERT REPORT OF RONALD EPSTEIN**

**FEBRUARY 8, 2019**

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

# I.    PROFESSIONAL BACKGROUND AND QUALIFICATIONS

1.    I am the Managing Partner of EpicenterLaw, P.C. ("EpicenterLaw") and Founder and Chief Executive Officer of Epicenter IP Group, LLC ("EpicenterIP").  I have nearly 30 years of experience in developing, optimizing, and transacting Intellectual Property (IP) asset portfolios, delivering over $1 billion of value from the sale or licensing of patents in over 150 transactions.

2.    My Practice is dedicated to assisting patent holders in generating value from their patents.  I provide those services through EpicenterLaw and EpicenterIP.

3.    EpicenterLaw is the law firm through which I provide legal services related to patent monetization.  I formed EpicenterLaw in 2008 as IPotentialLaw, renamed it EpicenterLaw in 2010 in connection with the creation of EpicenterIP.  EpicenterIP is the consulting arm of my practice.   Among the plethora of services I offer through EpicenterLaw are outbound licensing services in all aspects of the engagement from strategic planning and counseling, identifying licensing opportunities, negotiating the deal and providing general management of licensing programs from initial contact negotiations and the signed deal.   This includes leading or supporting the client in technical, patent, and business discussions inherent in patent licensing transactions including effectively responding to counter-assertions and finding complex business solutions.

4.    EpicenterIP provides consulting services related to assisting clients in understanding the value of their IP and the options they have for monetizing or otherwise increasing the value of that IP. Many patent owners understand that they have the option to sell or license their patent, but do not necessarily have the experience to evaluate those options. Epicenter, as a result of our unmatched transactional success, is able to provide true, market based valuation analysis to support clients' decision process, and if the decision is to sell, EpicenterIP can act as a patent broker to assist in the sale of those patents.

5.    Through these two entities, I also assist companies dealing with patent assertions made against them to resolve them expeditiously and economically.

6.    While many clients in this area prefer confidentiality, I can share that my clients have included Fractus SA, NTP, Inc., and Interval Licensing, LLC.

7.    Prior to forming EpicenterIP and EpicenterLaw, I was the Chief Executive Officer and Founding member of IPotential, LLC, which was founded in 2003.  IPotential, an "IP Investment Bank," was dedicated to assisting clients in developing and executing world class intellectual property strategies to obtain the maximum value of their intellectual property, from a business, strategic, and economic perspective.

8.    Before forming IPotential, I was the Vice President and General Counsel at Brocade Communications Systems, Inc. from March 2001 through December 2003.   My responsibilities as the Vice President and General Counsel included developing and executing the company's intellectual property strategy, as well as managing litigation, M&A support, corporate compliance and governance, and transactional and counseling support for the business

units. I was Brocade's first in-house counsel, and during my time at Brocade, I created and executed Brocade's intellectual property strategy, filed for more than 80 patents over a 24-month period, and defended the company in three patent litigations filed during that period. From December 2003 to September 2004, I served as an Advisor to the CEO of Brocade.

9.      Prior to joining Brocade, I served as first Senior counsel and then Director of Licensing at Intel Corporation from October 1995 through March 2001. In these roles, I was responsible for Intel's intellectual property licensing strategy, including defense against assertions, and the creation of Intel's value licensing program. At Intel, I built and developed Intel's Corporate Licensing Group from a one man operation to a group of over 30 people. I was also responsible for pioneering many innovative IP programs, including creating the first dedicated patent purchasing program in the technology industry. In addition, I had responsibility for negotiating all corporate licensing agreements, setting policy for licensing transactions, training Intel legal staff on licensing and negotiation skills, and overseeing licensing transactions throughout the Corporation.

10.      I received my Bachelor of Science degree from Duke University in 1986, and my Juris Doctorate from Boalt Hall School of Law, University of California, Berkeley in 1989. After graduating from law school, I practiced law at Wilson, Sonsini, Goodrich and Rosati as a member of the Technology Licensing Group, where I specialized in helping clients minimize liability under the patent portfolios of leading companies (such as IBM, Lucent, and Intel), as well as negotiate patent cross-license agreements in conjunction with complex patent litigation settlements.

11.      I have been a frequent speaker on patent licensing, negotiations, monetization, and patent brokerage methodologies and strategies. For example, I have spoken on subjects including (1) Best Practices in Patent Monetization (January, 2009) and (2) Theory and Practice of Patent Valuation at U.C. Berkeley School of Law (February 6, 2009). I have also been invited to speak at the Global Technology, Media & Telecommunications Convergence Summit (October 2012), as well as the IP Futures Conference in 2013 and 2014. Most recently, I was invited to present at the Patent Damages Conference, held at the University of Texas at Austin School of Law in February 2017.

12.      On December 10, 2012, the Federal Trade Commission and the Department of Justice held a public workshop on patent assertion entity activities, intended to explore the impact of patent assertion entities activities, the economic and legal implications of such activities, as well as the patent monetization strategies. I was among several panelists presenting at the "Patent Assertion Entity Activities Workshop."

13.      I have extensive patent licensing experience in the technology industry, as well as my in-depth knowledge and understanding of the dynamics, methodologies and strategies present in technology patent licensing from both buyer and seller perspectives. Accordingly, I consider myself an expert on patent licensing and negotiations, including but not limited to reasons why companies buy or license patents, the factors used to determine interest, and the process used and the data needed to establish and evaluate value.

14.     A copy of my resume is attached hereto as Attachment A.

15.     I have served as a licensing expert witness in the following cases:

      a.      *ST Microelectronics, Inc. v. SanDisk Corp.*, before the United States District Court for the Northern District of California;

      b.      *BMC Software, Inc. v. NetIQ Corporation*, before the American Arbitration Association in Houston, Texas; and

      c.      *Uri Cohen (an individual) v. General Patent Corporation*, before the American Arbitration Association, in New York, New York.

## II.    ASSIGNMENT

16.     In light of my experience and expertise negotiating patent licenses, as well as my understanding of negotiation practices customary in the technology industry, my firm, Epicenter, and I were retained by Plaintiff MLC Intellectual Property, LLC ("MLC IP") in 2012, prior to the filing of this case, to represent MLC as its licensing agent in negotiations with Defendant Micron Technology, Inc. ("Micron") for a license for certain multi-level cell NAND Flash patents (the "MLC Patents"), including the 5,764,571 Patent ("the '571 Patent").

17.     I understand MLC IP filed the present patent infringement action against Micron on August 12, 2014.  Given my first-hand involvement in negotiations with Micron with respect to the MLC Patents, including the '571 Patent, I was asked by MLC IP to provide an account of my negotiations with Micron, as well as the facts and issues I considered with respect to said negotiations.

18.     I am being compensated at $1300 per hour, my standard consulting rate for projects of this nature.  My compensation is not in any way dependent on the outcome of the litigation.

## III.   REAL-WORLD PATENT LICENSING NEGOTIATION PRACTICES

19.     As stated above, I have negotiated hundreds of patent licenses and transactions, including licenses executed to avoid litigation and to settle litigation.  Intellectual property, specifically patents, is one of the single largest opportunities for companies to increase strategic business value, by, for instance, creating new business opportunities, creating barriers to entry for competitors, and as a way to influence and direct technology and direct the market.

20.     Patent assets also represent a significant business risk for companies facing a patent owner moving to monetize his or her patent assets and portfolio.  Patent owners monetize their patent assets by licensing their patents and/or enforcing their patent rights through infringement litigation against an entity, who, without authority makes, uses, offers to sell, or sells a product or service within the United States or imports into the United States any such product or service that practices the patent during the term of the patent.  Patent owners may also monetize their patent assets by enforcing their patent rights against any entity, who actively induces and/or contributes to the infringement of a patent.

21.     My typical approach with respect to patent licensing negotiations includes an understanding the parties to the negotiation, the value of the patent assets at issue, as well as an evaluation of the potential damages award should an enforcement action be filed and reach a jury, among several other considerations.

**A.     History of the MLC Patents**

22.     During the time I was retained by MLC IP to serve as its licensing agent in 2012, I was aware that prior to my involvement, inventor Gerald Banks (now known as Jerry Banks) and BTG International, Inc. ("BTG") entered into an agreement (the "MLC-BTG Agreement") on or about January 17, 1997, which was later amended on January 15, 2001, whereby Mr. Banks agreed to assign to BTG ownership rights to the MLC Patents and BTG agreed to take steps to commercialize the MLC Patents, and to share fifty percent (50%) of the revenue generated from such commercialization.

23.     I was also aware that prior to my involvement, on or about July 7, 2006, Jerry Banks and Robert Hinckley formed MLC IP, and Jerry Banks assigned to MLC IP his rights, title and interest in and his right to receive payments to be made by BTG under the MLC-BTG Agreement.

24.     I was also aware that prior to my involvement, the following entities had patent licenses to the MLC Patents:  Hitachi, Ltd., Renesas Technology Group, Hynix, and Toshiba, as well as SanDisk and Intel, who were sub-licensees of Hitachi.

25.     I was also aware that prior to my involvement, BTG had filed a complaint in the International Trade Commission on or about July 27, 2009 against Samsung Electronics and its related entities, Apple entities, Apple, Inc., ASUSteck Computer, Inc., ASUS Computer International, Dell Inc., Lenovo Group Ltd., Lenovo (United States) Inc., PNY Technologies, Inc., Research in Motion, Ltd., Research in Motion Corporation, Sony Corporation, Sony Electronics, Inc., and Transcend Information, Inc.  I also understood that on or about August 24, 2009, the ITC announced institution of an investigation.  *See In the Matter of CERTAIN MLC FLASH MEMORY DEVICES AND PRODUCTS CONTAINING SAME*, ITC Investigation No. 337-TA-683 (the "337-TA-683 ITC Investigation").

26.     I was also aware that prior to my involvement, BTG settled the 337-TA-683 ITC Investigation, and as a result of that settlement, Samsung Electronics agreed to take a license to the MLC Patents on or about December 20, 2010.  It was my understanding that BTG agreed to settle the 337-TA-683 ITC Investigation, in light of then-concerns BTG had regarding invalidity challenges in view of certain prior art.

27.     I was also aware that prior to my involvement, BTG had commenced patent infringement proceedings in the United States District Court for the Eastern District of Texas on or about July 20, 2009, alleging infringement of multiple MLC Patents, including the '571 Patent, against multiple defendants, including Apple, Inc., ASUS Computer International, Inc., ASUSteck Computer, Inc., Dell Inc., Lenovo Group Ltd., Lenovo (United States) Inc., PNY Technologies, Inc., Sony Corporation, Sony Electronics, Inc., and Transcend Information, Inc. *See BTG International, Inc. v. Apple, Inc*., et al. Civil Action No. 2:09-CV-223 (E.D. Tex. July

4

20, 2009).  I understand the matter was stayed pending the 337-TA-683 ITC Investigation, and was eventually dismissed in December 2010, in light of the settlement of that 337-TA-683 ITC Investigation.

28.     I was also aware that prior to my involvement, MLC IP had certain concerns and contractual disputes against BTG, and brought an action in the Superior Court of the State of California, County of Santa Clara, *MLC IP v. BTG*, No. 08-CV-198282, which matter was ultimately settled.  The parties entered into a Settlement Agreement and Release dated December 3, 2009 ("MLC-BTG Settlement Agreement").

29.     I was also aware that prior to my involvement, on or about May 2, 2012, MLC IP and BTG terminated the MLC-BTG Agreement, and the ownership rights to the MLC Patents were reassigned to MLC IP.

**B.     Prior Licenses to the MLC Patents, Including the '571 Patent**

**1.     Licenses to the MLC Patents**

30.     At the time I was retained by MLC IP to serve as its licensing agent in early 2012, I was aware that prior to my involvement multiple companies have already taken a license to the MLC Patents.

31.     By the time I began negotiating with Micron, the following patent licenses for worldwide patent rights to the MLC patents had been executed:

a.     May 7, 1999 Patent License Agreement between BTG and Hitachi, Ltd.;

b.     November 9, 2006 Patent License Agreement between BTG and Renesas Technology Corporation;

c.     April 11, 2007 Patent License Agreement between BTG and Hynix Semiconductor, Inc.;

d.     April 11, 2007 Patent License Agreement between BTG and Toshiba Corporation; and

e.     December 20, 2010 Settlement and License Agreement between BTG and Samsung Electronics Co., Ltd.

32.     Hitachi executed sublicense rights on the MLC Patents to SanDisk Corporation on or about October 1, 1999, and to Intel on or about July 31, 2002.  The BTG license with Hitachi was terminated on or about November 9, 2006 in light of the BTG agreement with Renesas, and pursuant to the termination, Hitachi's sublicense of the MLC Patents to Intel and SanDisk were assigned to Renesas.

33.     In my negotiations with Micron, I considered the foregoing license agreements in determining the appropriate royalty demand offered to Micron—as discuss further below.

### 2.     Differences Between a Real-World License Negotiation and a Hypothetical Negotiation in an Enforcement Action

34.     In negotiating a patent license against an alleged infringer, such as Micron, I understand that the alternative to a patent license negotiated without litigation would be an enforcement action where compensatory damages would be determined pursuant to 35 U.S.C. § 284, applying a fictitious construct of a "hypothetical negotiation." I also understand that in a hypothetical negotiation, courts permit the use of sufficiently comparable licenses to determine damages. *See, e.g., Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) ("a party may use the royalty rate from sufficiently comparable licenses"); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79-80 (Fed. Cir. 2012) ("Actual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure.").

35.     In preparing for my negotiations with Micron, I took advantage of the knowledge I had regarding real world patent license royalty negotiations and how they differed from the hypothetical negotiations envisioned by the *Georgia-Pacific* case. Indeed, based on my extensive patent licensing experience, real-world licensing negotiations are almost always very different from the *Georgia-Pacific* hypothetical negotiation exercise. Accordingly, in my negotiations with Micron, I evaluated all of these prior licenses and the royalty payments provided therein with these differences in mind.

36.     In patent litigation, 35 U.S.C. § 284 sets the compensatory damages floor and provides that "in no event" shall the patentee be awarded "less than a reasonable royalty for the use made of the invention by the infringer." The prevailing method for establishing the applicable reasonable royalty is to determine what price or royalty rate the patentee and the infringer would have reached had the two engaged in arms-length negotiations <u>before</u> any infringing activity occurred. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-1325 (Fed. Cir. 2009). "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme." *Lucent Techs.*, 580 F.3d at 1325; *see also, Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970).

37.     While the hypothetical negotiation permits consideration of "real-world" factors, referred to as the *Georgia-Pacific* factors, the hypothetical deal or transaction resulting from the hypothetical negotiation is based on important assumptions that do not necessarily exist in the real-world. Numerous courts have similarly recognized that parties to real-world patent licensing negotiations do not generally operate or negotiate under the strict assumptions applied in a hypothetical negotiation. *See, e.g., Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1228 (Fed. Cir. 2014) (acknowledging that "licenses are generally negotiated without consideration of the EMVR") For instance, in the hypothetical negotiation, the asserted patent claims are deemed to be valid and enforceable, the accused product in the litigation is deemed to be infringed, and the parties are assumed to be willing negotiators able to "successfully negotiate[] an agreement just

before infringement began." *Lucent Techs.*, 580 F.3d at 1325. Moreover, the royalty rate resulting from the hypothetical negotiation must be applied to a royalty base (*e.g.*, sale price or revenue) that has been apportioned and, thus, directly attributable to the patented technology, as opposed to the entire market value of a multicomponent product unless, of course, the patented feature is a driver of demand. *See, e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *VirnetX, Inc. v. Cisco, Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). Further, given the extraterritoriality limitations of patent rights, the royalty base must also be limited to sales or revenues resulting from domestic acts of infringement.

38.     However, real-world patent licensing negotiations on the price or royalty is rooted in myriad of competing economic interests, bargaining powers, and risks that are **not necessarily** present in a hypothetical negotiation. For instance, significant concerns such as unproven validity and infringement, the appropriate royalty base and royalty rates, as well the uneven ability of the two parties in dealing with the costs[1] and complexity of patent enforcement actions as an alternative to agreement often result in royalty payments heavily discounted from those expected under a *Georgia-Pacific* style hypothetical negotiation. As one example, it must be understood that in a world where reverse engineering is plentiful and cheap, an infringer receives an economic benefit in putting off paying a royalty, and a patent owner is forced to finance the expensive cost of litigation for years to have a chance at obtaining the withheld royalty.

39.     Indeed, numerous courts have recognized such differences between a real-world negotiated license from those negotiated within the construct of a hypothetical negotiation. *See, e.g., Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1576 (Fed. Cir. 1988) ("In a normal negotiation, the potential licensee has three basic choices: forego all use of the invention; pay an agreed royalty; infringe the patent and risk litigation. The [hypothetical negotiation] methodology presumes that the licensee has made the second choice, when in fact it made the third."); *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("Prior licenses, however, are almost never perfectly analogous to the infringement action.")

40.     Given these differences, courts have offered guidance on how to address them appropriately when using a comparable real-world license in a hypothetical negotiation. For example, as courts have recognized real world "licenses are generally negotiated without consideration of the EMVR," that is, parties typically consider the accused product as a whole in crafting a license rather than engage in apportionment and/or evaluate entire market value issues. *Ericsson*, 773 F.3d at 1228. My own experiences support these judicial observations and further find that parties do so often simply as a matter of convenience, and other times because a substantial question exists as to whether EMVR appropriately applies. Similarly, it has also been my experience that parties to a real-world negotiation, namely, the alleged infringer, would demand a license to make use and sell all of its products worldwide (i.e., licensed products) but will only agree to discuss paying royalties on products made, used or sold in the United States. In many of these cases, there is some debate on the ability to detect and differentiate those products which touch U.S. Territory, and in those cases the parties use worldwide sales as a

---

[1] The American Intellectual Property Law Association ("AIPLA") Economic Survey reports the median cost for patent litigation, as well as median cost of *inter partes* reexamination proceedings.

convenient way to determine royalty basis, since these numbers are often reported and audited, and agree on a lower royalty rate based on an agreed percentage or worldwide sales that they expect to be made, used or sold in the United States. Indeed, even the Federal Circuit acknowledged such a scenario where a reasonable royalty could be calculated using the entire sales price of a product by balancing it out with an artificially reduced royalty rate. *See Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("It is not that an appropriately apportioned royalty award could never be fashioned by starting with the entire market value of a multi-component product—by, for instance, ***dramatically reducing the royalty rate*** to be applied in those cases") (emphasis added). In other words, to account for the larger royalty bases resulting from these convenience-motivated terms, it would be appropriate to increase the effective royalty rate reflected in real-world negotiated licenses to get closer to what the rate would have been in a hypothetical negotiation.

41.     Understanding these differences was particularly relevant to my negotiations with Micron in 2013 because, as discussed further below, Micron requested copies of these prior license agreements for its own evaluation. It was incumbent upon Epicenter, as MLC IP's licensing agent, to ensure appropriate adjustments were considered in negotiations with Micron.

### C.    Considerations of Costs and Risks in Patent Licensing Negotiations

42.     Significantly, in a hypothetical negotiation pursuant to the *Georgia-Pacific* framework, the patents are not only presumed to be valid and infringed, but that the parties to the hypothetical negotiation are presumed to have full knowledge of the facts and circumstances surrounding the infringement at the time. *LaserDynamics*, 694 F.3d at 76 (Fed. Cir. 2012). There should be no dispute that in a real world context, none of these assumptions should be presumed, especially by the alleged infringer. That is, contrary to *Georgia Pacific*, in all patent licensing negotiations the potential licensee is rarely a willing licensee, and, absent a judicial finding, in all cases has some dispute with whether the patents in question are valid or infringed. The patent holder, on the other hand, often lacks full knowledge of the infringement and runs the risk of findings of both invalidity and non-infringement.

43.     In licensing negotiations it is appropriate to consider these real world risks and uncertainties, as I do in my own work and as I did do with respect to my negotiations with Micron. Based on my extensive experience negotiating patent licenses both as counsel for large corporations as well as on behalf of inventors, patent owners and accused infringers of all sizes, I have found that the dynamics of real-world licensing negotiation could be best understood using a Patent Licensing Market Model containing three market segments.

44.     As explained here, this Patent Licensing Market Model, developed based on my experience, conceptualizes the differences and changing dynamics present between a patent holder/licensor and an infringer/licensee in a real-world negotiation. In the Patent Licensing Market, real-world negotiations fall within one of three market segments as summarized in the table below:

| | "First Adopters" | "Ethical Adopters" | "Invention Plagiarists" |
|---|---|---|---|
| **Status of Technology Adoption** | • Technology not yet introduced to market<br>• Inventor introduces it to Licensee | • Potential licensee has already adopted; or<br>• Standards-based Technology to be adopted<br>• Potential licensee open to taking license for "right price" | • Technology widely used, often considered "industry standard technology."<br>• Potential licensees have little idea or concern where technology came from |
| **Value to Licensee** | • Improve market share<br>• Improve profitability through one or both of<br>  - Price Elasticity<br>  - Cost savings | • Prevent further losses in market share or profitability to First Adopters | • "It's all in the public domain" |
| **Alternative to Taking a License** | • Will not use technology without a license | • Will use it anyway<br>• Will engage in substantive negotiations outside litigation | • Will use it anyway<br>• Refusal to take a license absent enforcement action<br>• Litigation is negotiation |
| **Typical Negotiated Royalty** | • Willing to discuss royalties 1 % - 10% or more | • Willing to negotiate fixed sum<br>• Limit = 90 – 95% discount to what parties both understand are potential litigation damages | • Fixed sums only<br>• Calculated exclusively as ~ **discount off Licensee's view** of potential litigation damages |
| **Size of Market Segment** | **1 – 3 players Max** | **0% - 20%** | **80% - 100%** |

The three market segments are defined as follows:

45.    First Adopters are potential licensees that negotiate for a patent license prior to the patented technology being introduced into the marketplace. Thus the potential licensee can only learn about the patented technology from the patent holder (e.g., through an offer to license), as opposed to observing the innovation in the marketplace, and would not have access to the invention without an affirmative license from the licensor. The potential licensee is thus evaluating the potential patent license with regard to the direct economic benefit it will receive from adoption in terms of increasing the potential licensee's ability to (1) gain market share, (2) raise prices and/or (3) to lower costs. As a result, both the patent holder/licensor and licensee have a shared objective or mutual willingness to pay the patentee the fair price for the value of the patented technology in exchange for the licensee to have the right to practice the invention, as well as to capturing and/or improve its market share, revenue, and profits in the relevant market (e.g., by implementing an innovation before its competitors). It is in these situations that

you tend to see significant royalties in the range of 1% to 10%, or even more, depending on the value of the invention to the three economic factors advantages above.   In my opinion, this segment is the closest to the Georgia Pacific hypothetical negotiation.

46.     There are only a limited number of players in any product market able to be First Adopters, since only the first one or two adopters of a new patented technology gain the advantages of market share growth or increase in profitability available from price elasticity or cost reduction from adoption of that innovation.

47.     Both the second and third segments, Ethical Adopters and Invention Plagiarists, are based on the fact that there for all practical purposes, there is an unlimited supply of competent engineering talent in the world, so once a product containing a patented innovation is released into the marketplace, that innovation will be reverse engineered and copied by any who see an advantage to them in adopting that innovation.   The two segments differ only as to the willingness of the two parties to engage in negotiations without the necessity of engaging in some form of enforcement action.

48.     Ethical Adopters are potential licensees who have adopted a patented invention, usually through observing the innovation in the First Adopters' products or the patented invention is adopted by a standard setting body, but when approached by the patent holder are willing to engage in patent license negotiations without there having to be an enforcement action underway.   In this segment, the gains in market share and profitability available from adoption have been claimed by the First Adopter(s), so this potential licensee is seeking only to stop the loss of market share and/or profitability their first adopter competitor is causing them.  So, while the Ethical Adopters have some respect for intellectual property and are willing, once the infringement is pointed out, to engage in licensing negotiations, the price they are willing to pay is not defined by the value the patented technology brings the potential licensee, but rather by the cost of alternatives.   What that means from a practical perspective is the price the potential licensee thinks it would have to pay the patent holder in the event of a successful patent enforcement action, discounted to account for the risk associated with the patent holder's having to obtain a ruling that their patents are valid and infringed, as well as setting the appropriate royalty basis and royalty rate (under the Georgia Pacific factors), and have that ruling affirmed on appeal, as well as the time value of money associated with the time associated in getting that ruling.  In my experience, accounting for these issues results in royalty rates that represent a 90% - 95% or even more discount off of what the parties jointly believe might be the damages awarded in an enforcement action.

49.     It has also been my experience that in recent years there have been few Ethical Adopters outside the context of standards essential patents.  Often, the cost of enforcement to the patent holder together with the fact that interest on royalties delayed can often pay for any costs an infringer may incur in defending any enforcement actions that are actually brought by patent holders provides potential licensees a more economically attractive alternative to ethical adoption.  That said, after a patent holder has successfully enforced its patents against one or more Invention Plagiarists (see below), some number of Invention Plagiarists are then willing to become Ethical Adopters.

50.     Invention Plagiarists are potential licensees who have adopted the patented technology and are resistant to paying a fair amount for a license under such patents outside of a filed patent enforcement action.   Invention Plagiarists neither know nor care who actually spent the money and effort in developing the patented technology, and when approached by the patent holder, the Invention Plagiarists show no interest or concern in obtaining a license under the patents, claiming that they were simply practicing what has been in the "public domain."   The only option for a patent holder to obtain a royalty from an Invention Plagiarist is to file and pursue an enforcement action against them.

51.     Under this scenario, the potential licensee, in addition to considering the same risks and considerations discussed in the second "Ethical Adopter" scenario, add to their pricing consideration the question of whether the patent holder has the capability, commitment and resources to bring and maintain an enforcement action to conclusion.   This includes an evaluation of the legal and business acumen and resources the patent holder has, as well as the ability of the patent holder to afford the high cost of patent litigation as well as manage the stresses of a long adversarial process.   The patent holder, for their part, has to calculate for themselves whether they have access to sufficient risk capital to afford the high price of patent litigation, whether the return on a successful prosecution would provide an acceptable return on that capital, and whether they are prepared themselves to manage the stresses of participation in litigation.

52.     It has been my experience that Invention Plagiarists review these factors related to pricing and only offer settlement values that represent as much as a 90% - 95% discount off of what the Invention Plagiarist itself believes would be damages awarded against it in the outcome of a trial (as opposed to an agreed upon potential damages in the Ethical Adopter segment).   That said, Invention Plagiarists are not shy in refraining to make any serious offer until they have had an opportunity to use their superior sophistication, experience and access to capital to exhaust potential licensees into accepting a *de minimis* sum.

53.     Additionally, Invention Plagiarists typically seek lump-sum payments, as opposed to running royalties for a number of reasons including the opportunity to obtain further discounts by paying immediately, by being able to calculate the amount due on an agreed, intentionally conservative, volume of product, allowing the potential licensee to sell additional product volume royalty free, and the ability to characterize such payments as capital expenses as opposed to operating expenses which can matter a lot to publicly traded companies.   Indeed, the Federal Circuit has observed that "certain fundamental differences exist between lump-sum agreements and running-royalty agreements" as they rely on "different considerations."   *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326, 1330 (Fed. Cir. 2009).   The Federal Circuit observed a myriad of advantages and disadvantages to a patent holder and licensee under either payment arrangement, including the avoidance of ongoing administrative burdens of monitoring usage of the invention.   *Id.*   In my experience, as stated above, the licensee/infringer, particularly where the licensee/infringer is a large company, typically prefers to negotiate lump-sum payments as opposed to running royalties so as to characterize the royalty payment as a one-time capital expense as opposed to an ongoing operating expense.

11

### D.    Licensing History Between BTG and Micron for the MLC Patents





### E.    Licensing Communications Between Muir Patent Consulting with Micron



## IV.    EPICENTER LICENSING NEGOTIATIONS WITH MICRON



















I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 8, 2019, in Los Altos Hills, California.

Ronald Epstein

ATTACHMENT A



# Ron Epstein
## CEO



Ron Epstein is Founder and CEO of Epicenter. With more than 20 years of experience in developing, optimizing, and transacting Intellectual Property (IP) asset portfolios, Ron is recognized globally as a leader in helping patent owners maximize the value of their IP. As a market-maker, Ron has been instrumental in defining the category of patent brokers in the emerging patent marketplace, delivering over $1 Billion of value from the sale or licensing of patents in over 150 transactions.

Ron formed Epicenter IP Group in 2010 to continue to the work he had been doing for the previous 7 years at IPotential, LLC, which he founded in 2003. Prior to founding IPotential, Ron was vice president and general counsel at Brocade Communications Systems, Inc. where he created and executed on Brocade's intellectual property strategy, filing for more than 80 patents over a 24-month period and defending the company in three patent litigations filed during that period.

Before joining Brocade, Ron served as Director of Licensing at Intel Corporation, where he was responsible for the company's IP licensing strategy, including defense against assertions, and the creation of Intel's value licensing program. At Intel, Ron built the Corporate Licensing Group from a one man operation to a group of over 30 people, and was responsible for pioneering many innovative IP programs, including creating the first dedicated patent purchasing program in the technology. Ron is most proud of the fact that individuals who worked in the Intel Corporate Licensing Group, many of whom are now in leadership positions at some of the most forward thinking IP firms in the industry.

Ron built his legal career at Wilson, Sonsini, Goodrich and Rosati as a member of the Technology Licensing Group, where he specialized in helping clients minimize liability under the patent portfolios of leading companies such as IBM, Lucent, and Intel; and negotiate patent cross-license agreements in conjunction with complex patent litigation settlements.

Ron holds a Bachelor of Science from Duke University and a J.D. from the School of Law, University of California, Berkeley. Ron is an active member of the Licensing Executives Society.



## RONALD S. EPSTEIN

Epicenter IP Group, LLC
1350 Bayshore Hwy., Ste 420
Burlingame, CA 94010
contact@epicenterip.com

**Epicenter IP Group, LLC**                                    **April 2010 - present**
**CEO**

> Founder and CEO of Epicenter IP Group, LLC.  Epicenter is dedicated to assisting patent owners in obtaining the maximum value from their efforts in monetizing their patents.  Epicenter brings together a highly specialized cadre of experienced IP professionals focused on large opportunities, both from the buy side (purchasers and licensees) and the sell side (sellers and licensors).

**EpicenterLaw, PC.**                                    **July 2008 - present**
**Managing Partner**

> Founder and sole member of specialty firm dedicated to assisting patent owners in licensing their patents.

**IPotential, LLC**                                    **December 2003 – April 2010**
**CEO**

> Founder and CEO of IPotential, LLC, an "IP Investment Bank," dedicated to assisting clients in developing and executing world class intellectual property strategies to obtain the maximum value of their intellectual property, from a business, strategic, and economic perspective.

**BROCADE COMMUNICATIONS SYSTEMS, INC.**
**VP, General Counsel**                                    **March 2001 – December 2003**
**Advisor to the CEO**                                    **December 2003 – September 2004**

> Responsible for all legal issues facing the company, including developing and executing the company's intellectual property strategy as well as managing litigation, M&A support, corporate compliance and governance, and transactional and counseling support for the business units.  I was the company's first in-house lawyer and built the legal team, processes and results orientation required to integrate a legal function into this post IPO Company.

**INTEL CORPORATION**                                    **October 1995 – March 2001**
**Director of Licensing**

> Responsible for IP asset management within the company, including dealing with claims made against the company, obtaining an economic return on the company's intellectual property assets and identifying ways to use the company's IP to obtain measurable business results.  Built and managed a diverse group of licensing professionals, including lawyers, business people, technologists and IT to provide world-class IP asset management services.  In addition, I had responsibility for negotiating all corporate licensing agreements, setting policy for licensing transactions, training Intel legal staff on licensing and negotiation skills and overseeing licensing transactions throughout the corporation.



**WILSON, SONSINI, GOODRICH AND ROSATI**                 **September 1989 – October 1995**
**Associate, Technology Transaction Group**

> Counseled clients in a variety of business relationships in the technology business including technology transfers, Patent, copyright, trade secret and trademark licenses, sales and marketing agreements and in intellectual property protection. My practice spanned a wide range of technology related industries, including the semiconductor, computer hardware and peripherals, software, telecommunications, new materials and medical instruments industries.

**EDUCATION**

> **J.D. Boalt Hall School of Law, University of California at Berkeley**, 1989; High Technology Law Journal, Editor-in-Chief, 1988-1989; Managing Editor, 1987-1988
> **B.S. Duke University**, cum laude, joint major in Zoology and Anthropology, 1986

ATTACHMENT B

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| MLC INTELLECTUAL PROPERTY, LLC,<br><br>          Plaintiff,<br><br>     v.<br><br>MICRON TECHNOLOGY, INC.,<br><br>          Defendant. | Case No. 3:14-cv-03657-SI<br><br>**DECLARATION OF RONALD EPSTEIN PURSUANT TO FED.R.EVID 803(6) & 902(11)** |

I, Ronald Epstein, declare as follows:

1.     I am an attorney duly admitted to practice in California. I am the Managing Director of Epicenter Law, PC, and the Chief Executive Officer of Epicenter IP Group LLC, (collectively, "Epicenter"). I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would competently testify thereto.

2.     I submit this declaration to authenticate certain business records pursuant to Federal Rules of Evidence 803(6) and 902(11).

3.     I am the custodian, and where noted, author of the records addressed herein, and have first-hand knowledge of their creation, storage, and/or transmission. Beginning at least as early as February 2013, I approached Micron regarding its infringement of U.S. Patent No. 5,764,571 (the "'571 patent"), from the sales of Micron's MLC NAND Flash, to extend Micron a patent license. My contacts at Micron included Mr. Steven Arnold, Mr. Joel Poppen, Mr. David Kaplan, and Mr. Michael Myers. Patent licensing and negotiating patent licenses is a regular practice of Epicenter. My communications with Micron continued up through at least August of 2014.

4.     The document stamped EPICENTER029193-9211 (hereinafter, "EPICENTER029193") is a license summary by Epicenter for Micron. EPICENTER02919 was made in or around 2013. I have personal knowledge of EPICENTER02919 because I partook in the creation of the presentation. EPICENTER02919 was kept in the course of my regularly conducted licensing practice, and was made pursuant to Epicenter's regular practice.

5.     The document stamped EPICENTER029194-9211 (hereinafter, "EPICENTER029194") is a presentation by Epicenter to Micron. EPICENTER02919 was made in or around June 2014. I have personal knowledge of EPICENTER02919 because I partook in the creation of the presentation. EPICENTER02919 was kept in the course of my regularly conducted licensing practice, and was made pursuant to Epicenter's regular practice.

6.     The document stamped EPICENTER029212-15(hereinafter, "EPICENTER029212") is a presentation by Epicenter to Micron. EPICENTER029212 was made in or around August 2013. I have personal knowledge of EPICENTER029212 because I

DECLARATION OF RONALD EPSTEIN
CASE NO. 3:14-CV-03657-SI

1  participated in the creation of the presentation and my contact information is provided on the

2  final page of the presentation. EPICENTER029212 was kept in the course of my regularly

3  conducted licensing practice, and was made pursuant to Epicenter's regular practice.

4      7.      The document stamped EPICENTER029216-EPICENTER029229 (hereinafter,

5  "EPICENTER029216") is a claim chart prepared by Epicenter for Micron demonstrating how

6  Micron MLC NAND Flash infringes the '571 Patent. EPICENTER029216 was made in or

7  around the first half of 2013. I have personal knowledge of EPICENTER029216 because it was

8  created at my direction. EPICENTER029216 was kept in the course of my regularly conducted

9  licensing practice, and was made pursuant to Epicenter's regular practice.

10      8.      The document stamped EPICENTER029230-242 (hereinafter,

11  "EPICENTER029230") is a presentation by Epicenter to Micron. EPICENTER029230 that was

12  made in or around August 2013. I have personal knowledge of EPICENTER029230 because I

13  participated in the creation of the presentation and my contact information is provided on the

14  final page of the presentation. EPICENTER029230 was kept in the course of my regularly

15  conducted licensing practice, and was made pursuant to Epicenter's regular practice.

16      9.      The documents stamped EPICENTER209477 and EPICENTER209503 are my

17  email correspondence with Mr. Arnold (hereinafter "ARNOLD CORRESPONDENCE"). The

18  ARNOLD CORRESPONDENCE was made at or near the time of sending, and/or recorded at or

19  near the time of receipt. I have personal knowledge of the ARNOLD CORRESPONDENCE

20  because I was a party to it and I wrote or received this correspondence during the ordinary course

21  of business. MUIR001335 was kept in the course of my regularly conducted licensing practice,

22  and was made pursuant to Epicenter's regular practice.

23      10.     The documents stamped EPICENTER209503-04 and EPICENTER209662-63 are

24  my email correspondence with Mr. Poppen (hereinafter "POPPEN CORRESPONDENCE").

25  The POPPEN CORRESPONDENCE was made at or near the time of sending, and/or recorded at

26  or near the time of receipt. I have personal knowledge of the POPPEN CORRESPONDENCE

27  because I was a party to it and I wrote or received this correspondence during the ordinary course

28  of business. The POPPEN CORRESPONDENCE was kept in the course of my regularly

conducted licensing practice, and was made pursuant to Epicenter's regular practice.

11.    The documents stamped EPICENTER209420-27, EPICENTER209430-34, PICENTER209453-476, EPICENTER209478-498, EPICENTER209507-510, EPICENTER209513-16, EPICENTER209527-569, EPICENTER209571-72, and EPICENTER209611-661 are my email correspondence with Mr. Myers (hereinafter "MYERS CORRESPONDENCE"). The MYERS CORRESPONDENCE was made or near the time of sending and/or receiving. I have personal knowledge of the MYERS CORRESPONDENCE because I was a party to it and I wrote or received this correspondence during the ordinary course of business. The MYERS CORRESPONDENCE was kept in the course of Epicenter's regularly conducted licensing practice, and was made pursuant to Epicenter's regular practice.

12.    The documents stamped EPICENTER209435-52 (hereinafter, "EPICENTER209435") is a presentation by Epicenter to Micron. EPICENTER209435 was made in or around June 2014. I have personal knowledge of EPICENTER209435 because I participated in the creation of the presentation. EPICENTER209435 was kept in the course of Epicenter's regularly conducted licensing practice, and was made pursuant to Epicenter's regular practice.

13.    The documents stamped EPICENTER209511-12 (hereinafter, "EPICENTER209511") is a calendar invite to, and acceptance by, Mr. Myers for a meeting regarding the "MLC IP Portfolio". EPICENTER209511 was received and recorded at or around the time of sending and receipt on August 1, 2013. I have personal knowledge of EPICENTER209511because it was an invitation extended at my direction. EPICENTER209511 was kept in the course of Epicenter's regularly conducted licensing practice, and was made pursuant to Epicenter's regular practice.

14.    The documents stamped EPICENTER209505, EPICENTER209499-502, EPICENTER209505-06, EPICENTER209517-26, EPICENTER209570, and EPICENTER209578-9610 are my email correspondence with Mr. Kaplan (hereinafter "KAPLAN CORRESPONDENCE"). The KAPLAN CORRESPONDENCE was made at or near the time of sending, and/or recorded at or near the time of receipt. I have personal

-3-

DocuSign Envelope ID: 85E09437-09DD-4F6B-8B56-64A606B52CBF

1  knowledge of the KAPLAN CORRESPONDENCE because I was a party to it and I wrote or

2  received this correspondence during the ordinary course of business. The KAPLAN

3  CORRESPONDENCE was kept in the course of Epicenter's regularly conducted licensing

4  practice, and was made pursuant to Epicenter's regular practice.

5      15.     The document stamped EPICENTER209664-66 is an email chain with Mr.

6  Arnold, Mr. Poppen, and Mr. Kaplan, from February 7, 2013 to April 4, 2013 (hereinafter

7  "EPICENTER209664"). EPICENTER209664 was made at or near the time of sending, and/or

8  recorded at or near the time of receipt. I have personal knowledge of the EPICENTER209664

9  because I was a party to it and I wrote or received this correspondence during the ordinary course

10 of business. EPICENTER209664 was kept in the course of Epicenter's regularly conducted

11 licensing practice, and was made pursuant to Epicenter's regular practice.

12     I declare under penalty of perjury under the laws of the State of California that the

13 foregoing is true and correct and this declaration was made this 14th day of December, 2018 in

14 Palo Alto, California.

15     By: _____

16     Ronald Epstein

17

18

19

20

21

22

23

24

25

26

27

28

-4-