UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MLC INTELLECTUAL PROPERTY, LLC, | Case No. 14-cv-03657-SI |
| Plaintiff, | |
| v. | **ORDER GRANTING MICRON'S _DAUBERT_ MOTION TO EXCLUDE EXPERT TESTIMONY OF RONALD EPSTEIN** |
| MICRON TECHNOLOGY, INC., et al., | |
| Defendants. | Re: Dkt. No. 448 |

On June 6, 2019, the Court held a hearing on numerous pretrial motions. For the reasons set forth below, the Court GRANTS Micron's motion to exclude the expert testimony of Ronald Epstein pursuant to the Federal Rules of Evidence and _Daubert v. Merrell Dow Pharms., Inc._, 509 U.S. 579 (1993).[1]

**BACKGROUND**

Mr. Epstein is the Managing Partner of EpicenterLaw, P.C. Epstein's Expert Report ¶ 3

---

[1] Portions of the briefing on this motion, as well as entire exhibits, were filed under seal because Epstein represented MLC in the licensing negotiations with Micron, and those negotiations were conducted pursuant to a non-disclosure agreement. The NDA (and, more tangentially, Epstein's role in drafting the NDA) has been the subject of much litigation in this case. _See, e.g._, Order Re: Micron's Motion for a Preliminary Injunction and/or to Strike; Denying Micron's Motion to Strike Epstein Declaration (Dkt. No. 439).

In order to resolve the present motion, the Court must discuss the under seal material in detail, and the Court finds it appropriate that this order be filed entirely in the public docket. Further, after engaging in an in-depth review of these materials, the Court concludes that while the NDA contains broad confidentiality provisions and limitations on the parties' use of information disclosed pursuant to the NDA, for present purposes in this litigation none of the under seal material – such as Epstein's report and his deposition – is truly confidential. In any event, the parties have put these matters directly at issue in this litigation and the Court cannot rule on the current motion without discussing Epstein's report, deposition testimony, and fee agreements.

(Dkt. No. 442-9). EpicenterLaw "is the law firm through which [Epstein] provide[s] legal services related to patent monetization." *Id.* In September 2012, MLC retained EpicenterLaw to "perform legal services related to the monetization of the MLC Portfolio (identified in Exhibit A attached hereto)[2] through licensing, sale or other disposition." MLC/EpicenterLaw Engagement Agreement ¶ 1(a) (Dkt. No. 442-39). Under the terms of that agreement, MLC agreed to pay EpicenterLaw a "success fee" of 15% to 20% of the licensing revenue if EpicenterLaw successfully negotiated a license between MLC and Micron. *Id.* ¶ 2.[3]

Pursuant to the MLC/EpicenterLaw engagement agreement, Epstein represented MLC in licensing negotiations with Micron during 2013-2014. Those negotiations were unsuccessful, and MLC filed this lawsuit against Micron on August 12, 2014.

On November 2, 2018, MLC first identified Epstein as a percipient witness with "Knowledge regarding notice of infringement, and prior efforts to license the '571 patent." MLC's First Amended Initial Disclosures at 3 (Dkt. No. 419-4).

In January 2019, MLC retained Epstein as an expert. MLC states that Epstein is a "licensing expert" and that he will "serve as a testifying expert to explain to the jury the differences between

---

[2] Exhibit A to the engagement agreement lists 26 patents, including the '571 patent. Exhibit A states, *inter alia*, that in addition to the 26 listed patents, the agreement covered related patent applications, reissues, reexaminations, extensions, continuations, etc., and foreign patents. There is evidence in the record that MLC's patent portfolio includes 30 U.S. patents and 11 foreign patents. *See, e.g.*, Dkt. No. 442-5 at 10 (Hynix license).

[3] At his April 15, 2019 deposition, Epstein asserted attorney client privilege and refused to answer any questions about the terms of the EpicenterLaw/MLC engagement agreement, including whether he expected to receive any payment in his capacity as licensing counsel if MLC prevails in this case. Epstein Tr. at 58:2-67:9 (Dkt. No. 442-35). Epstein also testified that he did not believe he had been paid "with regard to my representation of MLC as of this point." *Id.* at 66:7-12. After the deposition, Epstein produced the licensing engagement agreement, and Messrs. Epstein, Marino and Hinckley filed declarations in opposition to Micron's *Daubert* motion, each stating that Epstein does not have a contingent financial interest in the outcome of this case. Because Micron had been prevented from questioning Epstein about this matter at his deposition, the Court permitted questioning on the matter at the *Daubert* hearing. At the hearing, Epstein testified that he will be not be receiving any additional compensation in this case beyond the $1,300 per hour expert rate he is charging. June 6, 2019 Tr. at 4:12-6:23 (Dkt. No. 612).
At his deposition, Epstein could not remember if he had signed a written expert engagement agreement with MLC, Epstein Tr. at 48:5-53:16, and later stated that that he believes he has a verbal, and not written, agreement with MLC/Polsinelli regarding his expert testimony. *Id.* at 123:6-124:19. Epstein also stated that he agreed to give MLC a "cut rate" of $1,300 per hour for his expert work. *Id.*

real world and hypothetical licensing negotiations." Opp'n at 1 (Dkt. No. 501). Epstein's description of his expert assignment is as follows: "Given my first-hand involvement in negotiations with Micron with respect to the MLC Patents, including the '571 Patent, I was asked by MLC IP to provide an account of my negotiations with Micron, as well as the facts and issues I considered with respect to said negotiations." Expert Report at ¶ 17. MLC states that Epstein is "not being offered as a damages expert." Opp'n at 23 n.13. Similarly, at his deposition, Epstein repeatedly stated that he was not providing an opinion about damages. *See, e.g.*, Epstein Tr. at 241:10-11 ("Yeah, I make no opinion as to damages in this case."); *id.* at 269:9-11 ("A: Yeah, I wouldn't propose to testify to the jury – what they should find as – yes, what they should find as damages.").

Micron challenges Epstein's expert testimony on numerous grounds, including that he is essentially providing lay percipient testimony in the guise of expert testimony, and that he is in fact providing damages opinions that are inadmissible. In order to evaluate these arguments, the Court sets forth a detailed description of Epstein's expert opinions as set forth in his report and his deposition.

Epstein first opines about "Real-World Patent Licensing Negotiation Practices." Expert Report at ¶¶ 19-66. In that section of his report, Epstein details the "History of the MLC Patents" and the "Prior Licenses to the MLC Patents, Including the '571 Patent," which is essentially a factual recitation of the ownership and assignment of the MLC patents and the licensing of the MLC patent portfolio. *Id.* ¶¶ 19-33. Epstein was not personally involved in negotiating the prior licenses (with *e.g.*, Hynix and Toshiba); those licenses were negotiated by BTG (the prior owner of the MLC patent portfolio). Epstein states that in his 2013-2014 negotiations with Micron, he considered those license agreements in determining the appropriate royalty demand offered to Micron. *Id.* ¶ 33.

Epstein then discusses the "Differences Between a Real-World License Negotiations and a Hypothetical Negotiation in an Enforcement Action," including the "Patent Licensing Market Model" that Epstein created. Epstein states that "[i]n preparing for my negotiations with Micron, I took advantage of the knowledge I had regarding real world patent license royalty negotiations and how they differed from the hypothetical negotiations envisioned by the *Georgia-Pacific* case." *Id.*

¶ 35.[4] Epstein states,

> 37. While the hypothetical negotiation permits consideration of "real world" factors, referred to as the *Georgia-Pacific* factors, the hypothetical deal or transaction resulting from the hypothetical negotiation is based on important assumptions that do not necessarily exist in the real-world. . . . For instance, in the hypothetical negotiation, the asserted patent claims are deemed to be valid and enforceable, the accused product in the litigation is deemed to be infringed [sic], and the parties are assumed to be willing negotiators able to "successfully negotiate[] an agreement just before infringement began." *Lucent Techs.*, 580 F.3d at 1325. Moreover, the royalty rate resulting from the hypothetical negotiation must be applied to a royalty base (*e.g.*, sale price or revenue) that has been apportioned and, thus, directly attributable to the patented technology, as opposed to the entire market value of a multicomponent product unless, of course, the patented feature is the driver of demand. [citations] Further, given the extraterritoriality limitations of patent rights, the royalty base must also be limited to sales or revenues resulting from domestic acts of infringement.

> 38. However, real-world patent licensing negotiations on the price or royalty is rooted in myriad of competing economic interests, bargaining powers, and risks that are **not necessarily** present in a hypothetical negotiation. For instance, significant concerns such as unproven validity and infringement, the appropriate royalty base and royalty rates, as well as the uneven ability of the two parties in dealing with the costs and complexity of patent enforcement actions as an alternative to agreement often results in royalty payments heavily discounted from those expected under a *Georgia-Pacific* style negotiation. . . .

*Id.* ¶¶ 37-38 (emphasis in original).

Epstein then explains that he has "found that the dynamics of real-world licensing negotiation could be best understood using a Patent Licensing Market Model containing three market segments." *Id.* ¶ 43. Epstein states that the three market segments are "first adopters," "ethical adopters" and "invention plagiarists." *Id.* ¶ 44. "First adopters are potential licensees that negotiate for a patent license prior to the patented technology being introduced into the marketplace." *Id.* ¶ 45. The "first adopters" "will not use the technology without a license," are

---

[4] The "hypothetical negotiation or the 'willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (citing *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970) (setting forth 15 factors relevant to determining a reasonable royalty)). "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme. The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed." *Id.*

generally "willing to discuss royalties 1% - 10% or more," they evaluate "the potential patent license with regard to the direct economic benefit it will receive from adoption in terms of increasing the potential licensee's ability to (1) gain market share, (2) raise prices and/or (3) to lower costs," and they comprise a very small percentage of the market, of between 1 to 3 players "max." *Id.* ¶¶ 44-45. In Epstein's opinion, "this segment is the closest to the *Georgia-Pacific* hypothetical negotiation." *Id.* ¶ 45.

Epstein states that "the second and third segments, Ethical Adopters and Invention Plagiarists, are based on the fact that there [sic] for all practical purposes, there is an unlimited supply of competent engineering talent in the world, so once a product containing a patented innovation is released in the marketplace, that innovation will be reverse engineered and copied by any who see an advantage to them in adopting that innovation. The two segments differ only as to the willingness of the two parties to engage in negotiations without the necessity of engaging in some form of enforcement action" *Id.* ¶ 47.

Epstein states,

> 48. Ethical Adopters are potential licensees who have adopted a patented invention, usually through observing the innovation in the First Adopters' products or the patented invention is adopted by a standard setting body, but when approached by the patent holder are willing to engage in patent license negotiations without there having to be an enforcement action underway. In this segment, the gains in market share and profitability available from adoption have been claimed by the First Adopter(s), so this potential licensee is seeking only to stop the loss of market share and/or profitability their first adopter competitor is causing them. So, while the Ethical Adopters have some respect for intellectual property and are willing, once the infringement is pointed out, to engage in licensing negotiations, the price they are willing to pay is not defined by the value the patented technology brings the potential licensee, but rather by the cost of alternatives. What that means from a practical perspective is the price the potential licensee thinks it would have to pay the patent holder in the event of a successful patent enforcement action, discounted to account for the risk associated with the patent holder's having to obtain a ruling that their patents are valid and infringed, as well as setting the appropriate royalty basis and royalty rate (under the *Georgia-Pacific* factors), and have that ruling affirmed on appeal, as well as the time value of money associated with the time associated in getting that ruling.[5] In my experience, accounting for these issues results in royalty rates that represent a 90% - 95% or even more discount off of what the parties jointly believe might be the damages awarded in an enforcement action.

---

[5] It appears to the Court that this sentence is missing one or more words. However, because the Court does not want to inadvertently change the meaning of this sentence (or any other portions of the report) by correcting it, the Court reproduces the text as it appears in Epstein's report.

49.  It has also been my experience that in recent years there have been few Ethical Adopters outside the context of standards essential patents.  Often, the cost of enforcement to the patent holder together with the fact that interest on royalties delayed can often pay for any costs an infringer may incur in defending any enforcement actions that are actually brought by patent holders provides potential licensees a more economically attractive alternative to ethical adoption.  That said, after a patent holder has successfully licensed its patents against one or more Invention Plagiarists (see below), some number of Invention Plagiarists are then willing to become Ethical Adopters.

50.  Invention Plagiarists are potential licensees who have adopted the patented technology and are resistant to paying a fair amount for a license under such patents outside a filed patent enforcement action.  Invention Plagiarists neither know nor care who actually spent the money and effort in developing the patented technology, and when approached by the patent holder, the Invention Plagiarists show no interest or concern in obtaining a license under the patents, claiming that they were simply practicing what has been in the "public domain."  The only option for a patent holder to obtain a royalty from an Invention Plagiarist is to file and pursue an enforcement action against them.

51.  Under this scenario, the potential licensee, in addition to considering the same risks and considerations discussed in the second "Ethical Adopter" scenario, add to their pricing consideration the question of whether the patent holder has the capability, commitment and resources to bring and maintain an enforcement action to conclusion.  This includes an evaluation of the legal and business acumen and resources the patent holder has, as well as the ability of the patent holder to afford the high cost of patent litigation as well as manage the stresses of a long adversarial process.  The patent holder, for their part, has to calculate for themselves whether they will have access to sufficient risk capital to afford the high price of patent litigation, whether the return on a successful prosecution would provide an acceptable return on that capital, and whether they are prepared themselves to manage the stresses of participation in litigation.

52.  It has been my experience that Invention Plagiarists review these factors related to pricing and only offer settlement values that represent as much a 90% - 95% discount off of what the Invention Plagiarist itself believes would be damages awarded against it in the outcome of a trial (as opposed to an agreed upon potential damages in the Ethical Adopter segment).  That said, Invention Plagiarists are not shy in refraining to make any serious offer until they have had an opportunity to use their superior sophistication, experience and access to capital to exhaust potential licensees into accepting a *de minimis* sum.

53.  Additionally, Invention Plagiarists typically seek lump-sum payments, as opposed to running royalties for a number of reasons, including the opportunity to obtain further discounts by paying immediately, by being able to calculate the amount due on an agreed, intentionally conservative, volume of product, allowing the potential licensee to sell additional product volume royalty free, and the ability to characterize such payments as capital expenses as opposed to operating expenses which can matter a lot to publicly traded companies.  Indeed, the Federal Circuit has observed that "certain fundamental differences exist between lump-sum agreements and running-royalty agreements" as they rely on "different considerations."  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009).  The Federal Circuit observed a myriad of advantages and disadvantages to a patent holder and licensee under either payment arrangement, including the avoidance of ongoing administrative burdens of monitoring usage of the invention. *Id.*  In my experience, as stated above, the licensee/infringer, particularly where the licensee/infringer is a

large company, typically prefers to negotiate lump-sum payments as opposed to running royalties so as to characterize the royalty payment as a one-time capital expense as opposed to an ongoing operating expense.

*Id*. ¶¶ 48-53.

Epstein then reviews the efforts first by BTG, and later Muir Consulting, to license the MLC patents to Micron.[6] Epstein noted that in 2007, BTG offered Micron a fully paid up license for the patent portfolio for $21 million, which he states was derived by applying a 0.25% royalty rate on an estimate of Micron's forecasted worldwide revenue for MLC NAND Flash from 2006 through 2011. *Id*. ¶ 57. Epstein states, "Regarding the 0.25% rate being offered to Micron in the 2007 BTG Letter, it is my opinion that this rate represented an offer to potential licensees in the category I defined above as Ethical Adopters, and as such had been already heavily discounted versus the value of such patented inventions as might be calculated in an enforcement action under the *Georgia Pacific* factors." *Id*. ¶ 58. Epstein states that it was also his opinion at the time [he was retained by MLC to serve as its licensing counsel] that the 0.25% rate being offered to Micron by BTG was "further discounted" because (1) the offer was based on worldwide revenues, and "[h]ad the revenue base been limited to U.S. sales only, it goes without saying that the royalty rate would have been higher to account for the smaller revenue base"[7]; (2) the 2007 BTG letter expressly stated that its $21 million offer was based on a "very conservative forecast of Micron's future sales"; (3) the 2007 BTG letter expressly stated that the "proposed amount also reflects a heavily discounted royalty

---

[6] Epstein was not personally involved in these efforts, and his understanding of these efforts is based on reviewing the letters from Simon Fisher of BTG and John Muir of Muir Consulting to Micron, as well as his review of Simon Fisher's deposition testimony in the civil litigation between BTG and MLC, described *infra*. Epstein Tr. at 78:12-79:22; 95:1-7.

[7] Epstein cited Mr. Fisher's deposition testimony in which he testified that he used 0.25% rate for worldwide shipments but that if he had focused only on U.S. sales, Mr. Fisher would have used a 0.75% figure. *Id*. ¶ 59; *see also* Fisher Tr. at 237:5-238:4 (explaining that he used a 0.25% royalty rate when formulating licensing offers because "Given that a third of the worldwide shipments, as a rule of thumb, end up in the U.S., it's equivalent to a .75 percent based on the U.S. shipments which represents a discount off of a sort of one percent U.S. royalty rate which one might reasonably anticipate as a reasonable outcome from a U.S. court case") (Dkt. No. 442-15). Micron asserts that Mr. Fisher's deposition testimony is of little probative value because it is the "self-serving testimony of the MLC portfolio's licensing agent from a different litigation, where patent infringement damages were not at issue." Micron's *Daubert* Motion re: Milani at 17 n.4 (Dkt. No. 446). Micron states, and MLC does not dispute, that the BTG-MLC lawsuit was a breach of contract case.

rate," which Epstein states is "in accord with those offered to Ethical Adopters"; and (4) the letter expressly stated that the conservative and discounted offer was motivated in part by BTG's eagerness to resolve the matter. *Id.* ¶¶ 59-63. Epstein states, "as such, BTG was willing to offer a discount on the higher end of those generally offered to Ethical Adopters, meaning a discount of 90% - 95% or more to what BTG reasonably thought it might receive at trial if an enforcement action were pursued through judgment and appeal." *Id.* ¶ 63. Epstein also states that he "understand[s] that BTG's analysis as to the discounted royalty rate was based on general market data of U.S. shipments of NAND Flash products, as opposed to any particular entity. In other words, BTG did not investigate Micron's infringement in determining the royalty rate it offered Micron." *Id.* ¶ 60.[8]

Epstein then discusses EpicenterLaw's licensing negotiations with Micron. Epstein states that in his negotiations with Micron, he presented Micron with a royalty rate ranging between 1% to 3%. *Id.* ¶¶ 68, 85. Epstein describes his negotiations with Micron, during which he presented infringement and validity charts for the '571 patent, as well as charts showing a "Damages Model" applying different royalty rates to Micron's forecasted worldwide and U.S. revenue.[9] Epstein reproduces that Damages Model in his report, which shows a damages range of $172,000,000 (applying a 1% royalty to U.S. revenue) up to $786,000,000 (applying at 3% royalty to worldwide revenue). *Id.* ¶ 83.

Epstein provides the following explanation of how he arrived at the 1-3% royalty range:

> 85. Epicenter arrived at the 1% to 3% royalty range identified in the [Damages Chart] by considering the 0.25% rate BTG offered based on worldwide sales, and taking into account the evidence[10] of validity and infringement Epicenter developed

---

[8] At noted *supra*, Epstein was not personally involved in BTG's efforts to license the MLC patents to Micron, and thus all of his knowledge is based on his review of BTG's written communications and Fisher's deposition testimony. Epstein Tr. at 78:1-79:16. When asked "So you don't have personal knowledge of the efforts by BTG or Muir Consulting, correct?" Epstein replied, "Well, I don't have knowledge of being present or knowing what the people at BTG or Muir might have been thinking, no." *Id.* at 78:16-20.

[9] Among its many objections to Epstein's report, Micron asserts that the revenue numbers contained in the Damages Chart are incorrect. Motion at 12 (Dkt. No. 448). MLC asserts that the numbers are not incorrect because they were forecasts, not actual sales.

[10] The evidence that Epstein refers to is a report titled "Internal Waveform Analysis of the

against Micron, the fact that there was widespread willingness of other players in the market to take a license. These factors, had they been known to BTG at the time, would not have warranted in the "heavily discounted royalty rate" of 0.25% that BTG initially offered. Rather, the applicable discount would have been significantly smaller, resulting in a royalty rate higher than 0.25%.

86. However, despite the increased confidence of a favorable verdict and damages award, the uncertainty of litigation, the risk of judicial findings of invalidity and non-infringement remains a critical concern, as well as the desire to avoid the cost of litigation. As such, the 1% to 3% royalty range still reflects a discount on what the appropriate royalty rate in the event of an enforcement action where validity was confirmed and definitive proof of infringement existed. In other words, where validity was confirmed and definitive proof of infringement existed, the appropriate royalty rate would be higher than the 1% to 3% royalty range I presented to Micron in 2013.

*Id.* ¶¶ 85-86.

At his deposition, Epstein provided the following explanation of how EpicenterLaw determined the 1-3% royalty range:

Q: And you adjusted that based on – where did you start to get your 1 percent number, do you recall?

A: So my view was, my initial thought was, well, this seems to be a blocking patent on a type of product, MLC flash. And blocking portfolios, you tend to see anywhere from 2 to 5 percent, because, you know, this – this is a little bit smaller than that. I think we went down, in part so we didn't have to argue too much. We went down to 1 to 3 percent. And then when I saw what BTG wrote, I said, "Well, they seem to be thinking the same thing." So that just seemed to be further confirmation.

Q: Now, that 2 to 5 percent that you talked about, that's not in your report, correct?

A: No.

Q: Why not?

A: I didn't – I mean, this is just my – as I said earlier, you know, my general knowledge. You asked me how I got here. How I got here is, you know, if you look at what Rambus and Tessera and Qualcomm charge, you know, those look more like first-adopter royalties. That would be the kind of thing you would expect to see in an arm's length, you know, *Georgia-Pacific* kind of situation. So you start there.

Epstein Tr. at 272:4-273:5.

Epstein states in his report that when he was negotiating with Micron, he believed that the

---

Micron (IMFT) MT29F32G08CBAAA 34mm 32Gbit MLC NAND Flash" dated March 2010 and prepared by UBM TechInsights. *Id.* ¶ 70. Epstein states that "UBM TechInsights is an independent third-party research organization in Canada that teardown studies and analyzes advanced technology products in the semiconductor and electronics industry." *Id.* Epstein states that "[b]ased on Epicenter's analysis of TechInsights report, which analyzed a representative Micron multi-level cell NAND flash device, it was Epicenter's belief that Micron's MLC NAND Flash devices infringed the MLC Patent, specifically the '571 Patent." *Id.*

9

'571 patent was the most important and valuable of the patents in MLC's patent portfolio "because the '571 Patent provided multi-level cell functionalities that were fundamental to the other MLC Patents in the portfolio. Even though all the MLC Patents are a related family of assets that provide similar features and benefits, those benefits would be *de minimis* beyond the benefits provided by the '571 Patent. Indeed, it was Epicenter's understanding that compared to the other MLC Patents, the '571 Patent accounted for most, if not all, of the value of the MLC Patent[s] because it provided fundamental functionality without which the technologies claimed by the other MLC Patents cannot be effectively practiced." *Id*. ¶ 81.

At his deposition, Epstein was asked about his opinion in Paragraph 81 that the '571 patent was the most important patent in the portfolio. Epstein stated that the reason he reached that conclusion "was the mere idea of how to program a multi-level cell. That was the big challenge to a successful multi-level cell, is how to take something that is traditionally on/off and make it on/off plus, even more on, and – even – even more on. That was a difficult challenge." Epstein Tr. at 185:24-186:5. When he was asked about his conclusion that the programming methodology was the fundamental aspect of the '571 patent, Epstein stated, "Well, if you can't program it, then everything else after that is pointless." *Id*. at 191:1-2. The questioning continued:

Q: I guess what steps did you do to determine it was fundamental?

A: We came – you know, the position we took with Micron is – and I stand by the position we took with Micron, which is, this was fundamental to the whole idea of MLC, multi-level cell. There was no multi-level cell memory sold in the world that did not infringe that patent.

Q: And what was your proof of that?

A: In part, you know, our analysis of the – of the – Micron art and in part the relative ease with which BTG got licenses from Toshiba and some of the other players.

Q: Well, that – that could just be because Toshiba didn't want to spend money fighting it, correct?

A: Hypothetically, sure. In practice, doubtful.

. . .

Q: You mentioned earlier is your – in your – one of your answers that there was no MLC in the world that didn't practice the '571 patent. At what point in time did you form that opinion?

A:  Back in the 2012, 2013 time frame.

Q:  And did analyze all of the existing MLC at the time to make that determination?

A:  As I just said, no.

Q:  So if you did not do – perform the analysis, how can you make such a broad-based statement?

A:  Because in general I don't believe people take licenses for double-digit millions of dollars unless they believe that there's – the patents involved are extremely troublesome.  So I took from what we saw that this – you couldn't program MLC without this methodology.  And it seemed clear that everybody else had generally agreed and taken a license, with the exception of Micron.

*Id*. at 191:3-192:13.  The questioning about Epstein's opinion about the importance of the '571

patent continued:

Q:  Now, you also say in paragraph 81 that the value of the other patents in the MLC portfolio would be *de minimis* without the '571 patent, right?

A:  That's what I said.

Q:  Now, where's your analysis that you cite to for that proposition?

A:  What I say is, once you've got something like that, you don't need to keep adding on – I mean, it's one royalty per portfolio.  So we've got ourselves a pretty fundamental blocking patent.  That's really the thing that's going to set the royalty rate, regardless of how many more additional patents we have.  The royalty won't keep going up.

Q:  Sitting here today, are you aware of any – or any company's products that employ the technology of the '571 patent?

A:  So I haven't analyzed anybody recently, no.

Q:  So the answer's no?

A:  I have not made an analysis of any memory products today.

Q:  Did you analyze any of Toshiba's or Hynix's products to – in the 2013, 2014 time frame to determine if they actually practice any of the patents in the MLC portfolio?

A:  No, I didn't.

Q:  So you would agree with me from a fundamental perspective that just because a company takes a license to a patent or a patent portfolio does not necessarily mean any of their products practice the technology, correct?

A:  Yeah, in theory that's right.

Q:  And so without more in regards to an analysis, there's nothing to rely on just by virtue of a license being in existence to determine whether a product practices a particular technology, whether it be world blocking or not, correct?

A: You know, technology's not that flexible, no. I mean, it's unlikely that there's seven different – seven different instantiations of multi-level cell flash. It's unlikely. People don't – it's not like there's seven different kinds of flash memory. I mean, every type of flash memory from every manufacturing company tends to look pretty much the same.

So I think it is reasonable to conclude from looking at how Micron was doing its stuff that it's likely everyone who was making multi-level cell did it pretty much that way, and, you know, the fact that they took licenses was interesting. And, you know, I had heard a story how even Eli Harari[11] admitted in the end that Jerry's was the way, that – that even they used it.

So, yeah, it was pretty good evidence, in my mind. It certainly created a rebuttable presumption in my mind that everyone was doing it that way.

Q: And what do you base Mr. Harari's statements on? You heard a story about how he admitted in the end?

A: Yeah.

Q: Where did you hear that?

A: I don't know. Seven years of discussions with people.

Q: It's in your head, right?

A: It's in my head.

. . .

Q: Okay, do you have any documents that would support your statement at paragraph 81 that shows that the value of the other patents would be *de minimis* without the '571 patent?

A: No.

Q: So you stated earlier, in your prior response, quote "So I think it is reasonable to conclude from looking at how Micron was doing its stuff that it's likely literally everyone" who's "making multi-level cell did it pretty much that way."

So is that – what you were staying is that everyone who was making multi-level cell was making it in a similar manner to the single Micron product that you analyzed in respect to the Insight Tech reports?

A: I think that was a fair, rebuttable presumption.

*Id.* at 198:1-201:9.

---

[11] The Court *sua sponte* takes judicial notice of the fact that Mr. Harari is the founder of SanDisk and the recipient of numerous awards, including the 2014 National Medal of Technology and Innovation "for invention and commercialization of flash storage technology to enable ubiquitous data in consumer electronics, mobile computing, and enterprise storage." https://mae.princeton.edu/about-mae/news/eli-harari-73-inducted-national-inventors-hall-fame; *see also* https://www.nationalmedals.org/laureates/eli-harari.

**LEGAL STANDARD**

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony under Rule 702 must be both relevant and reliable. *Daubert*, 509 U.S. at 589. When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable. *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003). As a guide for assessing the scientific validity of expert testimony, the Supreme Court provided a nonexhaustive list of factors that courts may consider: (1) whether the theory or technique is generally accepted within the relevant scientific community; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique can be tested. *Daubert*, 509 U.S. at 593-94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

**DISCUSSION**

Micron contends that Epstein's proposed testimony is irrelevant and unreliable. As a threshold matter, Micron argues that Epstein's "testimony is pervasively and irreparably biased from his close entanglement with the facts of this case." Reply at 2 (Dkt. No. 543). Micron asserts that Epstein's report and proposed testimony largely consist of his factual account of the licensing negotiations he held with Micron in 2013-2014, and that MLC is paying Epstein $1,300 per hour to provide lay percipient testimony recast as expert testimony. Micron argues that "[i]t simply cannot be the case that one can use the guise of expert testimony to reveal an unjustifiably high royalty rate that the 'expert' calculated when he stood to receive a portion of the royalty payment that rate would generate." *Id.* at 10-11. Micron emphasizes the undisputed fact that Epstein formed the 1-3% royalty opinion when he was working as MLC's licensing counsel and when he stood to gain 15-20% of any royalty payment, and that Epstein stated at his deposition that he had not performed any additional analysis regarding that royalty opinion since the 2013-2014 licensing negotiations. *See*

13

Epstein Tr. at 273:8-16 (Q: "Now, you haven't done anything since – to adjust your opinion based on occurrences after you attempted to license Micron, correct, in that – when your work ended in 2014?" A: "In terms of that, saying that is a reasonable place to start from understanding what the damages at trial might be, we didn't – no, I haven't really looked at that since our negotiations ended.").

Micron also challenges Epstein's Patent Licensing Market Model on numerous grounds. Micron argues that the model is entirely unreliable because it is highly subjective and biased against large corporations. Micron notes that Epstein testified that he created the model to counter the *Georgia-Pacific* factors which he believes were adopted as a result of lobbying efforts by the patent defense bar, and to correct the perception that "giant corporations are seen as the good guy" in patent litigation. *Id*. at 232:17-233:19, 234:8-14; 149:19-150:2. Micron cites Epstein's testimony in which he stated that he coined the term "invention plagiarist" because of his belief that "it's weird that in patents is the only field where giant corporations are seen as the good guy and little individuals are seen as the bad guy. It's unique and contrary to normal American morals. So I've been seeking to find terms that will help people see more clearly that rooting for the big guy isn't necessarily an American value. And I use these terms to help them see that." *Id*. at 149:19-150:2. Micron argues that Epstein's model is highly subjective, citing Epstein's testimony that he would not categorize USAA as an "invention plagiarist" because they are his "friend," and that Epstein is biased against Micron in particular, citing his testimony that although he did not analyze whether Micron was an "invention plagiarist" in this case, he has considered Micron to be an "invention plagiarist" "from the beginning" because he considers Micron to be a "dirty rotten infringer." *Id*. at 154:23-155:7-9; 152:13-22; 32:11-23.[12] Micron asserts that there is no evidence that anyone other than Epstein has used or endorsed his model. In addition, Micron notes that Epstein has never published an article in a peer-reviewed journal regarding his model and Epstein testified in his deposition that he has never presented the model in court before. *Id*. at 228:9-14.

Micron also argues that Epstein's testimony about the Patent Licensing Market Model is

---

[12] Epstein also stated that Apple, Intel, and IBM are all invention plagiarists. *Id*. at 152:16-22.

irrelevant because Epstein presents his model in the abstract and he does not apply it to this case. Micron cites Epstein's deposition testimony in which he testified that (1) he did not provide an opinion about damages in this case under either his own model or a hypothetical negotiation, *id.* at 269:2-11; (2) he did not provide an opinion in his report as to whether Micron was a "first adopter," "ethical adopter" or "invention plagiarist" because he was not asked to, *id.* at 269:12-25; (3) he did not have an opinion as to whether licensee Hynix would be an "ethical adopter" under his model because he "would need to know more information about them," *id.* at 254:11-20; (4) he did not have an opinion as to whether Hitachi, as the first licensee of the MLC portfolio, would be a "first adopter" under his model because he would need "additional information," *id.* at 252:15-22; and (5) he did not apply his real-world licensing labels to any of the MLC patent portfolio licensees. *Id.* at 254:21-25.[13] Micron argues that Epstein's proposed testimony explaining the abstract differences between real world and hypothetical licensing negotiations is of no utility to the jury, who will be charged to calculate a royalty using the *Georgia-Pacific* hypothetical negotiation, and that Epstein's testimony about his Patent Licensing Model will only confuse the jury.

With regard to the remainder of his testimony – the details of EpicenterLaw's negotiations with Micron and the 1-3% royalty that Epstein proposed – Micron argues that this testimony is irrelevant and that the 1-3% figure cannot be relied upon. Micron argues that the details of the parties' failed licensing negotiations are not relevant to any question the jury will be considering,

---

[13] Epstein also testified,

My damages report doesn't try to apply [the *Georgia-Pacific* hypothetical negotiations damages model], except to the extent I'm trying to interpret – you know, explain what proposal I made to Micron and why I thought it was a reasonable proposal. And I put it in the – I put that discussion in the context of my market model, which is in – which, while not informed by the – it is not directly informed by the *Georgia-Pacific* factors, is, as I said earlier, based on an assumption of worst case scenario *Georgia-Pacific* factors.

*Id.* at 240:21-241:5. This testimony was followed by this colloquy:

Q: But your report ultimately doesn't apply the hypothetical negotiations model, correct?
A: To the facts in this case?
Q: Correct.
A: Yeah, I make no opinion as to damages in this case.

*Id.* at 241:6-11.

United States District Court
Northern District of California

and Micron asserts that MLC's reliance on failed licensing discussions with Micron to prove the amount of Micron's liability violates Federal Rule of Evidence 408 and contravenes the parties' NDA, which explicitly provided for Rule 408 protection. *See* NDA § 4.6 (Dkt. No. 360-7).[14]

Micron also cites Epstein's testimony in which he states that the 1-3% royalty rate was meant as a "worst case scenario" and "not a proposal in any regard." Epstein Tr. at 278:20-279:1 (Q: "Okay. So thank you for that clarification. So this 1 to 3 percent royalty range would – essentially was presented as a worst case scenario, then, to the potential licensee? Is that fair?" A: "Yes. This was not a proposal in any regard."). Epstein explained that "the 1 to 3 percent is what I argued the alternative to a negotiated agreement is. And the alternative to a negotiated agreement was we would – or the – MLC would have to take them to trial and win." *Id*. at 271:22-272:3. It was the "worst-case scenario, worst-case scenario in the event of a failure to agree on a behalf of the licensee." *Id*. at 273:5-7. Micron argues that there is no reliable basis to allow Epstein to testify about the 1-3% royalty rate offer that Micron rejected and that has no basis in record evidence, and Micron contends that such testimony poses a risk of skewing the jury's damages consideration wildly upwards.[15]

MLC responds that Epstein is qualified as an expert on licensing negotiations based upon his 30 year career in the field, and that he will offer relevant testimony "regarding how the considerations of parties in real world negotiations, and those specific to the '571 patent, relate to the *Georgia-Pacific* framework." Opp'n at 6. MLC asserts that because Epstein is an expert on patent licensing and negotiations, he is qualified to opine about "reasons why companies buy or license patents, the factors used to determine interest, and the process used and the data needed to

---

[14] Micron first raised Rule 408 in its reply to the *Daubert* motion. The Court notes that on June 21, 2019, Micron filed another motion in limine regarding Epstein's "factual" testimony about the licensing negotiations (Dkt. No. 625), and that motion is premised squarely on Rule 408.

[15] Micron advances a number of other specific challenges to Epstein's opinions that underly his 1-3% royalty opinion, such as his belief that the '571 patent is a "blocking" patent that is fundamental to the field of multi-level NAND flash technology and his conclusion that all of Micron's multi-level NAND flash products are designed in the same way and thus they all infringe the '571 patent. *See generally* Motion at 14-16; Reply at 12-14. Because the Court concludes that Epstein's proposed testimony is generally irrelevant and unreliable, the Court does not address every specific critique.

establish and evaluate value," and that "[a]s such, MLC asked Epstein to 'provide an account of [his] negotiations with Micron, as well as the facts and issues considered with respect to said negotiations." *Id*. at 7. MLC repeatedly asserts that Epstein is not being paid for factual testimony.

MLC argues that evidence from the parties' actual negotiations is relevant to determining a reasonable royalty rate, and MLC argues that "Micron does not deny that Mr. Epstein proposed a 1-3% royalty rate during the 2013-2014 licensing negotiations" and that "Micron has not offered any evidence whatsoever that it disputed [the Damages Model/Impacted Revenue] powerpoint slide" which showed the range of damages under the 1-3% royalty proposal. *Id*. at 23. MLC also argues that Epstein's testimony "coherently compliments [sic]" the testimony of MLC's damages expert, Mr. Milani. *Id*. at 24. MLC asserts, "Mr. Milani clearly articulates how Mr. Epstein's opinion will slot in 'to account for differences between real-world and hypothetical licenses, such as the assumption of validity and infringement, which is discussed in Mr. Epstein's report.'" *Id*. (citing Milani's deposition testimony at 42:10; Dkt. No. 442-11).[16] In response to a different motion challenging Epstein's testimony about the failed licensing negotiations, MLC argues that the testimony is relevant to "Micron's then-state of mind and its interest, and willingness to negotiate and license on certain terms given the fact that Micron, back then, continued negotiations for nearly a year despite knowing from day one the proffered royalty range." Opp'n to Micron's Damages MIL No. 1 (Dkt. No. 492).

---

[16] In his report, Milani provides opinions about a reasonable royalty in this case. At his deposition, Milani stated that although he assumed that the '571 patent was valid and infringed when formulating his damages opinions "because, again, in the absence of validity and infringement is there's – there's no need for the analysis," he did not quantify or value the "adjustment" that would need to be made for validity and infringement: Q: "Would you agree that in connection with performing your *Georgia-Pacific* analysis in this case, you did not value the assumption of validity and infringement?" A: "I would agree. . . . I would agree that the approach I've taken, the conclusions I've drawn in my report, do not explicitly account for differences between hypothetical negotiations and real-world licenses, one of which I understand to be is the assumption of validity and infringement." Milani Tr. at 27:8-19. In the portion of Milani's deposition transcript cited by MLC to support the assertion that Epstein's testimony complements Milani's testimony, Milani states that he is providing "opinions on what I believe the proper royalty rate is, but I also make it clear that that that royalty rate reflects a minimum rate that does not account for the differences between real-world and hypothetical licenses, such as the assumption of validity and infringement, which is discussed in Mr. Epstein's report." *Id*. at 42:4-10.

Milani's expert report and opinion is the subject of a pending *Daubert* motion and a pending motion to strike.

MLC contends that each of Micron's critiques goes to the weight and not the admissibility of Epstein's testimony. MLC argues that Epstein's Patent Licensing Market Model illustrates the dynamics of real-world license negotiations based upon his experience, and MLC notes that Epstein presented a similar model at a December 2012 workshop where he was asked by the Federal Trade Commission and the U.S. Department of Justice to speak regarding real world patent licensing practices. Expert Report at ¶¶ 12, 44.[17] MLC argues that *Daubert* does not require an expert to publish an opinion in a peer-reviewed publication or present that opinion in prior litigation in order to be admissible. MLC also argues that Epstein's model does not disregard the *Georgia-Pacific* factors, and instead that Epstein explains how real world license negotiations "interact with [] *Georgia-Pacific*'s hypothetical negotiation." Opp'n at 14.

The Court concludes that Epstein's proposed expert testimony is inadmissible because it is irrelevant and unreliable. Epstein is offered to testify about (1) his Patent Licensing Market Model and the differences between a real-world licensing negotiation and (2) his unsuccessful negotiations with Micron during which he proposed a 1-3% royalty rate as a "worst case scenario." As to the first subject, the Court finds that Epstein's model is unreliable given its highly subjective and biased nature – for example, depending on the motivation and intent of the parties involved in the negotiations – and Epstein's testimony that he considers "most corporations" to be "invention plagiarists," except in certain circumstances such as when he represents them, like USAA who he does not consider to be an "invention plagiarist" "because they're my friend." Epstein Tr. at 152:1-7; 155:6-9. While the Court does not doubt that Epstein's opinions are based upon his experiences negotiating licenses during his career, that does not mean that his assessment of negotiation dynamics can be packaged into an admissible expert opinion containing blatantly pejorative categories such as "invention plagiarists."[18]

---

[17] In that presentation, Epstein did not use the term "Invention Plagiarist" and instead referred to that category as "Innovation by Observation." *Id.* Another difference between the presentation and the current model is that in the presentation Epstein did not include specific royalty rate ranges for the three categories. *Id.*

[18] The inherent bias in Epstein's model is demonstrated by the following. When asked whether he would "call someone an invention plagiarist regardless of whether you analyzed their products specifically against the patent claims?" Epstein answered,

More fundamentally, however, Epstein and MLC never explain why it would be helpful to the jury to know about Epstein's Patent Licensing Market Model and his view of the differences between a real-world licensing negotiation and a hypothetical negotiation. MLC asserts that Epstein's testimony relates to the first *Georgia-Pacific* factor, namely the royalties received by the patent owner for the licensing of the patent-in-suit. Opp'n at 14. However, aside from describing the facts of some of the licenses based upon his reading of some documents, Epstein does not actually apply his "real world" model to those licenses or to the facts of this case, rendering his testimony about the differences between "real world" licensing and hypothetical licensing irrelevant. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) ("If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded."). Epstein's report does not apply the model to Micron[19] or any of the licensees, and at his deposition Epstein confirmed that he did not apply his model to this case and that to do so he would need "more information." *See* Epstein Tr. at 254:11-20; 252:15-22; 254:21-25. MLC has not articulated any reason why it would be helpful to the jury to know in the abstract about Epstein's Patent Licensing Market Model and how "ethical adopters" and "invention plagiarists" approach licensing negotiations, or to know about the differences between a generic real-world licensing negotiation (since Epstein did not apply his model to any of the actors in this case) and a hypothetical

---

Okay. It's a category. It's a category. You treat these like [they are] individual situations. They're not. They're companies that perfectly well understand that their R & D is dependent on copying what people outside the company are doing. Right? That's – that's what – most corporations understand that as part of their R & D budget, which is why they spend their money on D instead of R. So, yeah, in general large corporations like Micron get a lot of their ideas by examining what's already on the market and trying to copy quickly. Those are invention plagiarists.

*Id.* at 151:7-152:7.

[19] Epstein did opine that BTG's 2007 letter to Micron offering a license to MLC's patent portfolio for $21 million "represented an offer to potential licensees in the category I defined above as Ethical Adopters . . . ." Expert Report at ¶ 58. The Court need not decide now whether BTG's 2007 unaccepted offer to license MLC's entire patent portfolio is relevant to the determination of a reasonable royalty, as that question has not been squarely presented. However, the Court does not consider Epstein's conclusory statement that BTG's 2007 offer was in accord with offers made to Ethical Adopters to be an actual application of the model, particularly given Epstein's testimony that he did not, in fact, analyze how his model applied to Micron or any of the relevant actors.

negotiation.

MLC claims that Epstein applied his model to the Hynix license, citing his testimony at 299:3-300:3 of his deposition. Opp'n at 23. MLC's selective citation does not support its claim. Earlier in the deposition, Epstein provided the following testimony regarding the Hynix license:

Q: You're also aware of a license with Hynix, as you set forth in paragraph 24 of your report?

A: That's correct.

Q: Do you know when the Hynix license agreement was executed?

A: I don't recall the date it was executed.

Q: Do you recall it was around [the] 2007 time frame?

A: I certainly won't argue with you on that.

Q: Would you agree that Hynix would be an ethical adopter, as per your licensing model?

A: I would need to know more information about them.

Q: What would you need to know?

A: I'd need to know how they engaged in the conversation, whether they entered it with ethical – with a desire to, with good intent, figure out what's really going on here or try to play some form of the "catch me if you can" game.

Q: Did you apply any of your real-world licensing model labels to Hitachi, for example, as part of your expert report?

A: I don't think I labeled any of those guys one way or another.

Epstein Tr. at 254:1-25.

In the section of the deposition MLC cites, Epstein was asked whether he would "be surprised that Mr. Milani included data about the Hynix license, and from that you can calculate an effective royalty rate of 0.11 percent?" Epstein replied, "Well, that would fit within my licensing model; so, no, I wouldn't be surprised." *Id*. at 299:3-8. Epstein then proceeded to explain why a 0.11% royalty fits within his licensing model, although he does not state under which category Hynix would fall. *Id*. at 299:9-300:3. Thus, Epstein clearly did *not* apply his licensing model to any of the licensees or the facts of this case, and instead in the portion of the transcript that MLC cites, Epstein simply says that he is not surprised that the effective royalty rate of the Hynix license

is 0.11% because that would be consistent with his model.

MLC asserts that Epstein's testimony about the differences between real world licensing negotiations and hypothetical negotiations will somehow complement Milani's damages testimony. As noted *supra*, Milani testified that he did not quantify validity and infringement when calculating his royalty opinions. Milani's deposition testimony suggests that he believes Epstein's testimony about "the differences between real-world and hypothetical licenses" would provide a basis for the jury to make an upward adjustment to Milani's proposed royalty rate to account for validity and infringement. It is far from obvious how "the differences between real-world and hypothetical licenses" translate into a valuation or quantification of validity and infringement. In any event, however, Epstein expressly *does not provide a damages opinion*. *See* Epstein Tr. at 264:3-25 (Q: "Now, you haven't offered an opinion in your report with respect to the amount of damages Micron should pay if the '571 patent was found valid and infringed, correct?" A: "I have not given a damages opinion, that is correct." . . . Q: "You haven't offered an opinion as to the amount of a reasonable royalty due in this case, have you, in your report?" A: "No, with this proviso: I did provide what I thought might be the range of potential reasonable royalties that I considered when engaging in negotiations with Micron.").

Indeed, it appears that although MLC (and Epstein) repeatedly state that Epstein is "not being offered as the damages expert," Opp'n at 13, Epstein is, in fact, providing damages testimony through the guise of his "licensing expert" testimony, and that the purpose of his proposed testimony is to provide some basis for the jury (assuming a finding of infringement) to upwardly adjust Milani's royalty rate opinions by some unspecified amount. *See* Expert Report ¶ 86 ("As such, the 1% to 3% royalty range still reflects a discount on what the appropriate royalty rate in the event of an enforcement action where validity was confirmed and definitive proof of infringement exists. In other words, where validity was confirmed and definitive proof of infringement existed, the appropriate royalty rate would be higher than the 1% to 3% royalty range I presented to Micron in 2013."). Among the innumerable flaws with Epstein's proposed testimony, a statement that the appropriate royalty rate "would be higher" than the 1-3% royalty rate is entirely speculative.

Epstein's testimony about the 1-3% royalty range (and upwards) are in the context of his

recounting of his failed negotiations with Micron, the second main topic of his proposed testimony. MLC argues that evidence from parties' actual license negotiations is relevant in subsequent litigation arising from those failed negotiations. The Court disagrees and concludes that under the facts of this case, Epstein's proposed testimony about the unsuccessful licensing negotiations and the 1-3% royalty proposal is irrelevant.[20] The Federal Circuit has acknowledged that "proposed licenses may have some value for determining a reasonable royalty in certain situations." *WhitServe, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 29-30 (Fed. Cir. 2012). "Their evidentiary value is limited, however, by, *inter alia*, the fact that patentees could artificially inflate the royalty rate by making outrageous offers." *Id.* at 30 (citation omitted). In *WhitServe*, the Federal Circuit reversed a damages award and held that the plaintiff's expert's royalty rate calculation was speculative because it relied on a proposed but unaccepted license that was "based on fiction and contradicted [] other testimony." *Id.* at 30; *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078-79 (Fed. Cir. 1983) (affirming exclusion of license offers because "[t]he fact that licenses were offered at a particular rate does not show that that rate was the 'established' rate, since the latter requires actual licenses, not mere offers to license. . . . Moreover, since the offers were made after the infringement had begun and litigation was threatened or probable, their terms 'should not be considered evidence of an established royalty,' since '[l]icense fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation . . . .'"); *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1556-1557 (Fed. Cir. 1983) (affirming district court's exclusion under Rule 408 of licensing offer made after litigation ensued and affirming district court's "finding of no significant persuasive value" of separate licensing offer made at time when patent was "untested" and "of indeterminate value"); *MiiCs & Partners, Inc. v. Funal Elec. Co.*, Civil Action No. 14-804-RGA, 2017 WL 6268072, at * 4 (D. Del. Dec. 7, 2017) (granting *Daubert* motion to exclude damages expert in patent case where expert used an unaccepted offer

---

[20]  The Court has already held that MLC cannot rely on information disclosed pursuant to those negotiations to prove notice of infringement. Dkt. No. 439. To the extent that Epstein purports to provide expert opinions about notice in his report, *see e.g.*, Report at ¶ 64 ("it is my opinion that the BTG 2006 and 2007 Letters should have put Micron on notice of infringement"), such legal testimony is impermissible.

made in anticipation of litigation as an input to calculate a reasonable royalty because "Mr. Boles'

unaccepted offer has limited, if any, value for determining a reasonable royalty for the '927 patent").

In contrast, courts have admitted evidence of a patentee's offer to license where the offer

possessed some indicia of reliability and commercial value. *See e.g.*, *Atlantic Thermoplastics Co.,*

*Inc. v. Faytex Corp.*, 5 F.3d 1477, 1482 (Fed. Cir. 1993) (affirming reasonable royalty award based

on patentee's prior licensing offer to third party because district court found that offer was

"consistent with the commercial value and profitability of the [] patent and the extensive remaining

life of the patent at the time of infringement."); *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1561 (Fed.

Cir. 1983) (concluding that failed negotiation between the parties was relevant to determining

reasonable royalty where plaintiff and defendant had contractual relationship over several years,

engaged in negotiations to replace existing agreement with licensing agreement and ultimately could

not agree, leading to infringement suit).

Here, Epstein's 1-3% royalty offer does not possess any indicia of reliability that would

make this offer relevant to the determination of a reasonable royalty or any other issue in this case.[21]

Significantly, the offer was made in the context of negotiations pursuant to an NDA, and Micron

refused it, leading to this lawsuit. Thus, the offer was made when the parties were well aware that

litigation was a possibility, if not a likelihood. *See Hanson*, 718 F.2d at 1078-79. In addition,

Epstein testified that he arrived at the 1-3% royalty range by determining that the '571 patent is a

"blocking patent" and that "blocking portfolios, you tend to see anywhere from 2 to 5 percent" and

"this is a little bit smaller than that. I think we went down, in part so we didn't have to argue too

much. We went down to 1 to 3 percent." Epstein Tr. at 272:7-14. This explanation shows that

Epstein's 1-3% royalty range was based on assumptions[22] and speculation and not any careful

---

[21] As a separate and independent basis of exclusion, the Court finds that Epstein's testimony about the 1-3% royalty proposal is barred by Rule 408 because – notwithstanding MLC's obfuscation about the purpose of such testimony – the only possible relevance this testimony has is to a determination of damages.

[22] A full reading of Epstein's deposition transcript reveals the many layers of assumptions embedded in the 1-3% royalty proposal. These assumptions include, *inter alia*, (1) the '571 patent is a "blocking" patent that is fundamental to MLC technology; (2) the '571 patent is the most valuable patent in MLC's entire patent portfolio; (3) all manufacturers of NAND flash memory, including Micron, were infringing the '571 patent; (4) the single Micron product analyzed in the

analysis tied to the facts of this case. *See Exmark Manufacturing Co. Inc. v. Briggs & Stratton Power Prods. Group, LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (excluding conclusory expert opinion on damages where "Exmark's expert concluded with little explanation that Exmark and Briggs would have agreed to a 5% reasonable royalty rate on the sales of the accused lawn mowers as the value for the improved baffle. Nowhere in her report, however, did she tie the relevant *Georgia-Pacific* factors to the 5% royalty rate or explain how she calculated a 5% royalty rate using these factors. To be admissible, expert testimony opining on a reasonable royalty must "sufficiently [tie the expert testimony on damages] to the facts of the case."); *see also Uniloc*, 632 F.3d at 1317 (holding that evidence relying on "25 percent rule of thumb," which was a tool used to approximate the reasonable royalty rate the manufacturer of patented product would be willing to offer to pay to the patentee during a hypothetical negotiation, was inadmissible under *Daubert* since it failed to tie a reasonably royalty base to facts of case at issue). Further, Epstein testified that he presented the 1-3% royalty range as a "worst case scenario" of damages to Micron, and that "[t]his was not a proposal in any regard." Epstein Tr. at 278:20-279:1. Epstein also testified that Epicenter and Micron "never got to [the] part of the discussion" where the parties discussed the "most likely scenario" of damages." *Id.* at 279:2-6. Thus, the record evidence before the Court shows that the 1-3% royalty range that Epstein proposed was an artificially inflated opening offer that Micron rejected.

To the extent MLC asserts that "Micron's then-state of mind" during the failed negotiations is relevant, the Court disagrees. MLC seeks to bolster the 1-3% royalty range proposal based on the fact that the parties' negotiations lasted some time. *See* MLC's Opp'n to Micron's Damages MIL #1 at 8 ("But the jury is entitled to evaluate and infer Micron's then-state of mind and its interest, and willingness to negotiate and license on certain terms given the fact that Micron, back then, continued negotiations for nearly a year despite knowing from day one the proffered royalty range."). However, the fact that Micron was willing to negotiate pursuant to an NDA says nothing

---

2010 TechInsights report is representative of the thousands of accused Micron products; and (5) the licensees to MLC's patent portfolio entered into those licenses because they were infringing the '571 patent and a majority, if not all, of the value of those licenses could be attributed to the value of the '571 patent.

about the validity of Epstein's admittedly "worst case scenario" opening proposal, and MLC does not contend that Micron ever made a counter-proposal or responded in any way that indicated it believed the 1-3% royalty range was reasonable. To the contrary, the record reflects – as Epstein's deposition testimony shows – that Micron rejected the offer. The reasonable inference regarding Micron's "then-state of mind" is that Micron was willing to negotiate pursuant to an NDA, negotiated with MLC, and rejected the opening proposal. This is of no relevance to the issues the jury will be evaluating.

In addition, all of Epstein's testimony regarding his licensing negotiations with Micron and the 1-3% royalty proposal must be viewed through the lens of EpicenterLaw's engagement agreement with MLC under which Epstein stood to receive 15-20% of any licensing revenue. In the Court's view, the fact that Epstein had a direct financial interest in the outcome of those licensing negotiations renders his current "expert" testimony about those negotiations highly suspect. MLC seeks to have Epstein testify about how he, as a licensing expert, arrived at the 1-3% royalty range as if Epstein arrived at that number through an entirely objective analysis based upon his experience in the field, without regard for the fact that Epstein formulated that proposal when he was working as MLC's licensing counsel with a contingent fee agreement. While Epstein may be an expert in patent licensing based upon his experience (a question the Court need not resolve), his testimony in this case regarding the negotiations in which he participated is more properly characterized as lay percipient testimony rather than expert testimony. Indeed, the largely lay percipient nature of Epstein's proposed testimony is demonstrated by the description of Epstein's assignment in his expert report: "Given my first-hand involvement in negotiations with Micron with respect to the MLC Patents, including the '571 Patent, I was asked by MLC IP to provide an account of my negotiations with Micron, as well as the facts and issues I considered with respect to said negotiations." Expert Report at ¶ 17.

MLC states that Epstein is both a percipient and expert witness, and MLC argues that the fact that Epstein has percipient knowledge does not disqualify him as an expert. As a theoretical proposition this is correct, and courts have recognized that an expert (generally a treating physician) may be a "hybrid expert" who provides testimony that is a hybrid of percipient expert information

United States District Court
Northern District of California

and opinions that are not based solely on percipient observation. *See Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011) (holding that treating physician who is a "hybrid" expert is exempt from Rule 26(a)(2)(B)'s written report requirement to the extent opinions were formed during course of treatment but that if expert provides testimony beyond the scope of treatment, the expert must provide a written report); *see also generally* David H. Kaye, David E. Bernstein & Jennifer L. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence, § 4.2.2 "Hybrid Expert Witnesses" (2d ed. 2010).

However, in this case Epstein is more appropriately characterized as a "dual-role" expert who is being offered both for his lay testimony (the licensing negotiations with Micron) and his purported expert testimony (the Patent Licensing Market Model and differences between real world negotiations and hypothetical negotiations). *See id.* at § 4.2.2.(a) ("Dual Role Experts: Combining Lay and Expert Testimony).[23] While the Court concludes that all of Epstein's proposed "expert" testimony is irrelevant and unreliable, the Court is troubled by the fact that MLC has presented Epstein as an expert (who is being paid $1,300 per hour) to provide testimony that consists primarily of a lay percipient account of his licensing negotiations. In opposition to the current motion, MLC repeatedly denied Micron's charge that Epstein was being paid for his factual testimony, asserting that "Mr. Epstein is not being paid for factual testimony" and "As stated at his deposition and in his declaration, the only compensation Mr. Epstein is entitled to receive is for his role as an expert in this case." Opp'n at 5, 24 (Dkt. No. 501); *but see* June 6, 2019 Hearing Tr. at 10:9-17 (The Court: "All right. My next question – well I have one other question about Mister – about your expectation for Mr. Epstein's testimony. Do you plan for him to testify as a percipient witness to anything?" Mr. Marino: Yes, Your Honor. I think –" The Court: "What?" Mr. Marino: "In fact, he's primarily a percipient witness. He was the primary negotiator between MLC and Micron."). In any event, regardless of how MLC characterizes Epstein's testimony, the Court concludes that all of his proposed expert testimony is irrelevant and unreliable, and therefore inadmissible.

---

[23] "The classic example of such dual-role testimony is police detectives who testify both about the investigation of the defendants in which they personally participated and as an expert on gang structure, drug jargon, activities relating to narcotics transactions." *Id.* (citing cases).

**CONCLUSION**

For reasons set forth in this order, the Court concludes that Epstein's proposed expert testimony as set forth in his report and as elaborated and explained in his deposition is irrelevant and unreliable, and therefore Micron's motion to exclude Epstein as an expert is GRANTED.

**IT IS SO ORDERED**.

Dated: June 28, 2019

_____

SUSAN ILLSTON
United States District Judge