UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MLC INTELLECTUAL PROPERTY, LLC,

        Plaintiff,

    v.

MICRON TECHNOLOGY, INC.,

        Defendant.

Case No. 14-cv-03657-SI

**ORDER GRANTING IN PART AND DENYING IN PART AS MOOT MICRON'S DAMAGES MOTION IN LIMINE #1**

Re: Dkt. No. 444

On June 6, 2019, the Court held a hearing on numerous pretrial motions. For the reasons set forth below, Micron's damages motion in limine #1 is GRANTED in part and DENIED in part as moot.[1]

## INTRODUCTION

Pursuant to Federal Rules of Evidence 401, 402 and 403, Micron seeks to "preclude MLC from relying on any testimony, evidence, argument, or insinuation regarding irrelevant royalty rates for the '571 patent that exceeds the disclosure within the four corners of the license agreements themselves." Motion at 1 (Dkt. No. 444). Specifically, Micron moves to exclude evidence and

---

[1] Portions of the briefing on this motion, as well as entire exhibits, were filed under seal. In order to resolve the present motion, the Court must discuss the under seal material in detail, and the Court finds it appropriate that this order be filed entirely in the public docket. Further, after engaging in an in-depth review of these materials, the Court concludes that none of the under seal material – such as the licenses, discovery responses, and deposition testimony – is truly confidential. In any event, the parties have put these matters directly at issue in this litigation and the Court cannot rule on the current motion without discussing this material.

argument regarding: (1) the alleged royalty rate that Mr. Milani (MLC's damages expert) derives from the Hynix and Toshiba agreements, (2) the royalty rate Mr. Milani derives from the testimony of a BTG witness (Simon Fisher) in litigation between MLC and BTG, and (3) the royalty rates and slide presentations that Mr. Epstein[2] offered during the failed licensing negotiations with Micron in 2013-2014. *Id.* Micron also seeks to preclude MLC from eliciting testimony from Mr. Liesegang (Micron's rebuttal licensing expert) regarding royalty rates tied to IBM's licensing policy in the 1980s and 1990s.

In a separate order, the Court has granted Micron's *Daubert* motion to exclude Epstein's expert testimony, concluding *inter alia* that testimony regarding Epstein's licensing negotiations with Micron is irrelevant. Accordingly, for the reasons set forth in that order, the Court GRANTS this motion to the extent it is directed at Epstein's testimony. Further, because Liesegang is Micron's rebuttal witness to Epstein, the Court DENIES AS MOOT the portion of the motion regarding Liesegang's testimony about IBM's royalty rates, as Micron has represented that Liesegang will not testify if Epstein is excluded.

Thus, what remains of the present motion focuses on the question of whether there is a factual basis for Milani to testify that the BTG/Hynix and BTG/Toshiba lump sum licenses contain or "reflect" specific royalty rates, as well as whether Milani may rely on Fisher's deposition testimony for alleged royalty rates.[3] As set forth below, the Court concludes that the Hynix and Toshiba licenses do not contain specific royalty rates nor do they state how the lump sums were calculated, and therefore Milani may not mischaracterize those agreements by testifying that they do, in fact, "reflect" specific royalty rates. The Court also concludes that Milani's opinion that the

---

[2] In 2012-2014, Epstein was MLC's outside licensing counsel/agent and pursuant to a contingent fee agreement he represented MLC in the unsuccessful licensing negotiations with Micron. In January 2019, MLC retained Epstein as a "licensing expert" in this case. *See generally* Order Granting Micron's *Daubert* Motion to Exclude Expert Testimony of Ronald Epstein. Dkt. No. 636.

[3] Micron has also filed a *Daubert* motion to exclude Milani's expert testimony, as well as a motion to strike his testimony based on MLC's alleged failures to disclose its damages case during fact discovery in violation of Federal Rules of Civil Procedure 26 and 37. The Court will issue separate orders on those motions. However, to the extent those motions raise overlapping challenges to Milani's opinion regarding the 0.25% royalty rate, the Court also addresses those questions in this order.

Hynix and Toshiba agreements reflect a 0.25% royalty rate is not grounded in any facts or a reliable methodology because even if admissible, the extrinsic evidence upon which Milani relies suggests that BTG may have calculated the lump sum payments by applying 0.25% to Gartner forecasts of future revenue for Hynix and Toshiba from 2006-2011. However, both license agreements covered a significantly longer time period through the expiration of the last patent in December 2017 (and the '571 patent's expiration in June 2015), and thus to the extent 0.25% was used to calculate lump sum payments, that number was not applied to forecasted sales over the entire terms of the license agreements and therefore cannot reflect a royalty rate for those licenses. Thus, Milani's opinion that the Hynix and Toshiba agreements "reflect" a 0.25% royalty rate is supported neither by the actual license agreements nor by the extrinsic evidence. Finally, as a separate basis of exclusion, the Court finds that Milani may not rely on the Fisher deposition testimony and the other extrinsic evidence that he relies upon for his opinion that the licenses reflect royalty rates because MLC failed to disclose that evidence as a basis for a royalty rate calculation in discovery.

## BACKGROUND

### I. The Hynix and Toshiba Licenses

On April 11, 2007, BTG (which then owned the rights to the MLC patent portfolio) entered into licenses with Hynix and Toshiba. Both licenses were to MLC's entire portfolio of 30 U.S. patents (including the '571 patent), and 11 foreign patents.[4]

The Hynix license agreement defines "Licensed Products" as "any and all Hynix products, including MLC Memory Devices, the making, using, selling or offering for sale, exporting, importing or otherwise disposing of which would otherwise infringe one or more claims of the Licensed Patents." Hynix License § 1.5 (Dkt. No. 444-2). The license granted Hynix and its subsidiaries a "non-exclusive, worldwide, indivisible non-transferable and personal license" to 41

---

[4] Hynix is a South Korean company and Toshiba is a Japanese company. Dkt. Nos. 442-5, 444-7. Exhibit A to both agreements lists the following foreign patents: 1 German patent; 2 "Europe" patents; 1 United Kingdom patent; 1 Italian patent; 2 Japanese patents; 2 South Korean patents; and 1 Dutch patent. *Id.*

3

patents "through the expiration date of the last of the Licensed Patents to expire." *Id.* §§ 3.1, 6.1.[5]

Under "Compensation," the agreement states that "In consideration of the release and License, Hynix shall pay to BTG $21,000,000 (twenty-one million dollars) as follows: (a) $11,000,000 (eleven million dollars) no later than 30 April 2007 (b) $5,000,000 (five million dollars) no later than 31 March 2008 [and] (c) $5,000,000 (five million dollars) no later than 31 December 2009." *Id.* § 4.1.

Section 4.3 of the agreement, titled "Future Licenses," is the basis of Milani's opinion that the agreement contains a 0.25% royalty rate. That section provides:

> <u>Future Licenses</u>. BTG hereby agrees that Hynix will be granted most-favoured customer status. In the event that BTG grants a license under the Licensed Patents after the Effective Date, other than a license granted in settlement of litigation, in which the royalty rate is less than 0.25%, then as its sole remedy, Hynix's future payments, if any, shall be reduced so that Hynix, in total pays not more than 90% of the royalty rate paid by the new licensee. In no event shall Hynix receive any refund of any amount paid, or which became due, prior to the execution of the new license agreement. In the case of a paid up license, the royalty rate shall be calculated using formula X/Y x 100 where X is the gross undiscounted value of sales of MLC Memory Devices made and forecast to be made by the new licensee through 31 December 2011 (future sales shall be BTG's reasonable and good faith estimate based upon a reputable industry analyst data). BTG shall notify Hynix within thirty (30) days after BTG enters into an agreement granting a license under the Licensed Patents to a new licensee. Within six (6) months of BTG notifying Hynix it has entered into a new license under the Licensed Patents, Hynix may have an independent internationally recognized accounting firm conduct an audit of BTG's records, without disclosing such records to Hynix, and subject to such accounting firm entering into a reasonable non-disclosure agreement, to confirm Hynix is paying, in total as specified in Section 4.1, not more than 90% of the rate paid by the new licensee taking into account the factors described above.

*Id.* § 4.3.

The Hynix agreement also contains Section 7.7 titled "Entire Understanding." That provision reads:

> This Agreement embodies the entire understanding between the parties relating to the subject matter hereof, whether written or oral, and there are no prior representations, warranties or agreements between the parties that are not contained in this Agreement.

*Id.* § 7.7.

---

[5] The licensed patents expired at different times, with the '571 patent expiring in June 2015 and the last patent expiring in December 2017. Milani Tr. at 151:1-19 (Dkt. No. 442-11). Milani opines that the '571 patent comprised "at least 50%" of the value of the licenses to Hynix and Toshiba. Milani Report at 67 (Dkt. No. 442-3).

The Toshiba license agreement is similar to the Hynix agreement in several respects. The "Licensed Products" are defined as "all Toshiba or its Subsidiaries' products, including MLC Memory Devices," and the term of the license was through the expiration of the last of the licensed patents. Toshiba License §§ 3.1, 6.1. The license also provided Toshiba with the option of extending the license to a Toshiba-SanDisk joint venture. *Id.* §§ 3.2, 3.6. The compensation provided under the license is as follows:

> 4.1. <u>Compensation</u>. In consideration of the release and license granted by BTG in this Agreement, Toshiba shall pay to BTG the following sums:
>
> (a) $6,000,000 (six million dollars) no later than 30 days after the Effective Date;
>
> (b) $11,000,000 (eleven million dollars) on or before March 31, 2008;
>
> (c) if Toshiba has exercised the Option in accordance with Section 3.6, a further $10,000,000 (ten million dollars) on or before March 31, 2009;
>
> (d) $6,000,000 (six million dollars) on or before March 31, 2009;
>
> (e) if Toshiba has exercised the Option in accordance with Section 3.6, a further $10,000,000 (ten million dollars) on or before March 31, 2009; and
>
> (f) if BTG has, on or before December 31, 2008, either: (i) entered into a license under the Licensed Patents with two of the companies whose annual worldwide revenue of NAND Flash Memory Devices in 2007 as reported by Gartner Dataquest (or if such information is not available from Gartner, then as reported by another reputable market research firm agreed by the parties such as iSupply or Forrester) is ranked as top three other than Toshiba; or (ii) initiated any litigation against any one of such company in any jurisdiction for infringement of one or more claims of any of the Licensed Patents, a further $2,000,000 (two million dollars) no later than April 30, 2009, provided that BTG shall notify Toshiba in writing indicating the above with relevant evidences . . . .

*Id*. § 4.1. The Toshiba license does not contain a "most favored customer" provision. The Toshiba license contains Section 7.7 "Entire Understanding" that is identical to the "Entire Understanding" provision in the Hynix license. Milani states that Toshiba paid a total of $25 million under the license ($23 million followed by a $2 million payment). Milani Report at 48.

## II.  Milani's Royalty Rate Opinion re: the Hynix and Toshiba Licenses

In his report, Milani states that he considers the Hynix and Toshiba licenses to be the most relevant licenses for determining a reasonable royalty in a hypothetical negotiation. Milani Report

at 47-48, 50.  Regarding the Hynix license, Milani states that it "contains a most favored customer

provision which provides a quantitative metric allowing for the application of the terms of the Hynix

Agreement to the Hypothetical License, while also adjusting for Micron's extent of use.  To that

point, I consider the 0.25% royalty rate called for in the most favored customer provision to reflect

a relevant consideration for evaluating a reasonable royalty and understand that rate was applied to

Hynix's worldwide sales."  *Id*. at 47 (citing BTG_06398-06402).[6]  With regard to the Toshiba

license, Milani states, "given the most favored customer provision in the Hynix Agreement, and the

fact that both agreements were executed on the same day, it's reasonable to presume BTG

considered the royalty rate in the Toshiba Agreement to reflect a running royalty that is at least equal

to the rate reflected by the Hynix Agreement."  *Id*. at 48 (citing BTG_06398-06402).

Milani uses the 0.25% royalty rate derived from the Hynix license as the starting point for

his calculation of the appropriate royalty rate in this case.  Milani states,

> Relative to the Hynix Agreement, the scope of the hypothetical license would be
> narrower, because the Hynix Agreement had a worldwide scope.  Mr. Simon Fisher,
> the BTG employee responsible for licensing the '571 Patent, provided deposition
> testimony regarding the relationship between the worldwide scope of the license
> grant and the 0.25% royalty rate reflected within the Hynix agreement.  [citing
> Fisher's deposition testimony at 237-238, produced in this case as BTG_02097-
> BTG_02142][7]  On that point, Mr. Fisher testified that BTG's historical licenses were
> based on worldwide shipments, but the MLCIP Patent Portfolio was predominantly
> made up of U.S. rights.  Recognizing this, Mr. Fisher explained that rather than
> adjusting the royalty base to reflect only U.S. sales, BTG discounted the royalty rate
> in the Agreements to account for the larger royalty base.  Mr. Fisher further explained
> that, in connection with negotiating the Agreements, BTG considered the proper rate

---

[6] The document cited by Milani is a September 6, 2007 letter from Christine Soden of BTG to Jay Shim of Samsung.  Dkt. No. 442-44.  The letter states that it is "Subject to FRE 408" and that it is confidential subject to a non-disclosure agreement between Samsung and BTG.  In the letter, which appears to be a licensing proposal, Soden states that "[o]ur calculation still supports a fully paid up figure for Samsung of $69 million which was based on a 0.25% rate applied to sales forecasts," and she states that enclosed with the letter are "the sales forecast data that we used in March 2007 to calculate fully paid up licenses at an effective royalty rate of 0.25%."  *Id*. at BTG_06398.  The enclosed market share forecast data includes data for Hynix and Toshiba showing forecasted (or actual) sales from 2006 – 2011, and a 0.25% royalty rate applied to those forecasts to derive lump sum payments.  *Id*. at BTG_06400-BTG_06401.

As Micron notes, this letter is not a contemporaneous communication between BTG and Hynix showing how those parties negotiated the BTG/Hynix license, but rather an after-the-fact licensing proposal made by BTG to Samsung.  In connection with other motion briefing, Micron has submitted contemporaneous communications (dated March 2007) between BTG and Hynix showing that the parties negotiated over lump sum payments.  *See* Dkt. Nos. 481-8, 481-9.

[7] Fisher's deposition testimony is discussed *infra*.

to apply to U.S. sales would be 0.75%, but since BTG presumed that amount reflected only a third of a licensee's total shipments, the rate in the agreement was discounted to 0.25%. Therefore, I consider the Hynix Agreement suggests a royalty rate of 0.75% is the proper rate to consider in connection with determining a reasonable royalty in a hypothetical negotiation.

Milani Report at 54 (internal footnotes omitted).

Milani further explains his royalty rate calculation:

In summary, as discussed throughout the *Georgia-Pacific* factors (and the remainder of this report), I consider the 0.25% rate discussed in the Hynix Agreement to be a relevant metric for evaluating a reasonable royalty in a hypothetical negotiation. I also consider that the 0.25% royalty rate should be adjusted to 0.75%, to reflect the fact that it was applied to a base of worldwide sales. Further, I consider that at least 50% (and potentially much more) of the 0.75% royalty rate is attributable to the technology of the '571 Patent. Based on that apportionment, I consider the resultant 0.375% royalty rate to reflect the minimum rate that does not account for differences between real-world and hypothetical licenses, such as the assumption of validity and infringement, as discussed in Mr. Epstein's expert report.

Finally, I recognize that the historical licensing practices of both BTG and Micron have been based on lump-sum payments. I also recognize the lump-sum payments included in the BTG license agreements reflect the application of the 0.25% royalty rate reflected in the agreements to a royalty base comprised of estimated worldwide sales. [citing BTG_06398-06402]. Therefore, applying the 0.375% royalty rate to the royalty bases discussed above in Section 10 results in the following lump sum payments, but recognizes that the appropriate lump sum payment in this case may be much higher after the rate has been properly adjusted, as discussed above.

Milani Report at 67.[8] The lump sum damages payments that Milani arrives at are between $63,142,053 and $70,207,876. *Id.*

III.    **Fisher's Deposition Testimony**

Excerpts from the Fisher deposition testimony are at Dkt. No. 442-15. Fisher was a BTG employee who was involved in negotiating the Hynix and Toshiba licenses and the other efforts to

---

[8] In his report, Milani also states that the 0.25% royalty rate that he derives from the Hynix agreement is consistent with BTG's licensing history, citing documents related to BTG's negotiations with Samsung, ST Micro, Micron, and Acacia. Milani Report at 63-64. All of these negotiations were unsuccessful, and BTG ultimately sued Samsung in the ITC and then entered into a settlement after, *inter alia*, the ITC staff preliminarily concluded that the '571 patent was invalid. BTG did not enter into licenses with ST Micro, Acacia, or Micron. The specific documents cited by Milani as additional support for the 0.25% royalty rate are: BTG_05660-670; MLC00056549-551; MLC00060545; MLC00054615-616; MICRONM034216-218; MLC00002575-576; ACACIA00000228-229; and MLC00056617-628. Milani Report at 63-64. Based on Milani's description of these documents, they appear to be BTG internal memos discussing licensing negotiations, BTG's licensing offers, and an unsigned draft agreement between BTG and Acacia.

license the BTG/MLC patent portfolio.  Fisher was deposed in connection with a breach of contract lawsuit brought by MLC against BTG.  In the deposition excerpts provided to the Court,[9] Fisher was asked about BTG's negotiations with Toshiba.  Fisher Tr. at 236:1-239:25.  Fisher testified, "And if we can get a deal done quickly with Toshiba as the initial licensee, we would do it at this [unspecified] number and then presented that number."  *Id*. at 236:3-6.  The questioning continued:

Q:  Was that number supposed to be an up-front number that was going to be paid –

A:  Yeah, it was a fully paid-up lump sum number.

Q:  All right.  And would that fully paid-up lump sum number be considered a royalty rate?

A:  Well, it's – it was a payment in lieu of past shipments and a paid-up amount in lieu of future royalties.  So I don't know how – I don't know how the finance people would view it, whether they'd view it as a compensation payment or as a royalty payment.

Q:  What calculations did you, BTG, use to get to $60 million?

A:  We did a number of calculations.  There were sort of different approaches for what we, you know – I think I termed out early bird licensing model that – the value that we had put forward, and we calculated on a variety of royalty rates initially taking the Gartner Dataquest numbers, taking the U.S. – as I recall, the U.S. proportion of those, taking a potential royalty award that might come from a court at some future date, MPV'ing that with a fairly harsh discount because of the risk of litigation.

Another model was to take the Gartner Dataquest numbers worldwide and use a .25 percent royalty rate.

And there was another model which had a staggered or tiered set of royalties.

So actually, you know, there was a whole range of numbers that [sic] could come up with.  And I think in the Toshiba case it was as low as $16 million, and I don't remember what the upper bound was, but through the process of discussion, I think we all settled on the opening number of 60 something million dollars being the appropriate one.

Q:  Why did you, BTG, use the .25 percent royalty rate when you were talking about using the Dataquest material?

A:  Well, based on the – based on the worldwide shipments, leveraging worldwide licenses off of a predominantly U.S. patent position, that was a reasonably – well, seemed to be deemed appropriate by everyone at the time number to use for a first

---

[9]  The parties have not provided the Court with the entire deposition, nor have the parties provided any evidence regarding the details of the *MLC v. BTG* litigation or the circumstances surrounding that case, except to state that it was a breach of contract case and that it ultimately settled.

8

licensee scheme.  Given that a third of the worldwide shipments, as a rule of thumb, end up in the U.S., it's equivalent to a .75 percent based on the U.S. shipments which represents a sort of discount off of a sort of one percent U.S. royalty rate which one might reasonably anticipate as a reasonable outcome from a U.S. court case.

*Id*. at 236:7-238:4.

## IV.  Discovery

The parties dispute the adequacy of MLC's initial (and amended) disclosures regarding damages, as well as MLC's responses to specific interrogatories seeking information related to MLC's damages.  The extensive briefing on that matter is found at Dkt. Nos. 452, 499, 544, and 594-595.  The Court recounts the discovery only as it specifically relates to MLC's damages based upon a reasonable royalty rate.

### A.  Interrogatory No. 6

Micron's Interrogatory No. 6 asked MLC to "Describe in detail the factual and legal basis and supporting evidence for the relief Plaintiff seeks . . . including but not limited to Your contention that You are entitled to damages (e.g. a reasonable royalty) . . . ."  Dkt. No. 278-13.  MLC's original response stated,

**RESPONSE TO INTERROGATORY NO. 6:**

MLC incorporates the above-stated General Objections as if fully set forth herein. MLC also objects to this interrogatory as being premature and properly the subject of expert discovery and reports.  MLC further objects to this interrogatory to the extent it seeks information that is protected from disclosure by the attorney-client privilege and attorney-work product doctrine.

Subject to and without waiving the foregoing General and Specific Objections, MLC responds as follows: MLC is the holder of all rights and interest in the '571 Patent.  As demonstrated in MLC's Preliminary Infringement Contentions, Micron's NAND flash memory devices infringe multiple claims of the '571 Patent. Under 35 U.S.C. § 284, MLC is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty."  MLC does not presently know the volume or duration of sales of Micron's infringing devices, and the measure of damages adequate to compensate for the infringement will be determined no later than trial.

MLC's supplemental response stated:

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

MLC incorporates its prior response to this Interrogatory as if fully set forth herein.

Subject to and without waiving the foregoing general and specific objections set forth in its prior response, incorporated herein by reference, MLC provides the following supplemental response to this Interrogatory:

MLC objects to this request on the grounds that Micron has not complied with the Court's Order compelling discovery of financial information for Micron's accused multi-level cell and triple-level cell NAND Flash (Dkt. 193), which is now the subject of a motion for sanctions (Dkt. 214-4). For this reason, MLC still does not presently know the volume or duration of sales of Micron's infringing devices. Interrogatory No. 6 is objectionable on the grounds that it is compound and an improper attempt to enlarge the numerical limits under Federal Rule of Civil Procedure Rule 33(a)(1).

Notwithstanding, MLC responds that it is the holder of all rights and interest in the '571 Patent. As demonstrated in MLC's Infringement Contentions, Micron's multi-level cell and triple-level cell NAND flash devices infringe multiple claims of the '571 Patent. MLC's Infringement Contentions also provides a non-exhaustive list of devices accused of infringement.

Under 35 U.S.C. § 271, Micron "without authority makes, uses, offers to sell, or sells multi-level cell (including triple-level cell) NAND flash devices, within the United States, or imports into the United States, multi-level call NAND flash devices during the term of the patent therefor" that infringes multiple claims of the '571 Patent. Due to Micron's infringement, under 35 U.S.C. § 284, MLC is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty." And MLC is entitled to no less than a reasonable royalty measured and calculated in a manner consistent with federal case law.

MLC further responds that the calculation of damages will also be informed by, at least, the following documents identified pursuant to Rule 33(d): EPICENTER029194, EPICENTER029212, EPICENTER029216, EPICENTER029243, EPICENTER029247, EPICENTER029260, EPICENTER029334, EPICENTER029345, EPICENTER029347, MUIR000020, MUIR000027, MUIR000031, MUIR000033,MUIR000072, MUIR000085, MUIR000109, MUIR000149, MUIR000163, MUIR000174, MUIR000194, MUIR000208, MUIR000219, MUIR000256, MUIR000848, MUIR000862, MUIR000873, MUIR000893, MUIR000907, MUIR000918, MUIR001052, MUIR001056, MUIR001095, MUIR001101, MUIR001115, MUIR001126, MUIR001144, MUIR001155, MUIR001213, MUIR001233, MUIR001284, ACACIA00000005, ACACIA00000026, ACACIA00000037, ACACIA00000051, ACACIA00000057, BTG_02342, BTG_02345, BTG_02351, BTG_02793, BTG_02863, BTG_02866, BTG_02977, BTG_03037, BTG_05418, BTG_05438, BTG_05501, BTG_05569, BTG_05617, BTG_05618, BTG_05619, BTG_05654, BTG_05655, BTG_05657, BTG_05674, BTG_05686, BTG_05706, BTG_05813, BTG_05834, BTG_05835, BTG_05842, BTG_06058, BTG_06296, BTG_06433, BTG_06440, BTG_07877, BTG_07921, BTG_07995, BTG_07996, BTG_08102, MLC00002536, MLC00002575, MLC00002581, MLC00002583, MLC00007108, MLC00007112, MLC00033662, MLC00033675, MLC00052637, MLC00052641, MLC00052661, MLC00052674, MLC00053395, MLC00053396.

In addition to the foregoing documents, the proper calculation of damages will also depend on information from Micron's SEC 10-K statements, industry reports (such as MICRONM046812 and MICRON047492), as well as financial information solely within the possession, custody and control of Micron. On September 25, 2018, Micron produced financial data (MICRONM047490) for certain accused products and improperly excluded financial data for other products on the grounds that the excluded information is not relevant. MLC has since moved for sanctions regarding Micron's immediate supplementation. See Dkt. 215. Absent the requested information, MLC is without sufficient information regarding, at a minimum, the volume of sales of Micron's multi-level cell and triple-level cell NAND flash products during the relevant time period. And consequently, MLC is unable to respond to this contention interrogatory in full.

Micron's deficient document production notwithstanding, MLC further objects to this interrogatory on the grounds that it not only calls for a legal conclusions but also on the grounds that it is premature as it seeks information that requires expert discovery and analysis. Pursuant to Federal Rule of Civil Procedure 33(a)(2), such discovery "need not be answered until designated discovery is complete," that is, until expert discovery which does not commence until January 25, 2019. *See* Dkt. 184.

MLC reserves the right to further supplement the response to this Interrogatory in the course of fact and expert discovery.

MLC's second supplemental response, dated November 30, 2018, stated:

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

MLC incorporates its prior response to this Interrogatory as if fully set forth herein. Subject to and without waiving the foregoing general and specific objections set forth in its prior response, incorporated herein by reference, MLC provides the following supplemental response to this Interrogatory:

As permitted under 35 U.S.C. § 284, MLC is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty." MLC seeks a reasonable royalty with respect to infringement of the '571 Patent. The amount of a reasonable royalty will be based on expert analysis and testimony, and applicable law, including but not limited to the factors identified in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), and in the many district court and Federal Circuit cases that have adopted and opined on that methodology. The royalty rate will be based on at least the *Georgia-Pacific* factors, and will include but not limited to consideration of relevant license agreements for the patented technology, including those identified in MLC's prior response, as well as any prior negotiations between the parties regarding the patented technology. The royalty base will at least be based on financial sales information solely within the possession, custody and control of Micron including revenues from all infringing sales during the damages period—information Micron has yet to produce in response to the Court's November 26, 2018 Order (Dkt. 240).

The calculation of damages will also be informed by industry analysis and reports (such as MICRONM046812 and MICRON047492), as well as statements made by Micron in, for example, its SEC 10-K statements. For example, in its SEC 10-K Annual Statements, for Fiscal Years 2012 through 2015, Micron reported approximately $1.26 billion (FY12), $1.51 billion (FY13), $2.55 billion (FY14), and $2.56 (FY15) in Net Sales to the U.S. ("based on customer ship-to location"). Micron also reported that 44%, 40%, 27% and 33%, respectively, of Net Sales were from

NAND Flash Sales. Upon information and belief, MLC contends that it is entitled to a reasonable royalty to compensate it for said infringing sales.

Further, "'[t]he law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology,' unless it can 'establish that its patented technology drove demand for the entire product.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 978 (Fed. Cir. 2008) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *see also, TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir.1986) ("The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand."). Moreover, "[i]n some circumstances, for example, where the other features are simply generic and/or conventional and hence of little distinguishing character . . . it may be appropriate to use the entire value of the product because the patented feature accounts for almost all of the value of the product as a whole." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d at 978 (citing *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338-40 (Fed. Cir. 2015). The patented technology incorporated into the accused multilevel cell and triple-level cell NAND Flash products made and/or sold by Micron substantially creates the value of the accused products and constitutes the basis for customer demand.

Because this Interrogatory requests information requiring legal conclusions and expert analysis and testimony, which has yet to commence, and given that fact discovery has yet to conclude, MLC reserves the right to supplement and/or amend its responses to this Interrogatory in light of additional factual developments and expert discovery.

MLC's Second Supplemental Responses to Interrogatory No. 6 at 1-6 (Dkt. No. 278-13).

MLC's collective responses to Interrogatory No. 6 did not identify the Hynix license (MLC00007148-MLC00007158) or the Toshiba license (MLC00007159-MLC00007172) and did not disclose a reasonable royalty theory aside from generally stating "[t]he royalty rate will be based on at least the *Georgia-Pacific* factors, and will include but not limited to consideration of relevant license agreements for the patented technology, including those identified in MLC's prior response, as well as any prior negotiations between the parties regarding the patented technology." In addition, MLC's responses to Interrogatory No. 6 did not identify any of the extrinsic evidence cited in the Milani report in support of his opinion that 0.25% is the royalty rate "reflected" in the Hynix and Toshiba licenses.[10]

---

[10] That extrinsic evidence is: (1) Christine Soden's September 2007 letter to Jay Shim of Samsung (BTG_06398-BTG_06402); (2) Simon Fisher's deposition testimony (BTG_02097-BTG_02142); (3) a November 2007 internal BTG "Briefing Paper" summarizing BTG's

## B.    Interrogatory No. 22

Micron's Interrogatory No. 22 asked MLC to "[i]dentify all facts, evidence, and testimony regarding any applicable royalty rates that You intend to rely upon at trial and describe in complete detail why those royalty rates are applicable." Dkt. No. 465-2 at 11. MLC's December 12, 2018 response asserted various objections such as "the word product doctrine, joint-defense privilege, common-interest privilege, and any other applicable privilege or immunity"; objected to the interrogatory as premature "on the grounds that it seeks information that is properly the subject of expert discovery and testimony"; and then stated that MLC was entitled to a reasonable royalty:

> based on at least the *Georgia-Pacific* factors, and will include but not limited to consideration of license agreements for the patented technology, including but not limited to EPICENTER029247-29259; EPICENTER029326-EPICENTER029333; EPICENTER029334-EPICENTER029344; EPICENTER029345-EPICENTER029346; BTG00037609-BTG00037610; MLC00007148-MLC00007158; BTG_09023-BTG_09036, as well as any prior negotiations between the parties regarding the patented technology.

Dkt. No. 465-2 at 12.

MLC did identify the Hynix license (MLC00007148-MLC00007158), but did not identify the Toshiba license (MLC00007159-MLC00007172). MLC's response to Interrogatory No. 22 did not disclose a specific royalty rate, and did not disclose that it believed the Hynix or Toshiba licenses supported a 0.25% (or 0.75%) royalty rate. In addition, MLC's interrogatory response did not identify any of the extrinsic evidence upon which Milani would rely to support his opinion that the Hynix and Toshiba licenses "reflect" a 0.25% royalty rate. *See* footnote 10 *supra*.[11]

---

negotiations with Samsung (BTG_05660-670); (4) correspondence between BTG and Samsung regarding negotiations (MLC00056549-551, MLC00060545); (5) BTG's licensing offer to ST Micro (MLC00054615-616); and (5) documents related to BTG's licensing negotiations with Acacia (ACACIA00000228-229 and MLC00056617-628). *See* Milani Report at 63-64, notes 377-386.

[11] In addition, Micron's Interrogatory No. 18 requested information regarding, *inter alia*, "the factual and legal basis and supporting evidence for your contention that MLC is entitled to damages for Micron's alleged infringement of the Asserted Patent occurring before the filing of the Present Litigation." Dkt. No. 442-45 MLC's response to Interrogatory No. 18 did not identify the Hynix or Toshiba licenses, and did not contain any response regarding a royalty rate. *Id.*
        Micron's Interrogatory No. 21 requested MLC to identify "all agreements that You contend constitute a comparable licensing agreement that You intend to rely upon at trial and describe in complete detail the facts, evidence and testimony surrounding the formation of those license agreements and why those license agreements are comparable." In response to Interrogatory No. 21, MLC identified the Hynix license in a list of documents, and did not provide any description of why the Hynix license was comparable, nor did MLC ever state that it intended to rely on the Hynix

13

### C.     Mr. Hinckley's deposition

On December 11, 2018, Micron took the Rule 30(b)(6) deposition of Robert Hinckley.  Dkt. No. 442-41 (Hinckley Tr.).  Mr. Hinckley is the Chairman of MLC as well as its counsel.  Hinckley Tr. at 16:22-17:11.  MLC consists of Hinckley and Jerry Banks, the inventor of the '571 patent (and the other patents in the MLC portfolio).  *Id.*  Hinckley was produced as the Rule 30(b)(6) witness regarding, *inter alia*, the following topics:

> 82.  All information, facts, and documents relating to MLC's claim of damages for the Asserted Patent, including any reasonable royalty, the royalty base and rate, and any alleged lost profits damages.
>
> 53.  All agreements entered into by MLC or any prior owner of the Asserted Patent related to the Asserted Patent, Related Patents, or related technology field, including offers to license, settlement agreements, assignments, covenants, and technology agreements, and any related negotiations, communications, and drafts.
>
> 58.  Financial information relating to MLC's and BTG's licensing of the Asserted Patent, including, without limitation, products licensed, sales volume, dates of sales, revenue, and if known, gross margin, net profit, or loss.
>
> 64.   All facts and circumstances regarding any and all licenses granted for the Asserted Patent, including but not limited to the name and location of any licensee, the terms of each license, the circumstances under which each license was granted, communications with each of the past or present licensees including negotiations, the amount of royalties or other type of compensation paid to MLC, all products licensed to practice any of the Asserted Patent, the sales volume, dates of sales, revenue, as well as gross margin, net profit, or loss related thereto if known or calculated, and Documents related to the foregoing.

Micron's First Notice of Deposition to MLC (Dkt. No. 360-14).[12]

Hinckley was asked about the Hynix agreement at his deposition:

Q:  Is there a royalty amount associated with this agreement?

A:  I believe there is.

Q:  What is that amount?

---

license as evidence of a .025% royalty rate.  *See* Dkt. No. 465-2.  MLC did not list the Toshiba license in its response to Interrogatory No. 21.

[12]  Micron's motion to strike the Milani Report quotes these deposition topics, with a citation to Micron's First Notice of Deposition.  *See* Micron's Motion to Strike at 12, citing Dkt. No. 360-14 (Dkt. No. 452).  However, Dkt. No. 360-14 is only an excerpt of the deposition notice and does not contain topics # 53 and # 58.

A: Well, I can read you what it says, because my knowledge is based on what's in the agreement, not my recollection. It says, "4.1 Compensation. In consideration of the release and License, Hynix shall pay to BTG $21 million as follows: $11 million no later than 30 April 2007; $5 million no later than 31 March 2008;" and "$5 million no later than 31 December 2009."

Q: Now, there's not a royalty rate that's listed in this particular license agreement, correct?

A: Correct.

Q: Does MLC have an understanding as to what the royalty rate for this particular agreement is?

A: No, MLC has no understanding.

. . .

Q: I'm just asking you personally, as someone who has knowledge within the – the licensing industry, is one way to calculate a royalty rate for an agreement to take the sales revenue that's covered by the agreement and divide that into the total amount that was paid for that particular agreement?

A: I'm sorry. I don't – I don't understand the question, because when parties get into licensing discussions, they usually talk numbers. It varies all over the map how they get to those numbers. And in this particular case, I have no idea how these numbers came about.

Q: So MLC has no knowledge with respect to a royalty rate that could be inferred from this particular agreement?

A: That's correct. MLC has no knowledge about where these numbers came from.

Q: Has MLC attempted to investigate that?

Mr. Marino: Objection to the extent that it calls for privileged communications. If you have an independent knowledge, you can testify to that.

A: No, I don't have any independent knowledge. I – I – BTG did not include us in the negotiations, and – and so what communications were between Hynix and BTG over these numbers, MLC has no knowledge.

Hinckley Tr. at 61:9-63:23. Hinckley also testified that he did not know what Hynix products were covered by the agreement. *Id*. at 64:14-65:6.

Hinckley was repeatedly asked whether MLC would be relying on the Hynix agreement at trial:

Q: Now, there's a lot of things you've testified that you don't know with respect to this agreement. Are there any facts with respect to Exhibit 5 [Hynix License] that MLC will seek to rely upon with respect to its burden of proof at trial?

Mr. Marino: And objection. It's vague. I don't understand what – "facts with respect to" an agreement that aren't the agreement itself. But if you understand the question, please answer.

A: Same. I do not know what facts, if any, BTG will rely at trial – I mean, MLC will rely on at trial that pertains to Exhibit 5.

Q: And so MLC is not disclosing any facts with respect to this agreement that it will seek to rely upon at trial, correct?

A: Well, again, my answer is, I do not know one way or the other the extent to which MLC will be relying on – on any facts pertaining to Exhibit 5 in the trial.

Q: Who at MLC would know those facts?

A: Well, it would be me and Jerry. And so if I'm speaking on behalf of MLC, I'm saying MLC as an entity doesn't know one way or the other what facts, if any, it will rely on relating to Exhibit 5 at trial.

Q: Will MLC at least disclose those facts before the close of fact discovery?

A: I defer to my counsel.

Mr. Marino: I think that's a completely unfair question to ask of a fact witness. Also, again, I still don't understand what facts related to a document mean. So I think the question is vague.

Mr. Schartzer: Mr. Marino, we know that Mr. Hinckley is here designated as a corporate witness, not just a fact witness.

Mr. Marino: Corporate witness by definition is a fact witness. What do you think he is, an expert witness? That statement is nonsensical.

Mr. Schartzer: Mr. Hinckley, outside of what's written here within Exhibit 5, are there any other facts that MLC will seek to introduce at trial with respect to Exhibit 5?

A: Well, same answer. I do not know the extent – if MLC will seek to introduce any facts relating to this exhibit at trial or relating to the agreement between Hynix and BTG.

*Id*. at 65:7-67:7. Hinckley provided similar answers when questioned about the BTG/Toshiba license agreement. *See id*. at 67:11-69:4; 78:6-7; 77:13-79:14. As noted *supra*, MLC did not in fact disclose prior to the close of fact discovery that it intended to rely on "facts relating to Exhibit 5 [the Hynix license agreement]" – such as any of the extrinsic evidence cited in Milani's report.

## LEGAL STANDARDS

Federal Rule of Evidence 402 provides that "[i]rrelevant evidence is not admissible." Rule 403 provides that even relevant evidence may be excluded "if its probative value is substantially

outweighed by a danger" of unfair prejudice, confusion etc.

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable. *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003). As a guide for assessing the scientific validity of expert testimony, the Supreme Court provided a nonexhaustive list of factors that courts may consider: (1) whether the theory or technique is generally accepted within the relevant scientific community; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique can be tested. *Daubert*, 509 U.S. at 593-94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

Federal Rule of Civil Procedure 37(c)(1) provides that a party's failure to disclose or supplement information will result in that party being precluded from using that information on a motion, at a hearing, or at trial, unless that failure was substantially justified or harmless. This sanction applies to failures to supplement discovery responses in accordance with Federal Rule of Civil Procedure 26(e). *See id.*; *see also Hoffman v. Constr. Prot. Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008) (affirming district court's order excluding undisclosed damages evidence); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("[A]lthough we review every discovery sanction for an abuse of discretion, we give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1). . . . This particular subsection, implemented in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power. . . . The Advisory Committee Notes describe it as a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material. . . .' Fed. R .Civ. P. 37 advisory committee's note (1993).")

Micron contends that "[t]he Milani Report relies on a flawed, self-serving characterization of the Hynix and Toshiba Agreements to arrive at a royalty rate not found anywhere in the agreements." Motion at 3 (Dkt. No. 444). Micron argues that the 0.25% figure that Milani claims represents the royalty rate applied in the Hynix Agreement is mentioned only in the context of the "most favored customer" provision as a rate that, if given to a different, future, hypothetical licensee, would trigger an additional discount to Hynix. Micron argues that Milani's assertion that the Toshiba license effectively includes a 0.25% royalty rate is also entirely speculative, citing Milani's statement in his report that "it's reasonable to presume BTG considered the royalty rate in the Toshiba Agreement that is at least equal to the rate reflected in the Hynix Agreement." Milani Report at 48. Micron argues that the Hynix and Toshiba licenses speak for themselves, and that both agreements on their face provide for lump sum payments and neither agreement contains a royalty rate applicable to the licenses.

Micron also argues that because MLC failed to disclose during fact discovery (such as through the Hinckley deposition or its responses to Interrogatory Nos. 6 and 22) that it believed that 0.25% was the applicable royalty rate based upon the Hynix and Toshiba licenses, as well as MLC's failure to disclose the extrinsic evidence that Milani relies upon for his royalty rate opinion (such as Soden's 2007 letter to Samsung and Fisher's deposition testimony), Micron was prevented from conducting relevant discovery, such as depositions of BTG, Hynix and Toshiba witnesses focusing on the alleged 0.25% royalty rate, as well as a deposition of Mr. Fisher.

Micron also argues that the 0.25% rate is not a real rate because, to the extent the extrinsic evidence cited by MLC is considered, that evidence shows that BTG used 0.25% as a tool to calculate lump sum payments based on forecasted sales from 2006 to 2011, while the actual license agreements covered the period of April 2007 through the expiration dates of the 41 patents (including *inter alia* June 2015 for the '571 patent and December 2017 for the last expiring patent). Thus, Micron argues that Milani's opinion that the Hynix and Toshiba licenses reflect a 0.25% royalty rate has no basis in fact because (1) the contracts themselves provide for lump sum payments and do not specify a royalty rate and (2) the extrinsic evidence shows that, at most, BTG used 0.25%

as a method for calculating lump sum payments based upon a revenue base of forecasted sales from 2006-2011, thus ignoring years of Hynix's and Toshiba's sales that were covered by the term of the license. Micron argues that if an effective royalty rate was calculated for the Hynix and Toshiba licenses, that rate would need to also take account of the years of forecasted (or actual) sales from 2012-2017, and thus the actual effective royalty rate would be much less than 0.25%.

MLC devotes a significant portion of its opposition to arguing that the Hynix and Toshiba licenses are comparable and that the use of comparable licenses is a well-established methodology to determine a reasonable royalty. However, the specific issue presented by Micron's motion is whether Milani may testify that the Hynix and Toshiba license agreements "reflect" a 0.25% royalty rate, not whether those license agreements are comparable. As to that question, MLC argues that "the 0.25% royalty rate figure is expressly referenced in the 'most favored customer' provision of the license" which "provides Hynix with a guarantee that no subsequent licensee would receive a license 'in which the royalty rate is less than 0.25%.'" Opp'n at 3 (Dkt. No. 492). MLC also argues, "[i]ndeed, the record of the case is replete with references to 0.25% being used as the effective worldwide royalty rate – including several license agreements involving the patent-in-suit and contemporaneous business communications and testimony relating to the nature of the agreements and the manner by which they were negotiated – which have all been disclosed to Micron." *Id*. MLC's opposition to Damages MIL#1 does not cite any specific evidence in support of the assertion that the record is "replete" with references to the 0.25% royalty rate, nor does it identify how and when it "disclosed" all of this evidence to Micron.[13]

The Court concludes that Milani's proposed testimony that the Hynix and Toshiba licenses "reflect" a 0.25% royalty rate is speculative and not based on the facts of the actual licenses, and therefore GRANTS the motion as framed. Specifically, Milani may not testify that the Hynix and Toshiba agreements contain or "reflect" specific royalty rates because the documents speak for themselves and neither provides for an applicable royalty rate. Both license agreements are lump

---

[13] MLC's opposition to Micron's Motion to Strike the Milani Report asserts that MLC disclosed certain evidence in its response to Interrogatory No. 6 and 22. The Court discusses those responses *infra*.

sum agreements, and there is no explanation in the agreements regarding how the lump sum amounts were calculated. Milani's derivation of a 0.25% royalty rate based on the "most favored customer" provision in the Hynix license is contrary to the plain language of that provision, which provides that if BTG entered into a "future license" "in which the royalty rate is less than 0.25% . . . Hynix's future payments (if any) shall be reduced so that Hynix, in total, pays not more than 90% of the royalty rate paid by the new licensee." Hynix License § 4.3. The "most favored customer" provision does not state that the 0.25% royalty rate was applied to that license, nor does that provision (or any other provision in the agreement) state anything about how the lump sum payments were calculated.

Milani's testimony about the Hynix and Toshiba licenses containing a 0.25% royalty rate is not "based on sufficient facts or data" and is not "the product of reliable principles and methods." Rule 702. Even if the extrinsic evidence was admissible[14] to interpret the Hynix and Toshiba license agreements, the extrinsic evidence does not show that those licenses have an effective 0.25% royalty rate. Instead, that evidence suggests that BTG may have calculated lump sum amounts by applying 0.25% to forecasts of revenue from 2006-2011.[15] Of course, if 0.25% had been applied to forecasts of revenue for the term of the license (2007-2017), the lump sum amounts would have been greater; conversely, if the same lump sum figures were paid and measured across a revenue base of forecasted revenue from 2007-2017, the effective royalty rate would be less than 0.25%. Thus, Milani's opinion that the Hynix and Toshiba licenses "reflect" a 0.25% royalty range is not based

---

[14] As discussed *infra*, the Court finds that MLC did not disclose that it intended to rely on this extrinsic evidence in support of its reasonable royalty claim, and thus it is inadmissible on that ground. Further, even if that evidence was properly disclosed, the extrinsic evidence would not be admissible as parol evidence to interpret the license agreements because those agreements are clear and unambiguous. *See generally Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375-76 (9th Cir. 2004) (discussing parol evidence rule); *Transcore, LP v. Electronic Transaction Consultants Corp.*, No. 3:05-cv-2316, 2008 WL 2152027, at *5, *aff'd*, 563 F.3d 1271 (Fed. Cir. 2009) ("Although TransCore would like the court to consider its extraneous proof of the parties' discussions that were contemporaneous to the final preparation of the Settlement Agreement, the court cannot do so, because it finds that they intended the Settlement Agreement to be a final expression of their agreement.").

[15] As noted *supra*, the Hynix license covered "all Hynix products," and was not limited specifically to Hynix's MLC Memory Devices. The revenue base for all Hynix products for the term of the license was presumably larger than the revenue base for the subset of Hynix MLC Memory Devices.

in fact, but instead upon an misinterpretation of an inapposite "most favored customer" provision in the Hynix license and irrelevant extrinsic evidence suggesting that BTG used the 0.25% figure as a method for calculating lump sums in negotiations using forecasted sales data for a truncated period of the license agreements.

The Court is mindful of the principle that "[a] judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own methodologies, or judge credibility, including the credibility of one expert over another." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other grounds*, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). The Court also recognizes that resolving disputes of fact is the province of the jury. *See Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("In this case, the trial court properly did not rule inadmissible Fiorito's damages testimony simply because it was based on Micro Chemical's version of the contested facts."). Here, however, there is not a factual dispute about whether the Hynix and Toshiba licenses contain a royalty rate: they do not. Instead, Milani (and MLC) divine a royalty rate for these agreements by stitching together selected pieces of extrinsic evidence of BTG's description of how it formulated lump sum licensing proposals.[16] MLC cannot create a dispute of fact by having Milani mischaracterize evidence, and the Court cannot permit Milani to testify about a "fact" – the royalty rate reflected in the Hynix and Toshiba licenses – when there is no evidence to support that fact. *Cf. Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."); *see also Golden Bridge Tech. v. Apple, Inc.*, Case No. 5:12-cv-04882-PSG, 2014 WL 2194501, at *6 (N.D. Cal. May 18, 2014) (granting *Daubert* motion to exclude expert testimony about royalty rates derived from fully-paid lump sum licenses where, *inter alia*, the expert did not "account for the portion of the lump sum payments that would cover future sales").

---

[16] In the limited excerpts of the Fisher deposition provided to the Court, Fisher testified that there several "different approaches" leading to a "whole range of numbers" that BTG used when determining amounts for BTG's licensing negotiations. Fisher Tr. at 236:18-237:15.

United States District Court
Northern District of California

The Court also concludes that MLC never disclosed the factual underpinnings of its claim that the Hynix and Toshiba licenses "reflect" a 0.25% royalty rate, and that pursuant to Rule 37(c)(1), this failure is a separate and independent basis for excluding evidence and argument that those licenses contain such a rate. It bears repeating that because the Hynix and Toshiba licenses are lump sum agreements that do not contain specific royalty rates, absent a disclosure by MLC, Micron would have no way of knowing that Milani would opine that these agreements reflect a 0.25% royalty rate that should be applied to this case (and that the rate should be tripled to 0.75% based on Fisher's deposition testimony and ultimately halved to 0.375% to account for the value of the '571 patent). It is undisputed that prior to the submission of Milani's initial expert report in February 2019,[17] MLC had never disclosed what it believed was an appropriate royalty rate to calculate damages, had never disclosed that it believed the Hynix and Toshiba licenses "reflect" a 0.25% royalty rate, and had never disclosed any of the extrinsic evidence that Milani relies on for his royalty rate opinion (the 2007 BTG letter from Soden to Shim of Samsung; the Fisher deposition testimony; and the BTG memos regarding licensing negotiations and offers to Samsung, ST Micro and Acacia).[18] Further, at Hinckley's Rule 30(b)(6) deposition, he testified, *inter alia*, that the Hynix agreement did not have a royalty rate, that "MLC has no understanding" of the royalty rate for the Hynix agreement, and that "MLC has no knowledge about where these [lump sum] numbers came from." Hinckley Tr. at 61:21-62:2, 63:9-13. Although Mr. Marino repeatedly objected to questions asking Hinckley about whether MLC would rely on any "facts with respect to" the Hynix agreement at trial (such as objecting "It's vague. I don't understand what – 'facts with respect to' an agreement that aren't the agreement itself,"), in fact Milani and MLC are attempting to rely on "facts with respect to" the Hynix agreement that are not the agreement itself, namely extrinsic evidence such as Soden's 2007 letter to Samsung, Fisher's deposition testimony, and other BTG memos and license

---

[17] Milani first issued an expert report on February 8, 2019, and then issued an amended report on March 15, 2019 "to reflect the Court's order regarding the infringement contentions and schedule." Milani Report at 4.

[18] MLC had generally identified "any prior negotiations between the parties." However, that disclosure still does not state that MLC believed that 0.25% was a reasonable royalty rate that should be used as an input (before tripling and then halving, as Milani does) to determine damages.

offers. Thus, the record reflects that Micron repeatedly asked MLC – through interrogatories and the Hinckley deposition – for the factual basis of its reasonable royalty claim and about its reliance on the Hynix license in particular – and MLC consistently failed to disclose its contention that the Hynix license "reflected" a 0.25% royalty rate that should be applied to this case.

MLC argues that its responses to Interrogatories Nos. 6 and 22 were sufficient, and that in any event Micron has not been prejudiced. The Court disagrees. In both interrogatories, Micron asked MLC to "describe the factual and legal basis and supporting evidence" in support of MLC's claim for a reasonable royalty (Interrogatory No. 6) and to "identify all facts, evidence and testimony regarding any applicable royalty rates that You intend to rely upon at trial and describe in complete detail why those royalty rates are applicable." Interrogatory No. 22. MLC's responses to both interrogatories asserted numerous boilerplate objections and set forth a generic statement of the law regarding entitlement to damages with citations to *Georgia-Pacific* without ever stating that MLC believed that 0.25% was an appropriate royalty rate or MLC's contention that the Hynix and Toshiba licenses reflected such a rate. MLC's responses also contained a list of documents, which curiously did not include either license in response to Interrogatory No. 6 and only identified the Hynix license in response to Interrogatory No. 22. Crucially, none of the listed documents included any of the extrinsic evidence upon which Milani relies to conclude that the Hynix and Toshiba licenses "reflect" a 0.25% royalty rate and that the 0.25% rate should be tripled to account for the fact that the Hynix and Toshiba licenses were worldwide and damages in this case are based on U.S. revenue.[19] Because MLC never disclosed this information, Micron was prevented from conducting fact discovery regarding these issues.

To the extent MLC seeks to blame Micron for its inadequate damages disclosures, the Court is unpersuaded. To be sure, there were problems with Micron's production of sales data. However, none of that discovery was relevant to the issue of what MLC contended was the appropriate royalty rate in this case. Indeed, the vast majority of the evidence that Milani and MLC rely upon for the

---

[19] As Micron notes in its *Daubert* motion challenging Milani's testimony, notwithstanding Milani's explanation for tripling the alleged 0.25% royalty rate, Milani's damages numbers include Micron's (and its subsidiaries') foreign sales.

0.25% (and 0.75%) royalty rate opinion was produced by MLC. There is simply no explanation to excuse MLC's failure to disclose the factual basis for its claim about a reasonable royalty. MLC suggests that it was not required to do so because the reasonable royalty is the subject of expert testimony. However, while MLC was not required to disclose its expert opinions during fact discovery, MLC was still required to disclose the factual basis for its reasonable royalty claim. *See Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011) (affirming district court's evidentiary ruling excluding portions of expert testimony not disclosed during discovery, including expert's testimony about testing that was not disclosed during fact discovery); *Corning Optical Commc'ns Wireless Ltd. v. Solid, Inc.*, 306 F.R.D. 276, 279 (N.D. Cal. 2015) (finding interrogatory response summarized as "wait until we serve our expert report" to be "plainly insufficient" and granting motion to compel further responses to damages interrogatories, including disclosure of facts upon which plaintiff sought a reasonable royalty)

Accordingly, the Court concludes that Milani may not testify that the Hynix and Toshiba license agreements "reflect" a 0.25% royalty rate because such testimony is contrary to the plain language of the documents. Further, the extrinsic evidence that Milani relies upon (1) is inadmissible parol evidence; (2) even if considered, does not support a 0.25% royalty rate for the terms of the Hynix and Toshiba licenses; and (3) was never disclosed by MLC and thus MLC may not rely on this evidence to assert that the Hynix and Toshiba licenses "reflect" a 0.25% royalty rate.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Micron's Damages MIL#1 as to Milani's and Epstein's testimony and DENIES as moot the portion of the motion directed at Liesegang's proposed rebuttal testimony.


**IT IS SO ORDERED**.

Dated: July 2, 2019

_____
SUSAN ILLSTON
United States District Judge

24