UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MLC INTELLECTUAL PROPERTY, LLC,<br>Plaintiff,<br>v.<br>MICRON TECHNOLOGY, INC.,<br>Defendant. | Case No. 14-cv-03657-SI<br><br>**ORDER GRANTING MICRON'S DAUBERT MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL MILANI**<br><br>Re: Dkt. No. 446 |

On June 6, 2019, the Court held a hearing on numerous pretrial motions. For the reasons set forth below, the Court GRANTS Micron's *Daubert* motion to exclude the expert testimony of Michael Milani.

Micron raises numerous challenges to Milani's expert damages opinion. The Court has already resolved some of these matters in other orders. *See* Order Re: Micron's Damages Motions in Limine #2, #3, and #5 (holding MLC may not seek damages based on Micron's foreign sales or based on any sales by Micron's subsidiaries and IMFT) (Dkt. No. 596); Order Granting in Part and Denying in Part Micron's Damages Motion in Limine #1 (Dkt. No. 639) (holding Milani may not testify that the BTG/Hynix and BTG/Toshiba lump sum agreements "reflect" a 0.25% royalty rate and Milani may not rely on, *inter alia*, Fisher deposition testimony for alleged 0.25% or 0.75% royalty rates). This order resolves the remaining issues regarding Milani's testimony.

Milani offers two damages opinions: (1) the comparative license opinion and (2) the smallest saleable patent practicing unit "SSPPU" approach.[1] For the comparative license opinion, Milani

---

[1] The parties agree that the SSPPU is a wafer, or bare die.

applies a royalty rate of 0.375%[2] to a royalty base that includes all of Micron's revenue for the accused products. Milani Report at 34-35, 67 (Dkt. No. 585). For the SSPPU approach, Milani applies the same 0.375% royalty rate to a royalty base that includes all of the revenue for what Milani refers to as the "SSPPU Products" – the bare die or wafer – and a majority of the revenue for what he refers to as the "non-SSPPU Products" which are products that incorporate the bare die and have other components, such as controllers. *Id.* at 37-39. The revenue base for Milani's SSPPU approach includes 87.4% of the total accused product revenue. *Id*. at 39 & Exhibit 3.2. There are over 2,600 non-SSPPU products, including products such as solid state disk drives. *Id.* at Exhibit 3.2.1 (list of non-SSPPU products).

Micron contends that both approaches are flawed and unreliable because Milani did not apportion the revenue base to include only the revenue attributable to the patented technology. Micron argues that Milani has not shown that the patented feature is the sole driver of demand for the accused products, which is necessary to justify using the entire market value of the accused products for the revenue base. *See Power Integrations, Inc. v. Fairchild Sesmiconductor Int'l, Inc.*, 904 F.3d 965, 979 (Fed. Cir. 2018) ("[T]he entire market value rule is appropriate only when the patented feature is the sole driver of customer demand or substantially creates the value of the component parts. . . . When the product contains other valuable features, the patentee must prove that those other features do not cause consumers to purchase the product."); *see also Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018) ("[I]f the smallest saleable unit – or smallest identifiable technical component – contains non-infringing features, additional apportionment is still required."). Micron argues that Milani has used the entire market value for

---

[2] Milani arrived at the 0.375% royalty rate by starting with a 0.25% rate that he derived from the Hynix agreement, tripling that rate to 0.75% based on Simon Fisher's deposition testimony, and then halving it to 0.375% based on the conclusion that the '571 patent represented at least half of the value of the 41 patent portfolio licensed in the Hynix agreement. As noted *supra*, the Court has held that (1) the lump sum Hynix agreement does not contain a 0.25% royalty rate and thus that Milani may not testify that the agreement contains such a rate, and (2) Milani may not rely upon the Fisher deposition testimony for alleged royalty rates. Because the Court has excluded Milani's testimony regarding two of the inputs for his ultimate 0.375% royalty rate opinion, it does not appear that there is any reliable admissible basis for his royalty rate opinion, which he applies to both damages models. In any event, this order addresses the related but distinct challenges to the royalty bases.

the comparative license opinion because he includes all revenue for the accused products in the revenue base. Regarding the SSPPU approach, Micron argues that a bare die contains numerous non-infringing features, such as micro-fabrication and lithography techniques, error correction, and copy-back technology, and thus that Milani was required to apportion beyond the SSPPU. In addition, Micron argues that Milani engaged in a superficial apportionment for the non-SSPPU products (such as solid state disk drives) because he testified that did not evaluate or assign value to the non-infringing features of those products. *See* Milani Tr. at 201-206 (stating he did not put a value on various non-infringing features of a Micron solid state disk drive) (Dkt. No. 442-13); *see also* Milani Report at 35-39 (stating that he did not have an understanding of what many of the non-SSPPU products were and that he classified many as "unidentifiable").[3]

MLC asserts that Milani was not required to apportion the revenue base in his comparable license approach because the royalty rate from the Hynix license "already accounts for apportionment." Opp'n at 10 (Dkt. No. 497-4); *see also* Milani Report at 34 n.195 ("In other words, the royalty rate associated with the comparable license agreements already apportions for other components and technologies included in the infringing product."). MLC also asserts that Milani relied on evidence showing that the multi-level cell flash market is a "commodity" market, and thus that the Hynix products and Micron products were sufficiently similar. *Id.* at 8 (citing Milani Report at 8).[4] With regard to Milani's SSPPU approach, MLC asserts that Milani "ensured that the royalty rate, which was derived from the Hynix Agreement, was not applied to products that were broader than any Hynix products that were subject to a royalty under the Hynix Agreement (e.g., solid-state drives). In doing so, Mr. Milani, in consultation with Dr. Lee, determined that the SSPPU was a

---

[3] Milani also testified, *inter alia*, that he did not know who Micron's customers were, he did not conduct any consumer surveys to gauge demand for the accused products, and he did not consult with any market analysts or Micron engineers. Milani Tr. at 33-34, 97-99.

[4] In his report Milani states, "Given the significant supply of NAND flash by 2006, the market was described as a commodity market, with competitors mainly competing on price." Milani Report at 8. In support of that statement, Milani cites an article titled "NAND sails into 'commodity storm,'" published online at www.eetimes.com/document.asp?doc_id=1164075#. The article does not discuss or analyze any company's particular products, and states, *inter alia*, that "The NAND flash market, which has been in the 'oversupply' mode since the beginning of this year [2006], is fast becoming a mere commodity."

3

bare die. He then limited revenues in his alternative royalty base calculation to those associated with the SSPPU. The SSPPU is not a multi-component product, like a cellphone or computer. Rather, it is a single component with no non-infringing uses." *Id*. at 9. MLC argues that no further apportionment is necessary because "Milani is using the Comparable Licensing Approach methodology" and "Micron competes in a market where products are not sufficiently differentiated." *Id*.

Thus, MLC defends Milani's revenue base for both damages models by arguing that the royalty rate from the Hynix license already addresses apportionment. However, in order to start with the Hynix lump-sum agreement and reach Milani's comparative license opinion applying a 0.375% royalty rate to a royalty base comprised of the revenue of all the accused products, one is required to make numerous unsupported inferential leaps. As set forth in detail in the Court's Order Granting in Part and Denying in Part Micron's Damages Motion in Limine #1, the Hynix agreement is a lump-sum agreement that does not explain how the parties calculated each lump sum. There is no royalty rate in the Hynix agreement. Further, the Hynix agreement covered worldwide rights to 41 patents for "all Hynix products."[5] Although Milani states that the flash memory market is a "commodity market," he did not (nor did anyone) compare Micron's accused products to the licensed Hynix products. There is no evidence in the record regarding the nature or volume of the licensed Hynix products. Merely asserting that the flash memory market is a "commodity" market with a citation to a 2006 article about market conditions does not establish that the licensed Hynix products are similar to Micron's accused products for purposes of a damages analysis. *Cf. Lucent Tech. v. Gateway, Inc.*, 580 F.3d 1301, 1330-32 (Fed. Cir. 2009) (explaining why different licenses did not support damages award because jury was not provided with sufficient information about those licenses, including "the jury again did not hear any explanation of the types of products covered by the agreement or the various royalty rates set forth in the agreement"). Milani also relies on Lee's technical opinion that the '571 patent is "essential" to flash memory and that the '571

---

[5] In addition, the Hynix license provided Hynix with a release for sales prior to the April 11, 2007 effective date, and the term extended through the expiration of all of the licensed patents. *See generally* Hynix Agreement (Dkt. No. 442-5).

4

1   patent is the most important of MLC's patents. However, even if Lee is correct about the importance
2   of the '571 patent, there still is no basis for Milani to opine that the Hynix lump-sum agreement
3   reflects a royalty rate that can be applied to all of the revenue for Micron's accused products without
4   the need for any apportionment of the revenue base.

Simply put, there is no evidence regarding the Hynix agreement that supports Milani's opinion that a specific royalty rate derived from the Hynix agreement already accounts for apportionment of non-patented features in Micron's accused products and thus can be applied to all the revenue for Micron's accused products. *Cf. Lucent,* at 1330 ("[C]ertain fundamental differences exist between lump-sum agreements and running-royalty agreements. This is not to say that a running-royalty license agreement cannot be relevant to a lump-sum damages award, and vice versa. For a jury to use a running-royalty agreement as a basis to award lump-sum damages, however, some basis for comparison must exist in the evidence presented to the jury."); *see also Wordtech Systs., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) ("[T]he two lump-sum licenses provide no basis for comparison with INSC's infringing sales. Neither license describes how the parties calculated each lump sum, the licensees' intended products, or how many products each licensee intended to produce. . . . Thus, without additional data, the licenses offered the jury 'little more than a recitation of royalty numbers.'").

The cases in which the Federal Circuit has held that damages can be based upon the terms of a comparable license which already values the patented technology involve facts very different than those presented here. For example, in *Elbit Systems Land & C4I Ltd. v. Hughes Network Systs., LLC*, __ F.3d __, 2019 WL 2587754, at *5-6 (Fed. Cir. June 25, 2019), the plaintiff's damages expert relied on a settlement license between the defendant and another satellite internet company involving one-way satellite communication technology. The Federal Circuit affirmed the damages award because the expert "appropriately accounted for differences between the circumstances of that settlement and the present circumstances" and the expert "relied on the per-unit figure in the Gilat Agreement for one-way technology, together with Hughes-based evidence that two-way technology was worth at least an additional 20%, to arrive at his proposed per-unit figure – which the jury adopted." *Id*. at *6. The Federal Circuit found that the damages evidence did not violate

principles of apportionment because the expert testified that apportionment was "essentially embedded in the comparable value" from the Gilat Agreement: "Mr. Martinez's testimony allowed the jury to find that the components at issue, for purposes of apportionment to the value of a larger product or service, were comparable to the components at issue in the Gilat-Hughes agreement. . . Gilat and Hughes would have had to consider the benefit from the patented technology over other technology and account for that in the Gilat Agreement." *Id.* at \*7; *see also Commonwealth Scientific & Industrial Research Organisation v. Cisco Systems, Inc.* ("*CSIRO*"), 809 F.3d 1295, 1303 (Fed. Cir. 2015) ("Because the parties' discussions centered on a license rate for the '069 patent, this starting point for the district court's analysis already built in apportionment. Put differently, the parties negotiated over the value of the asserted patent, 'and no more.'"). Here, in contrast, Milani does not present any analysis that would support the conclusion that a 0.375% royalty rate derived from the Hynix license can be applied to the entire market value of Micron's accused products because the royalty rate somehow already accounts for apportionment.

The Court also finds that Milani's SSPPU approach does not satisfy apportionment requirements. As an initial matter, the Court notes that MLC defends the SSPPU approach on the ground that the royalty rate accounts for apportionment. Further, although MLC asserts that the bare die does not have any "non-infringing *uses*," MLC does not dispute Micron's evidence that the bare die has non-infringing *features*, such as error-correction software and implementation of copy-back technology. MLC's technical expert Dr. Lee testified at his deposition that the '571 patent does not cover these technologies. Lee Tr. at 228-231 (Dkt. No. 542-2). Milani was required to apportion for these non-patented technologies for both the SSPPU group and the non-SSPPU group. His failure to do so renders his damages analysis unreliable and excludable. *See Finjan*, 879 F.3d at 1311; *Dynetix Design Sols., Inc. v. Synopsys, Inc.*, No. C 11-05973 PSG, 2013 WL 4538210, at \*3 (N.D. Cal. Aug. 22, 2013) (excluding expert who "relied on the blanket assumption that, once he selected the smallest salable unit . . . he could end the analysis").

In light of the Court's conclusion that Milani's reasonable royalty analysis is fundamentally flawed both as to the royalty rate and the royalty base, the Court need not address Micron's other challenges to Milani's opinions. For the foregoing reasons, the Court GRANTS Micron's *Daubert*

6

motion to exclude Milani's testimony.

**IT IS SO ORDERED**.

Dated: July 12, 2019

_____
SUSAN ILLSTON
United States District Judge